IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

IN RE: ) BK. NO: 25-43157-BTR
)
D SAN JOSE, LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 13th day of January, 2026, before the HONORABLE BRENDA T. RHOADES, United States Bankruptcy Judge at Plano, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

# I N D E X


| | PAGE |
|---|---|
| LARRY WILLIAMS | |
| DIRECT EXAMINATION | |
| BY: Mr. Stanford | 27 |
| CROSS-EXAMINATION | |
| BY: Mr. Castillo | 53 |
| BY: Mr. Alfano | 54 |

E X H I B I T   I N D E X


| | PAGE FIRST REFERENCED |
|---|---|
| Exhibit Number 27 | 69 |
| Exhibit Number 35 | 67 |
| Exhibit Number 36 | 68 |
| Exhibit Number 38 | 69 |
| Exhibit F | 38 |
| Exhibit G | 47 |
| Exhibit H | 44 |
| Exhibit J | 44 |
| Exhibit K | 36 |
| Exhibit L | 70 |
| Exhibit N | 34 |
| Exhibit Q | 42 |
| Exhibit R | 42 |
| Exhibit S | 56 |
| Exhibit U | 28 |

P R O C E E D I N G S

COURTROOM DEPUTY: Number 2, D San Jose, LLC, 25-43157. Final hearing on motion for authority to use cash collateral and motion for appointment of Trustee pursuant to Section 1104.

THE COURT: Okay. Appearances.

MR. STANFORD: John Paul Stanford appearing for the debtor, D San Jose, LLC. Also with me today is my associate --

MR. NEALON: Rian Nealon representing the debtor, as well.

THE COURT: Thank you.

MR. RAY: Your Honor, Hugh Ray, III -- Your Honor, Hugh Ray, III on behalf of -- Pillsbury Winthrop Shaw Pittman on behalf of Choice Hotels International. I have some other counsel here with me.

THE COURT: Okay.

MR. ALFANO: Andrew Alfano from Pillsbury Winthrop Shaw Pittman, LLP on behalf of Choice Hotels International.

THE COURT: Okay.

MR. STENHJEM: Good afternoon, Your Honor. Joshua Stenhjem, Pillsbury Winthrop Shaw Pittman on the -- on behalf of Choice.

THE COURT: Thank you.

MR. STROMBERG: And Mark Stromberg as local counsel for Choice Hotels.

THE COURT: Okay.

So which one of the four of you is going to handle the hearing?

MR. RAY: Your Honor, I'll be doing most of the questioning, but we've divided the witnesses up so that Mr. Alfano will take some witnesses and I will take others.

THE COURT: Okay.

MR. RAY: And, Your Honor, before we get started, I would like to invoke the Rule.

THE COURT: Okay. Let me finish taking appearances before you do that.

MR. RAY: Oh, I'm sorry. I didn't know there was more.

THE COURT: All right.

MR. CASTILLO: Good afternoon, Your Honor. Mark Castillo on behalf of Mr. Jagmohan Dhillon is here, as well. I won't be presenting too much today.

THE COURT: Okay. Thank you.

MR. CASTILLO: Thank you.

THE COURT: All right. You want to invoke the Rule?

Do we have any non-party witnesses in the courtroom?

MR. STANFORD: That would be Mr. Powers --

Major, I'm sorry, Major. And I believe he's your witness.

MR. RAY: Yes, Your Honor. Mr. Azam, Anwer Azam has been subpoenaed to be here. He's the debtor's tax accountant. And we would like him to be sworn and then excluded from the courtroom until he's called.

THE COURT: Okay. Is he going to be your first witness?

MR. RAY: No, Your Honor.

THE COURT: Okay.

MR. STANFORD: I also see Mr. Ray in the courtroom.

MR. RAY: Yeah. Jason Ray is an expert witness, our forensic accountant and business -- and he's a distressed (indecipherable word due to audio) expert. So he's going to be here as an expert witness.

THE COURT: Okay. So the only non-party witness is Mr. Azam; is that right?

MR. RAY: Yes, Your Honor, apparently so.

THE COURT: Okay. Now, are there any witnesses -- are there more than one witness that is a party?

MR. RAY: Yes, Your Honor. The debtor has two party witness representations, Mr. Williams and Mr. Dhillon.

MR. STANFORD: That's correct.

THE COURT: Okay. You can only have one for purposes of the Rule, unless there are two different parties.

MR. STANFORD: Okay. That would be Mr. Williams would stay in the courtroom.

MR. CASTILLO: Mr. Dhillon is my client that's a party in support of the cash collateral and opposed to the Chapter 11 Trustee.

THE COURT: Okay. He is his own party?

MR. CASTILLO: Yes. We filed an objection --

THE COURT: As equity owner or something?

MR. CASTILLO: He's a 50 percent member of the debtor.

THE COURT: Okay. All right. Then he does not need to be excluded.

All right. So just Mr. Azam; is that right?

MR. STANFORD: Well, Mr. Major.

THE COURT: All right. If you'll step forward and be sworn.

Both of you? Okay. Let's swear in both witnesses.

(The witnesses were sworn by the courtroom deputy.)

THE COURT: All right. Let's start with the first gentleman. Would you state your name, please?

MR. AZAM: Anwer Azam.

THE COURT: Okay. And you are who, sir?

MR. MAJOR: Luigi Major.

THE COURT: Luigi Major. These are both non-party witnesses; is that right?

Okay. You didn't identify Mr. Major.

Okay. So I'm swearing you in now. And I'm going to excuse you from the courtroom. When you are excused, you are not to discuss your testimony with anyone and you should not discuss anyone else's testimony before you testify. Okay? So you're going to be excused from the courtroom. We'll call you when it's time.

Thank you. You may be excused.

THE COURT: All right. Do we have any telephonic appearances today?

MR. RAY: Yes, Your Honor. The United States Trustee has appeared.

THE COURT: I'm not asking you to make the appearances. I'm asking the person who is appearing to make their appearance. Okay?

MR. RAY: Understood, Your Honor.

THE COURT: Do we have a telephonic appearance today?

MS. SCHMIDT: Yes, Your Honor. Erin Schmidt for the U.S. Trustee.

THE COURT: Thank you.

MR. CATUOGNO: And, Your Honor, for clarity, David Catuogno from Super 8 Worldwide is here, but I'm just monitoring.

THE COURT: Thank you.

Okay. All right. Do we have any agreements before we start?

MR. STANFORD: Yes, we do, Your Honor.

Choice Hotel has presented two exhibit binders, one for the use of cash collateral motion and the other for the appointment of a Chapter 11 Trustee. On the exhibit list for cash collateral the debtor has no objections.

THE COURT: Okay.

MR. STANFORD: On the exhibit list for the appointment of a Trustee, the debtor objects to Exhibit 52, thus has no objections to Exhibits 1 through 51 and Exhibits 53 through 56.

THE COURT: Okay. All right. So let's see here. Are these the same exhibits for both the cash collateral and the Trustee motion?

MR. RAY: No, Your Honor. There is overlap. But to keep the record clear, there are some differences between the two.

THE COURT: Okay. But there -- you have 56 exhibits for both sets?

MR. RAY: Yes, Your Honor, that is correct.

THE COURT: Okay. All right.

All right. So Exhibits -- let's see here. Choice Hotels Exhibits 1 through 56 are admitted for purposes of the cash collateral hearing. And then with respect to the

Trustee -- the motion to appoint a Trustee, Exhibits 1 through 51 and 53 through 56 are admitted without objection. Okay?

And what about the debtor's exhibits?

MR. RAY: Your Honor, Choice Hotel has no objection to the debtor's exhibits or to Mr. Dhillon's first four exhibits. I think those are the only --

THE COURT: I'm sorry. You don't have any objections what?

MR. RAY: To the debtor's exhibits.

THE COURT: Right.

MR. RAY: And Mr. Dhillon has an exhibit book, also.

THE COURT: Right. Let's turn to that in just a moment.

So the debtor's exhibits is Debtor's Exhibits A through U, and that is for both matters before the Court today, correct?

MR. STANFORD: That is correct, Your Honor.

THE COURT: Okay. And then -- then Mr. Dhillon and Galaxy Management have also filed an exhibit and witness list. Okay. We're going to have an issue here because -- oh, okay, they're marked Galaxy; is that right?

MR. CASTILLO: Yes, Judge.

THE COURT: Okay. So we have Galaxy-A through

L?

MR. CASTILLO: We're only going to offer Galaxy-A through Galaxy-G.

THE COURT: Okay. Galaxy-A through G. Are there objections to those exhibits?

MR. RAY: No, Your Honor.

THE COURT: Okay. So Galaxy-A through G are admitted.

Okay. All right. Any other stipulations or agreements?

MR. STANFORD: I believe that covers everything, Your Honor.

THE COURT: All right. Mr. Ray, you may proceed.

MR. RAY: Thank you, Your Honor.

MR. STANFORD: Your Honor, since this is -- we're moving on our motion for cash collateral, I believe the debtor should go first to make their opening statement.

THE COURT: Well, you can make your opening statement on the cash collateral. It seems to me the two are related in part and not related in part, I suppose.

MR. STANFORD: Well, I understand that.

THE COURT: I'm going to have to rule on them -- I guess I don't know yet until we get to the end of the hearing.

MR. STANFORD: Okay.

THE COURT: One may be moot and one may not be moot, I don't know.

MR. STANFORD: If I may inquire, if the debtor will be able to go first and call his witnesses first in this matter?

THE COURT: With respect to the cash collateral issues?

MR. STANFORD: Yes.

MR. RAY: Your Honor --

THE COURT: Let him go first. Sit down.

You may go first.

MR. STANFORD: Okay. Thank you, Your Honor.

Well, Your Honor, this Chapter 11 case deals with the debtor owns a 204-room hotel in San Jose, California. It's operated as a Motel 6 and a Super 8 flag. The case was filed on October 22nd, 2025. The Joyce Lindauer firm handled the initial filing of this case, but shortly after that we were asked to step in and represent the debtor. We sought approval. Filed an application. And that application has now been granted.

The debtor's owned by Jagmohan Dhillon and his spouse. And Mr. Dhillon is here in the courtroom with us today. He owns approximately 32 hotels. Because he owns so many hotels, he created his own management company to take

advantage of the economy of scale ot make efficient use of his staff. Another advantage of owning several hotels is the pooling of their resources. If one hotel is short on cash, say around payroll time, one of the other hotels can make a short-term loan to that hotel quick and cheaply. The management company will keep track of these loans and they will be paid back eventually when another hotel needed a cash loan from one of the others it had made loan to.

Before the bankruptcy case was filed, Mr. Dhillon engaged Larry Williams to serve as the debtor representative and to guide the reorganization effort through the Chapter 11. Mr. Williams is very good at what he does. This is not his first rodeo. He's experienced in managing debtors' hotels in bankruptcy.

Now, the largest secured creditor in this case is Choice Hotels. And they have made their presence known throughout these proceedings. In the early days of the case the Court entered a short interim order authorizing the debtor to use cash collateral. By the time the matter came on for hearing -- for final hearing, my firm had entered the case and we negotiated and entered into an agreed interim order that was approved by this Court setting out several obligations of this debtor. That's at Docket 43. That was entered on December the 10th.

Now these requirements have guided nearly all of the

work that has been done by the debtor since that time. The activities, Your Honor, that we're here about today largely arise from compliance with that order. Among other things, and these are the highlights, the debtor had to replace the pre-petition management company, Galaxy, for the property with an independent third-party management company by December the 12th. And that has happened. Make no further payments to Galaxy, other than for non-insider payroll. Debtor has complied with that. Pay adequate protection payments of $80,000 a month. Those payments have been made; one for November and one for December of $80,000. Plus there was an overage, or excess payment that had to be paid I believe by the 10th of the following month.

THE COURT: Who did you make these payments to?

MR. STANFORD: To Choice Hotels.

THE COURT: Oh, to Choice, okay.

MR. STANFORD: For use of cash collateral.

I believe the first overage payment, or excess funds was about $10,000. And then the most recent one paid, I think just last week, was for $20,000.

The debtor was required to provide weekly operating reports reflecting the prior week's performance to Choice Hotels. The debtor had to provide Choice Hotels with read only access to the DIP account that the debtor opened up at

Chase Bank. And that has been done. The debtor had to submit daily cash deposit reports to Chase through Dropbox. Debtor had to provide proof of insurance showing that the debtor and not Galaxy Management was the named insured. And that has been done. Produce financial information for the last 24 months of the debtor. And quite a bit of information has been delivered.

There's a requirement that the debtor, the debtor agreed to file a plan within 60 days of that order, which would have put it about February the 10th. But the debtor filed this plan and disclosure statement yesterday, Your Honor. The debtor also agreed to produce Mr. Dhillon for a deposition on December 9th. And that has happened. And those are just the highlights. There's a few of the things in the order, as well. But the evidence will show that the debtor has worked in good faith to meet these requirements and is now ready to move forward with the confirmation of a Chapter 11 plan.

Choice Hotels has raised various complaints along the way. And those will be addressed through the testimony the Court will hear today. But the debtor needs continued use of cash collateral to keep the lights on and stay open. Shutting down a hotel benefits no one. It would only damage the value of the estate's primary asset. So if Choice is unwilling to agree to continue use of cash collateral, we ask

the Court to authorize use on terms consistent with the interim order that has successfully worked so far.

I believe once Your Honor hears the testimony, we believe it will be clear that the debtor should remain in possession of the asset and continuing moving forward to confirmation. Choice Hotel bears a heavy burden under Section 1104 to justify the extraordinary relief of appointing a Chapter 11 Trustee. Doing so at this stage, Your Honor, would just add additional layers of administrative expense and delay at the very time the debtor is prepared to move forward with confirmation of a plan.

The debtor's put together a formidable team to guide this debtor through the Chapter 11. The appointment of a Chapter 11 Trustee would be a big step backward. So for these reasons, we'll ask the Court to authorize continued use of cash collateral and deny the request for the appointment of a Chapter 11 Trustee.

MR. CASTILLO: Your Honor, ever so briefly.

Mr. Dhillon supports the use of cash collateral and opposes a Chapter 11 Trustee. We think the debtor has made a lot of corrections to some of the inelegance of what may have occurred pre-petition and the debts that are owed. And we have a lot of adequate protection here for Choice. We've got a plan and disclosure statement on file. We're ready to move forward on that promptly. So I think the debtor --

Mr. Dhillon has counsel now. His debtor entity has counsel now. I think the debtor's in a good spot and ready to move forward. And we would ask the Court to deny the appointment of an 11 Trustee and to continue the use of cash collateral.

Thank you, Your Honor.

THE COURT: All right. Mr. Ray.

MR. RAY: Thank you, Your Honor.

I agree with what you said, with what the Court said, that these are intertwined. Obviously if a Trustee is appointed, then Choice is willing to do many things to make sure that that Trustee gets the funding it needs to make sure that cash collateral is used.

Conversely, if there's no Trustee, Choice will have problems with cash collateral. In this particular case, Mr. Williams works for Mr. Dhillon. The debtor does not have the money to make the minimum interest payments to adequate protection that are required. It's $168,000. There's -- there have been defaults, many defaults. Some of them remain uncured. And there have been other issues that we'll discuss, but that's not the main concern.

The main concern, Your Honor, is that this debtor and its affiliates, but specifically this debtor looks like it is part of a tax lost harvesting scheme, a tax lost harvesting scheme and maybe a bleed out or bust out. Here there's five points to this scheme. And I believe the evidence will prove

each one of these.

The first is to go to creditors like Choice. And in July of 2024, and we have this in the record, it's been admitted, Mr. Dhillon gave Choice the organizational documents of San Jose that said the owner of San Jose is and always can be an LLC named Jose Motel, LLC. There's also pledge agreements signed by Mr. Dhillon both on behalf of Jose Motel, LLC and D San Jose. It says there will be no other members, no intercompany loans, and no other debt. That's in 2024, Your Honor.

Now, Your Honor, the second step is to lose money and file tax returns. And the debtor in 2024 filed tax returns and it did not say Jose Motel, LLC owned anything. Instead, it had a number of people listed as members. And it passed through in 2024 $3 million of passthrough losses. In 2023 it passed through $3 million of passthrough losses. In 2022 it passed through $2 million of passthrough losses or thereabouts. That's 8 million, right? But it's worse than that, because these members never gave any money to the debtor. We have the debtor's books. They never gave the debtor a penny, but they're listed as making contributions in 2024 of $3 million, in 2023 of $3 million, in 2022 of $2 million. And we found one of these investors and we talked to him and we got his records and they show he never gave money to this debtor. And, yet, this debtor has passed

through $8 million of losses to people who were never members. And it gets worse. They've allegedly contributed, but they didn't contribute. We have the debtor's books.

Your Honor, the Bankruptcy Code is part of this process. Because the next step, Your Honor, Step 3, after filing false tax returns is to make transactions from affiliates into the debtor. And you call those transactions on the general ledger at the time contributions from an affiliate that is not these same people. It's Mr. Dhillon's other companies. And then on the eve of bankruptcy you reclassify them, backdating reclassification to January 1. You reclassify them as loans. And the money went through an account called the AB 1887 account that is not disclosed on the schedules that was used in the last year that had $3 million running through it in 2024 and that was not disclosed on the statement of financial affairs and the schedules as a closed account. That account is on the general ledger. That account may still be opened. That account is with a bank here in Dallas.

But passing through the losses to these noninvestors is only half the scam. The other half is to write-off those loans using a bankruptcy. This is like the movie The Producers with Nathan Lane and it's also been a Broadway play. And the premise of The Producers is that when someone fails, you get these multiple investors in a scheme and you

invest -- you get 50 percent from one person and another person 50 percent and you over sell. No one ever cares what happens when the company fails. Your bankruptcy court is being used as part of the scheme because they're going to take those loans, call them loans, but they were previously called intercompany contributions, even though the organizational documents prohibit it. They're going to call those loans. They're going to write those down. They're going to take a second tax loss on the same money. And then they're going to do it in another case, and another case, and another case. And they're doing it across the country.

They've got three in L.A., three California cases going on right now. They've got one other case in your -- your jurisdiction, Your Honor. And the question for a Trusteeship, Your Honor, is not whether I'm right or wrong. We'll show you the documents. Maybe I'll prove beyond a reasonable doubt, beyond clear and convincing evidence, maybe you'll believe that. Maybe Your Honor will think it's different. But in any case the question is, who's best to investigate this? Is Mr. Dhillon, or Mr. Williams who works for him, who notarized the very documents at issue today, who notarized the agreements about which there have been these representations of a special purpose entity that could not have other members as part of the loan agreements? Is that the person you want to be investigating? Is Galaxy possibly

part of a different scheme, a bleed out scheme? Is Mr. Dhillon the right person to do that?

Your Honor, Mr. Dhillon may say, I just take money from people who invest with me and I allocate it between my various companies in an unofficial manner. We've had no prospectuses, no subscription agreements, no investment agreements, no registered investment advisor, nothing that complies with any of the laws that deal with that kind of a transaction. And even so, even so, you can't put down members on the tax return who aren't members. You can't put down contributions that aren't.

Galaxy's management is a question mark that needs an answer. It is going to be undisputed -- and this goes to the cash collateral usage -- that after the money goes into the debtor, it does not make the property improvement plans for Motel 6, for Super 8, or for Choice. It takes that money. In fact, the general ledger shows it left the debtor in days, in days, Your Honor. It went to affiliates. Not even two weeks. $3 million came into that bank account that's undisclosed and went out to affiliates. According to their own appraiser, the property would require $1.2 million in immediate capital expenditures to bring it up to 16.4 million in value, according to their appraiser. And that is assuming competent management. That is assuming the books are true. That is assuming that the 20 units with hot -- without hot

water got hot water. When the appraiser was there, 20 units didn't have hot water. There's a public policy here, Your Honor.

But what Choice is seeking in the appointment of a Chapter 11 Trustee is both under the for cause and best interest of the creditors' test under 1104(a)(1) and 1104(a)(2). This is not about punishing Mr. Dhillon. This is not a proceeding to punish him. This is about whether the estate can be administered with reliable books, with accurate sworn disclosures, and with arm's length governance or whether it needs an independent fiduciary. The evidence will show that even using the debtor's own records and sworn filings, core financial facts cannot be reconciled.

For example, who owns the debtor today? The debtor filed a sworn schedule saying Jose Motel, LLC was the 100 percent owner. Mr. Williams was deposed. He testified, Jose Motel, LLC was the 100 percent owner. We deposed Mr. Dhillon. We showed him the tax returns. He said on his testimony, they are -- there are these other owners. Then the next day he amended the statement of financial affairs and schedules to say that there were these former other owners, but he is now the 50 percent owner with his wife. Then the next day after that he had a 341 Meeting where he testified that there was an oral understanding some time in December 2024 that was never in a written document that he

then memorialized with minutes that he signed himself with no one else signing them that are largely undated that purport to relinquish control effective as of January 1, 2025.

Now, Your Honor, we can argue about the preponderance of evidence being the burden of proof, which I think is the correct burden of proof under the Supreme Court's test. But respectfully, even if there's a higher standard, whatever that standard is, it should be met. The debtor was contractually structured as a special purpose entity. The records show affiliate-style cash movements and commingling. The special purpose entity, SPE restrictions exist in the governing documents. They are there today. The amended and restated operating agreement says the company's an SPE. It requires separateness; separate books, separate records, no commingling, no cash management system of moving money around. Everything you just heard on opening from the debtor is a violation of those core principles of the document that creates the debtor. Distributions are to be made only to the sole member. But that's not what happened. Distributions were made to strangers.

This AB Bank 1887 account reflects over $3 million in activity. A debtor in possession cannot credibly administer a Chapter 11 estate when there are material missing operational and transactional accounts missing in the schedules. This goes to trustworthiness, accuracy reporting,

and creditor confidence.

The loans that Mr. Dhillon says are part of a tripartate set of books. On one hand you have the tax returns. And Schedule L of the tax return says no intercompany loans exist. Specifically line 7(a) and 19(a) of the debtor's 2024, 2023, and 2022 tax returns say, no intercompany loans exist. And yet -- and that's under penalty of perjury. And yet we have schedules filed in this case that say they do exist, because that's part of the scheme. These loans are not from the people who are supposedly the owners or investors.

Your witness will explain -- I have a witness here who's a forensic accountant and he'll explain that you cannot have it both ways. You cannot have one set of documents that says this debtor's owned by Jose and another set of documents that says it's owned by someone else, and one set of documents that says there are no loans, and another set that says there are loans. You cannot do that. It is an indicia of fraud. And he has got the -- Mr. Rae, no relation, has -- no relation to me -- has evidence -- has the experience to talk about this.

The pledge agreement that Mr. Dhillon signed in 2024 says the only owner of the debtor is Jose Motel, LLC. The operating agreement says the same thing. The pledge agreement recites the pledge -- the pledgor owns 100 percent

of the equity. Choice made a $23 million loan, or $21 million loan based on the representation in writing that that was the owner and that there was a pledge of those equity interests. And in 2024 the tax returns say otherwise. And in 2025 Mr. Dhillon is saying otherwise in his schedule -- in the schedules that he signed. This is about the best interest of the creditors managing an inherent conflict because besides the hotel, which has been now rundown from an original appraisal of $30 million three years ago to an appraisal now of 16.4 if you could get 1.2 million in capital into it, if you could fix the problems, if you could have competent management, that decrease means the only other asset besides that hotel -- those motels, there's technically two motels, but they're right next to each other. The only other asset are claims against insiders.

The management agreement under which Galaxy provides the services to the debtor is signed by Mr. Dhillon and his wife on both ends of the deal. And the rule is an insider transaction is presumed to be a breach of duty unless it's objectively fair. And that's really -- and the management agreement doesn't have a date on it. But it seems like this is all going to destroy the value. The debtor's continued operations, the debtor's continued use of the Tax Code, the debtor's -- in this way, the debtor's continued operations materially reduce what anyone will pay for this company. It

hurts the creditors. It hurts refinancing. It hurts third-party sales process. It makes a plan unconfirmable. But a Chapter 11 Trustee is what fits Congress' design. A Chapter 11 Trustee is Congress' solution for this kind of situation. Where you need an independent fiduciary to stabilize operations, restore credible reporting, investigate claims, and presume -- pursue a value maximizing outcome for creditors. We are not doing this out of some malice, but we are doing it out of grave concern. Because it turns out Choice is involved in other cases before Your Honor too. And this is the first one.

Your Honor, I do want to say something about defaults under the cash collateral order which did already happen. There have been three uncured defaults. One of them was a weekly report that was due December 18th that didn't get turned in and we sent a notice of default on December 19th and it was cured later. The second uncured -- after the cure period. The second unsecured default was a weekly report. It was cured after the cure period. The third uncured default was that they were required to pay $27,000 of excess net operating in July and they only paid 10. They kept the money. I know that they might have had good reasons internally to want to keep the money, but they didn't have consent to it. They just didn't follow the law. They didn't follow the order, rather. And so cash collateral has

terminated. But Choice will consent to it with a Trustee.

So, Your Honor, with that, I understand debtor's counsel desire to call his first witness. But I would like to call Mr. Rae first, who is our forensic accountant. And I would like to walk the Court through what I just said. Because if it's true, if even half of it is right by the books that I have, then the cash collateral issue is moot.

Thank you, Your Honor.

THE COURT: All right. Mr. Stanford, you may call your first witness.

MR. STANFORD: Okay. I will call Mr. Larry Williams to the stand.

(The witness was sworn by the courtroom deputy.)

LARRY WILLIAMS

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. STANFORD:

Q. Mr. Williams, is there a binder, a (inaudible word) in front of you?

A. No. I have no binder.

MR. STANFORD: Okay. Your Honor, we'd like to place our exhibit binder --

THE COURT: You may.

MR. STANFORD: -- on the witness stand.

Okay. May I proceed?
THE COURT: You may.
Q. Okay. Please state your name, please.
A. Larry Douglas Williams.
Q. And what is your current role with the debtor, D San Jose, LLC?
A. Owner representative or disbursing agent.
Q. Okay. When did you first become involved with this debtor?
A. I was asked to about two to three weeks before the filing of the bankruptcy.
Q. Okay. And in what capacity were you asked to serve?
A. Mr. Dhillon asked me to assist with the bankruptcy process and fill this role.
Q. Okay. Can you quick -- briefly describe the business of the debtor?
A. I'm sorry, I was having trouble hearing.
Q. Can you briefly describe the business of the debtor?
A. Yes. It's a 204-room hotel. It's a dual brand. 99 rooms are Motel 6, 105 are Super 8 by Wyndham, and it's located in San Jose, California.
Q. Okay. Would you open up the exhibit binder in front of you to U. I believe that's going to be the last

exhibit in that binder.
A. I have the binder.
Q. Okay. And you have Exhibit U?
Okay. Do you recognize that as your resume?
A. I'm sorry. Can you please -- I was just having trouble hearing which exhibit to look at.
Q. U as in umbrella.
A. U, I'm sorry. Thank you.
Bear with me, it just opened.
Q. Certainly.
A. Let me get to U and I'll keep these in order.
Yes. I'm at Exhibit U and, yes, that is resume.
Q. Okay. That describes you as a Receiver and bankruptcy manager and also a chief reorganization officer. Can you briefly just summarize your experience managing distressed or bankruptcy estate hotel properties?
A. Yes, sir. I've handled many different cases and properties. Most recently was the chief -- or I am still the chief reorganization officer for an entity, Thornco Hospitality. That's under the jurisdiction of Judge -- or was under the jurisdiction of Judge Everett. The plan was confirmed. We are now making all the plan payments on that entity. It was 109 -- or is 109-room hotel. I was originally the Receiver for almost a year. I'm also currently serving as a Receiver for Collin County on a case

that's a hotel, 101 rooms in Allen, Texas. And I'm working to get that hotel completed in construction and also open. There's been a number of other cases where I've done receiverships in other states and other bankruptcy cases.

Q. Okay. And that Thornco case, that was in the Northern District?

A. Yes, it was, in front of Judge Everett, yes.

Q. Okay. And what duties did you perform in those bankruptcy cases that you're performing in this one?

A. I came in and we took control -- or I took control of the bank accounts. I worked very closely with the lender, with the owner, with the onsite management team. I also brought in a third-party management team at that hotel. We -- the hotel was under construction. We got the hotel completed. We opened it. And it has now been open a little over a year and performing -- leading the competitive set in its area of Thornton, Colorado.

Q. Okay. What is your understanding of the duties of a debtor in possession and fiduciary obligations to creditors?

A. It's very important. That is the most important thing that you do is to make sure that the creditors are paid properly, that there are no payments that are either made from pre-petition or to insiders or anything that's not in accordance with the guidelines.

Q. I believe you were in the courtroom when Choice's counsel informed the Court that you work for Mr. Dhillon in this case.

A. I'm a contracted employee. I do receive compensation from Galaxy. But I'm not a direct employee of Galaxy Management.

Q. Okay. What experience do you have with financial compliance and reporting?

A. Sorry, financial?

Q. With financial compliance and reporting.

A. I've prepared many MORs for many cases. I also audit the bank accounts. I make sure that all of the invoices and all of the fiduciary responsibilities needed are in compliance with guidelines.

Q. Okay. Your resume says you're a certified hotel administrator?

A. Yes, sir. That was a title I gained in around 2006 from American Hotel & Lodging Association. There were multiple tests. And it's a designation of your knowledge in the overall hotel industry.

Q. Okay. Does it also have a requirement to perform ethically in your performance of your duties?

A. Yes.

Q. Okay. And also on your resume it indicates you were a certified general manager for Choice Hotels in 2006?

A. Yes. Back at that time I was helping manage about 20 to 30 Choice Hotels for a completely different ownership group. And I had to get that certification involved going to their headquarters and taking about a one to two-week course to get that designation.

Q. Okay. And also you stated also general manager for Best Western, 2013?

A. Again very similar. And it was needed because at that time I was providing management oversight to a Best Western, one or two Best Western Hotels.

Q. Okay. I want to make sure I give you a full opportunity to explain this, but in your own words what does it mean for you to act as a fiduciary for the bankruptcy estate and its creditors?

A. For a fiduciary it means that you're working in the best interest and the total interest of all of the creditors and the entity itself. You're making sure that everything is done correctly. Nothing is done incorrectly. And, again, you make sure that everything's protected.

Q. Okay. So what responsibilities have you undertaken for the debtor as its representative in this Chapter 11 case thus far?

A. When I took over the case we immediately took action to open up a debtor-in-possession bank account which was done with Chase Bank. It was then requested that we also

set up a bank account for property tax escrow, which we set up a debtor-in-possession account for that and started putting funds in there for the property taxes. Worked on closing the accounts that were not debtor in possession. Also early on it was directed that we should find a third-party management company and I engaged that process. That's some of the duties.

Q. And you're familiar with the cash collateral requirements in any bankruptcy proceeding; is that correct?

A. Yes.

Q. Okay. What would the cash collateral be in this case?

A. This was the cash collateral that was approved originally in December. And then I think we had a continued interim cash collateral order, which is the budget authorizing the use of funds. And the use of those funds must be limited to that. Or if there's any extraordinary event that takes place, you must get permission to handle that matter.

Q. Okay. Did you prepare a budget for this debtor for use of cash collateral?

A. Yes, I did.

Q. Would you turn to Debtor's Exhibit C?

A. I have Exhibit C.

Q. Okay. Do you recognize that as the budget you

prepared?
A. Yes, sir, I do.
Q. What time period does this cover?
A. It went from October of 2025 through April of 2026. It's a seven-month -- looks like a seven-month budget.
Q. Okay. Are these numbers proven to be fairly accurate thus far?
A. So far, yes.
Q. Okay. Now are you familiar with the, I'll call it the second agreed order, but the big agreed order to you is cash collateral that contains a number of different terms and requirements of the debtor?
A. Yes, sir, I am.
Q. Okay. Would you turn to Debtor's Exhibit N?
A. M as in Mary?
Q. No, N as in --
A. Nancy?
Q. -- Nancy.
A. Okay. I'm at N.
Q. Okay. Do you recognize that to be Docket Number 43 at the top?
A. Yes.
Q. And would you just flip through two or three pages looking at the order?
A. Yes. I recognize this.

Q. Okay. And did you discuss these terms with counsel as the order was being prepared with the Choice Hotel?
A. Yes, I did.
Q. Okay. We'll circle back around to that.
Before the bankruptcy was filed, how was the debtor's operations managed?
A. They were managed by Galaxy Management Company.
Q. Okay. And you know that Galaxy Management is owned by whom?
A. Mr. Dhillon.
Q. Okay. One requirement under the agreed order is to remove Galaxy Management Company and install a neutral third-party operator by December 12th; is that correct?
A. Yes.
Q. Okay. What steps did you take to comply with that requirement?
A. We -- excuse me -- interviewed four different management companies. Received proposals and proposed contracts form those four. We then selected what we felt was the best management company based on their experience and also location to the property. And we did get them under contract by that date of December 12th.
Q. Okay. To the best of your knowledge, was that list made available to Choice?
A. Yes, sir, it was.

Q. Okay.
A. Through counsel.
Q. And were you ever advised that they had any comments on which one to choose?
A. I don't recall any comments.
Q. Okay. So how did you settle on American Hospitality?
A. After interviewing their owner and comparing their qualifications to the other management companies that we presented, we felt that that was the -- is the best solution for this situation.
Q. Okay. Would you turn to Debtor's Exhibit K?
A. I'm at Exhibit K.
Q. Okay. Do you recognize that document?
A. Yes, sir. It's a management agreement that was entered into by the entity on December 12th with American Hospitality Services.
Q. Okay. And were you -- did you participate in drawing up the terms of this contract?
A. Yes. And we had a little bit of back and forth with both us and the management company to make sure everything was in order.
Q. Okay. And has this been executed by the parties?
A. Yes, sir, it was.
Q. Okay. Do you recall the date?

A. I believe we executed on December 12th.
Q. Okay. So just briefly describe what duties the new management company will have that Galaxy will not.
A. Well, there's a number of them. But essentially the overseeing and controlling the day-to-day operations of the manager and his staff onsite. They will prepare and process all invoices for payments. They will prepare monthly profit and loss statements. They will also work closely to make sure that the brand's in full compliance with both of -- I mean the hotel's in complete compliance with both brands. And there's more duties than that, but that's the major day-to-day duties.
Q. Okay. And how are they compensated, the management company?
A. They'll be compensated, as the contract says, for a percentage of the room revenue. And then they will have an accounting fee that is a flat fee that does not change and that's monthly.
Q. Okay. So how have your duties changed since --
A. I will be overseeing them. This company does not have a wealth of -- or really any bankruptcy or receivership type of management. And so my role will be, again, to the creditors to ensure, much like I did in the Thornco case and I'm still doing, that all payments and everything are processed correctly and the management company is doing their

job.
Q. Okay. Well, if today's January 13th and they've been on the job almost one month?
A. The holidays did impact a lot of that implementation. Part of that time period I was out of town. But more importantly, they also had some conflicts while they were trying to adjust some of their workload. We are already in the process of getting everything transferred over. I've had meetings with their operational people. Tomorrow I have more meetings with their financial people. And we are also in the process of moving the employees from Galaxy Management Company to the entity.
Q. Okay. Now the cash collateral order also requires the debtor to pay Choice a monthly adequate protection payment.
A. Yes, sir.
Q. Do you recall how much that is?
A. It is $80,000 as agreed in that first order.
Q. Okay. Would you turn to Debtor's Exhibit F?
A. I'm Exhibit -- I'm at Exhibit F.
Q. Okay. And do you recognize Exhibit F?
A. Yes. It's showing some wire payments, the first of which were in November.
Q. Did you have some trouble making the wire payment for the full $80,000?

A. Yes. Not realizing that the Chase Bank limitations was 50,000 per transaction, we made that -- 50,000 per transaction online. We made that first one and then that same day, I believe, I went into a Chase Bank to wire the balance. And then the payment that was made in December, knowing the limitation, again went into Chase Bank to make sure that was done properly for the full amount.
Q. All right. In addition to the $80,000 per month, there was also a requirement for an additional, I'll call it excess payment or excess fund payment. Can you describe what that entailed?
A. Yes. That should be any funds not -- it would not be previously or needed to pay the day-to-day bills and other approved items of the debtor. And so we made that first payment the first week. I believe we made it right around December 10th. It could have been December 11th, depending on the weekend. And then we made a second payment in January for the month of December.
Q. Okay. Do you recall how much was paid for the -- in November -- I'm sorry, in December for the month of November?
A. That was $10,000. And then the one that was made, I believe I did that on January 8th, was for $20,000.
Q. Okay. I believe you might have picked up on Choice counsel's opening statement that he believes the first excess

40

payment should have been in the amount of $27,000.
A. I heard that about the $27,000. I didn't quite catch the time period. But I'm not aware of a $27,000 protection payment that was missed. That can certainly be researched.
Q. Okay. So the debtor also made the $80,000 payment in the month of December, the second payment; is that correct?
A. That is correct.
Q. Okay. And is that reflected in Schedule -- I'm sorry, Exhibit F?
A. Yes. That second payment I made that, it looks like on January 29th. And part of that was because of the Christmas holiday and the weekend that occurred.
Q. Okay. And so then how much was the excess payment from the month of December?
A. That was $20,000.
Q. Okay. And it was made about when?
A. That was -- I think I did that on January 8th.
Q. Okay. If the Court orders the debtor to make the same adequate protection payment of $80,000 in January, would the debtor be able to do that?
A. Yes. I've already allocated those funds for that process.
Q. Okay. The order -- I'm referring back now again to

the agreed order, cash collateral, imposes a detailed operating budget with limits on variances. Can you describe your process for monitoring the actual receipts, disbursements to make sure the debtor stays within that budget?
A. Well, no invoice or any payments made without my review and approval. I do that sometimes daily or as needed to make sure that everything is in compliance. Any time you're in bankruptcy you're presented sometimes with invoices that are partial or are pre-petition. So I make sure that none of those are paid.
Q. Okay. Have you ensured that the debtor's able to deliver the weekly report of operations to Choice? And the report I'm referring to is one -- is due on Thursday of every week.
A. Yes. And I believe the only request we made is that's very difficult sometimes on Thursday. I believe through a mutual agreement, I think perhaps email, we agreed that it would be due on Friday of the week.
Q. What type of problems did you incur that would keep you from being able to get that report out on Thursday?
A. The turnaround time frame's tough. And Friday's more -- kind of a more logical end of week. And so we did that on a couple of occasions with the holidays and because one other person that was helping us prepare that had

resigned, we did admittedly turn those in a little bit late. But they're all -- are all current up to and including January 9.
Q. Okay. Has the debtor opened a DIP account?
A. The debtor-in-possession account was opened, yes.
Q. Okay. Would you turn to Debtor's Exhibit Q?
A. I'm at Exhibit Q.
Q. Okay. And is that the debtor's debtor-in-possession account they use for operations?
A. Yes. It ends in 9922. That is the correct account.
Q. Okay. Now has the debtor closed the old bank accounts?
A. Yes. Both that one and there was an East West Bank account, those are both closed and confirmation provided.
Q. If you'll turn to Debtor's Exhibit R.
A. Okay.
Q. Is that the confirmation you were referring to that the bank account had been closed?
A. Yes. That is the one for East West. And on the back side of that same paper it's referring to the former -- excuse me -- account for D San Jose that was in the name of -- or with Chase Bank.
Q. Okay. The agreed order also required that the debtor give Choice read only access to its DIP account. Do

you know if that's --
A. Yes. That was provided soon afterwards. We had a little difficulty with the password, but those were all solved and Choice indicated that they have that access.
Q. Okay. The order also required daily cash deposit reports, or daily logs, or the property system audits and daily logs. So what system have you put in place to meet that requirement?
A. Well, from each property management system, they are independent, we receive night audit reports which are generated around 2 a.m. each day for the previous day's activities. Initially I was asked to put those in a Pillsbury account that I had trouble accessing. We have the Galaxy office currently, and it will be the new management company will send all those reports to me. We're currently putting them in a Dropbox account. We also received notice that there was some past reports that needed to be -- that they had not received from October 22nd. We took action, I think a little over a week ago. And so all of the reports are current through last night in that present Dropbox access that Choice has access to.
Q. Okay. And then there will be some more deposited tonight?
A. Yes. Each say the reports come to me and I immediately upload them to the proper Dropbox.

Q. Okay. The debtor was required to show that the debtor and not Galaxy was named as an insured loss payee on the property insurance. Do you know if that has happened?
A. Yes. That took place and proof was provided of that.
Q. Would you turn to Debtor Exhibit H?
A. I'm at Exhibit H.
Q. Okay. And is this the newly reissued policy showing the debtor?
A. Yes, it does.
Q. Okay. I believe on page, perhaps page 3 and page 4?
A. Yes.
Q. But consistent with your understanding, okay.
The order also requires a segregated escrow to cure delinquent property taxes and occupancy taxes. Okay. Do you know if that has happened?
A. Yes. That took place, I believe I did that around the first week of December. We immediately put in property tax escrow for the month of November. And then -- and I'm doing that around the 25th when the protection payment's made to Choice. And then around the 29th of December I put the second amount in.
Q. Okay. If you turn to, let's see, Debtor's Exhibit J.

A. I'm at Exhibit J.
Q. Okay. Is that a bank statement from that escrow account?
A. Yes, sir, it is. And that is the current amounts in that account.
Q. Okay. Now the order also provides 24 -- required the debtor to provide 24 months worth of the following information. And I'm just going to read these off real quick. General ledger and trial balance, bank statements and reconciliations, deposit slips, accounts payable and accounts receiving aging, payroll registers, affiliate transfer detail, credit card statements. Under your supervision have those documents been provided to Choice?
A. Yes. All those items requested were provided, have been provided.
Q. Okay. Based on your experience in such cases, how would you describe the level of requests for documentation in this case?
A. It's been --
MR. RAY: Objection, Your Honor. Objection, Your Honor, that calls for an expert conclusion. He's not qualified as an expert on this issue.
MR. STANFORD: I was only asking for his experience in the cases he's worked on, for whatever that may mean to the Court.

THE COURT: Objection's overruled.

Q. All right. So based on your experience in a case such as this, how would you describe the level of requests for documentation in this case?

A. There's been a lot of documentation, sometimes with some very narrow time frames. But we've tried to work as hard as we could to make sure this was all provided.

Q. Okay. In regards to the inter-affiliate transfers, what is your understanding of the pre-bankruptcy procedure used by this debtor?

A. At times the affiliates were -- money was borrowed or loaned. And this was taking place prior to the bankruptcy as it was needed.

Q. And so what's the benefit of having this kind of funding available?

A. I'm sorry, I've been recovering from the flu and I'm having a little trouble with that last statement.

Q. What's the benefit to this debtor for having that kind of funding available?

A. Well, they didn't have to go out and get short-term very high interest loans which would save the entity in the long run.

Q. Okay. Have all these inter-affiliate transfers and loans, have they stopped?

A. Yes. There has been nothing since the filing of

the bankruptcy.
Q. Okay. I believe you prepared a schedule of those loans; is that correct?
A. That is correct.
Q. Okay. I believe -- if you would refer to Debtor's Exhibit G.
A. Let me clarify. When you ask, this was actually prepared by the Galaxy account manager and then I reviewed it after the preparation.
Q. Okay. So in your review of this report, was the debtor a net borrower or net lender?
A. Net lender.
Q. I'm sorry. Was the debtor owed more money?
A. I'm sorry. I guess it would be -- the debtor was paid back more than what they loaned. Maybe I'm not saying that.
Q. Okay. So I guess the question is, did they bring in more money than they paid back?
A. Yes. That's what I was trying to say.
Q. Okay. And you're somewhat familiar with either lines of credit or MCA loans. Why would that not have been a good avenue for this debtor?
A. I've never dealt directly with MCA loans. But my understanding is those are very short term, very extreme high interest loans.

Q. Okay. The agreed order also provided for the debtor to file a Chapter 11 plan within 60 days of the order, so that would put it around February the 8th or 10th. Do you know if a plan has now been filed?

A. Yes. It was filed as of yesterday.

Q. Okay. And were you involved in putting that plan together?

A. Very much in working on that.

Q. Okay. And did you provide the financial information which is shown in the disclosure statement?

A. Yes. And the projections over the period of the plan.

Q. Okay. Do you know if there are any third-party releases in this plan?

A. Third party. I'm not familiar with any third-party release.

Q. Okay. Do you believe that the debtor's Chapter 11 plan financially provides a realistic path to repaying the debts of this case?

A. Yes, I do.

MR. RAY: Objection, Your Honor. Again, he's not an expert on Chapter 11 bankruptcy.

Your Honor, I'm sorry, objection. This is expert testimony and the expert is not -- this person is not qualified as an expert to testify about the feasibility of a

plan. And if it's his naked belief, that's not helpful to the Court.

MR. STANFORD: Perhaps I can re-word the question, Your Honor.

THE COURT: You may proceed.

Objection sustained.

Q. In connection with the preparation of this Chapter 11 plan and disclosure statement, did you provide a set of projections?

A. Yes.

Q. Okay. Over how long of a period does that cover?

A. 60 months.

Q. Okay. And the result of those projections, do they provide for payment in full of secured claims?

A. Yes, it does.

Q. Okay. And does it provide for a distribution to the unsecured creditor class?

A. Yes, it does.

Q. And are you aware that there's a separate class for inter-affiliate transfers?

A. Yes, I am.

Q. And are you aware that that is subordinated to the class of unsecureds?

A. Yes.

Q. Okay. The order provided the debtor to produce a

knowledgeable representative to be deposed and for Mr. Dhillon to be deposed. Do you know if that happened?

A. Yes. He did on December 9.

Q. Okay. In fact, you were deposed in this case as well, weren't you?

A. Yes, sir, I was.

Q. Okay. So as the debtor representative, what steps have you taken to make sure the debtor remains current on its reporting obligations, such as the monthly operating reports and the guidelines provided by the U.S. Trustee's Office?

A. Those have been prepared and submitted to counsel. I'm currently working on the monthly operating report for December which will be turned in on time by the 21st. Also in the first required disbursement to the Trustee for fourth quarter will be paid in January before the 21st, also based on the disbursements that were made during that reporting period.

Q. Okay. Can you explain how preserving the going concern value for this hotel aligns with your duty to maximize the value for creditors?

A. Well, it's always in the best interest to keep the hotel performing to the best of our abilities, to have it making as much revenue and at the same time minimizing expenses and ensuring that all plan payments are made to the creditors.

Q. Okay. When is the first quarterly U.S. Trustee fee due in this case?
A. It will be due before January 21st. And, again, based on the disbursements during the months of October, November, and December in 2025.
Q. Okay. Who are the signatories on the debtor-in-possession accounts?
A. I am the only signer.
Q. Okay. In your judgment would the appointment of a Chapter 11 Trustee at this stage improve or impair the debtor's ability to preserve the going concern value?
A. I feel that with the job that we're doing and the controls in place that we are doing a very good job in that area and I think, yes, this could set things back.
Q. Okay. The other cases where you -- other bankruptcy cases where you represented the debtor, was a Chapter 11 Trustee appointed in any of those?
A. No. I've never had that experience.
Q. Okay. What kind of problems are common running a economy brand hotel in terms of maybe undesirable activity around the property?
A. This hotel is really not unique or any different than any hotel that's in the economy sector. And for that matter, I've run hotels in the higher branded sectors that will still have incidents take place or situations.

Q. Okay. Have you provided instant reports to Choice counsel at their request?

A. Yes, we have.

Q. Okay. Have there been any type of occurrences or incidents of, you know, bad behavior since the beginning of this bankruptcy case on the property?

A. There has not.

Q. Okay. So from -- in your experience and in your investigation, does this property encounter more than its fair share of undesirable activity?

A. No. Again, for this type of hotel and for any hotel, it's not out of the ordinary to occasionally have situations develop that have to be addressed.

Q. Okay. What type of instructions does -- has the staff at the hotel been given in regards to handling these types of disturbances?

A. Well, depending upon the severity or magnitude of the disturbance, we're going to immediately contact local law enforcement, whether that be the sheriff's department or city police. Have them work directly with the person and not confront the person directly.

Q. Okay. Has the City of San Jose or the County issued any warnings to the hotel because of undesirable activity or threats to close them down?

A. No.

Q. Would shutting down this hotel, even for a short period of time, result in a loss of value to the property?
A. Absolutely. Any loss of revenue for even one day can affect that value and then also impede the ability to make the proper plan, or proper payments to all creditors and other vendors.
Q. Okay. Can the debtor continue to operate and meet the obligations under the current interim cash collateral order if the Court extends use of cash collateral?
A. I feel that we've done -- taken all of the necessary steps as required, yes.
Q. So the debtor would be able to continue to operate for the rest of January, perhaps February, perhaps March under the same guidelines?
A. Yes.
Q. Okay.
MR. STANFORD: I'll pass the witness.
THE COURT: Cross?
MR. CASTILLO: Your Honor, I have just a real short line of questioning, if I may, Your Honor.
THE COURT: Okay. You may.

CROSS-EXAMINATION

BY MR. CASTILLO:
Q. Mr. Williams, you spoke briefly earlier about the intercompany transfers where you said more money was coming

in than was going out from the debtor. Do you recall that?
A. Yes, sir, I do.
Q. Is that continuing post-bankruptcy?
A. No, sir. Nothing -- no affiliate transfer to insiders, to anyone, to any entity has taken place since the bankruptcy filing.
Q. Thank you, sir.
MR. CASTILLO: Your Honor, the witness spoke about the disclosure statement and plan. I'd just ask the Court to take judicial notice that the disclosure statement and plan were filed yesterday at Dockets 82 and 83.
THE COURT: So noted.
MR. CASTILLO: Thank you. No further questions. Thank you, Judge.
THE COURT: Okay. Cross?
CROSS-EXAMINATION
BY MR. ALFANO:
Q. Good afternoon, Mr. Williams.
A. Good afternoon, sir.
Q. There's been some -- there's been some inconsistent statements today and I think in the past about what your role is with respect to the debtor. I believe Mr. Stanford said at the outset that you were the debtor representative. But that's not entirely true, right?
A. I work for the --

THE COURT: Hold on. Hold on. That mis-states the statement. I thought he said he was the owner representative.

MR. ALFANO: That's exactly the inconsistency.

THE COURT: Well, those are the words he used. So you asking the question, you mis-state his testimony.

MR. ALFANO: Okay.

THE COURT: So I just want to correct that.

MR. ALFANO: I apologize.

THE COURT: Thank you.

Q. Are you the owner representative?

A. I believe the agreement may say that. I'm employed by the entity and so that title is probably not a -- a good title to use.

Q. What entity are you employed by?

A. I'm referring to D San Jose, LLC. That's the agreement I have is with the entity.

Q. And you have a written agreement?

A. Yes. And I believe that agreement was produced.

Q. Okay.

THE COURT: Is that one of these exhibits here?

MALE SPEAKER: Yes.

THE COURT: Which agreement is that, for the record?

Q. I'd like you to turn to Exhibit -- Exhibit S.
THE COURT: Is this in response to the Court's question, or are you turning to some other topic?
MR. ALFANO: Related topic, Your Honor.
THE COURT: Okay. Is this the exhibit? Is this the agreement?
MR. ALFANO: Well, that's what I intend to ask Mr. Williams.
THE COURT: Okay. Is this what you believe is the agreement?
MR. ALFANO: I believe it's a backdated agreement.
THE COURT: Well, but it's the agreement that he's referring to?
MR. ALFANO: Yes.
THE COURT: Okay. You may proceed.
A. I'm at Exhibit S.
Q. Okay. And that agreement is dated, correct?
A. It is dated.
Q. And what's the date on that agreement?
A. October 22nd.
Q. And do you recall that you sat for a deposition in this case?
A. Yes, I did.
Q. And when you testified during that deposition you

were under oath, correct?
A. Yes, I was.
Q. Just as you are now?
A. Yes, sir. I understand that.
Q. Okay. And do you recall testifying that you had no written agreement at that time with the debtor?
A. I recall saying that. And I believe we said we would get an agreement put together to document that.
Q. This agreement is dated October 2nd, 2025, so it was backdated then, right?
A. That could have been a mistake on the dating. But we were trying to make sure there was a written agreement documenting everything with the entity.
Q. When did your involvement actually start with the debtor?
A. My official involvement was on the day of bankruptcy. But I was contacted probably about a week or two prior to the filing of the bankruptcy.
Q. And is October 22nd the same date as the bankruptcy?
A. That's the date of the filing, yes, sir, I believe so.
Q. Okay. Now you've testified that Galaxy Management put you in place as owner representative to the debtor; is that right?

A. I was contacted by the owner, Mr. Dhillon, who owns Galaxy Management. And he asked me to perform this role, yes.

Q. Okay. And you receive compensation as a 1099 from Galaxy, right?

A. That is correct, not from the entity.

Q. And you have an office at Galaxy, right?

A. When I'm in Dallas I work out of that office. And then I also work separately from my home.

Q. And you've been working for Mr. Dhillon and Galaxy since 2014, or so, right?

A. On various projects, primarily in the new development area.

Q. Okay. You're familiar with the original schedules that were filed in this bankruptcy case, right?

A. Yes, sir, I am.

Q. And you understand that those schedules were filed under penalty of perjury?

A. Yes, sir, I do.

Q. And you understand what that means?

A. Well, obviously there can be penalties and everything in regards to that, yes.

Q. Okay. And you listed in the original statement of financial affairs that Jose Motel, LLC was the 100 percent owner, correct?

A. I don't have that in front of me. But as I recall, I would believe that would be the case.
Q. Okay. And you testified during your deposition that Jose Motel, LLC was, in fact, the owner of the debtor, right?
A. I'd have to look back at my deposition. But if you're stating that, I would accept that, yes.
Q. And you also testified that Ms. Abbas was the manager of Jose Motel, LLC who you then thought was the owner of the debtor?
A. Again, at that time, yes, I believe that's what I testified.
Q. And you also testified during your deposition that you had not spoken to Ms. Abbas when you filed the petition; is that right?
A. I had made attempts, but her health was not good.
Q. And you hadn't spoken to Ms. Abbas when you signed the schedules or the statements, correct?
A. That is correct.
Q. So you signed the schedules and statements without speaking to the person that you believed was the manager of the debtor's owner?
A. My involvement with that was that at the time I thought we were -- between counsel, myself, I thought I had adequate information to fill those out.

Q. And when you signed the bankruptcy petition, you didn't speak to Ms. Abbas, right?

Strike that.

When you signed the bankruptcy petition, Ms. Abbas didn't tell you to sign it, right?

A. I was not given direction by her, no.

Q. You spoke with someone at Galaxy about signing the petition and filing it?

A. I believe I spoke with counsel and then, yes, I spoke with Mr. Dhillon.

Q. Okay. And the original schedules and statements that were ultimately filed, those turned out to be wrong in a number of material ways, right?

A. We found there were some mistakes and errors and then we worked to correct those, yes.

Q. But you didn't speak to Ms. Abbas before you signed those schedules and statements?

A. Again, due to her health situation, I was not able to.

Q. So you really just work for Mr. Dhillon and Galaxy Management, right?

A. No, sir. As I represented, I work for the entity D San Jose. I work to make sure the creditors and everyone are paid correctly. I do not -- I -- the compensation I received was because the Court in the original order would not allow

my compensation to come from the entity.
Q. But the compensation does come -- does, in fact, come from Galaxy, right?
A. At this time, yes, that's --
Q. And you have an office at Galaxy, right?
A. Occasionally I have an office, yes. It's not a full-time office.
Q. And you've worked with Mr. Dhillon for 14 years, right?
A. On other -- other matters, yes.
Q. Okay. And you're familiar with the cash collateral order that required the replacement of Galaxy Management as manager, right?
A. Yes, sir, I am.
Q. And now that, I believe it's American Hospitality is in place, you're still involved, right?
A. I'm involved to help, number one, make that transition, get them in place. And make sure all that's taken care of. And then I would continue to oversee what they're doing.
Q. So you're going to stay on as American Hospitality manages the debtor, right?
A. I would be working, as I think we can call it a couple of different terms. I believe disbursing agent or chief reorganization officer. But I feel that they need

guidance to make sure that everything's done in proper accordance with the cash collateral and with the bankruptcy guidelines.

Q. And what -- high level, what are their responsibilities? Can you remind me, please?

A. Well, again, day to day they're going to work with, directly with the hotel staff and manager. And this is outlined in their contract, a number of the things I'm saying. They will process the invoices from all vendors. Recommend those be paid. And then, of course, work with all brand standard items to make sure that the staff and the property are complying with brand standard. There is a revenue management company in place for both brands. They will work with that revenue management company as well as a third-party sales company to try enhance the revenues of the property. And that's some of the things they do. There are a number of others, but that's their primary task.

Q. And in terms of formulating a Chapter 11 plan and making other strategic decisions in the Chapter 11, that is not American Hospitality's responsibility, right?

A. We -- I would be working with them because obviously their participation, their involvement and knowledge as the case moves forward would be essential. So it would be working wit them.

Q. Is it you in consultation with Mr. Dhillon making

strategic decisions in this Chapter 11 case?
A. I really don't talk to Mr. Dhillon on a daily basis. I deal with, again, the requirements of the cash collateral budget and I make sure that everything's done in the proper accordance. But I do not consult with him in the way the property is managed day to day, no.
Q. So Mr. Stanford is debtor's counsel, correct?
A. That is correct.
Q. And who is the client representatives that confers with Mr. Stanford about strategy and makes decisions? Is it you?
A. I can -- probably talk to Mr. Stanford multiple times a day to always make sure that whatever we're doing or not doing is proper. And that we're -- we're following the proper guidelines and procedures.
Q. Okay. And you testified earlier that you are a fiduciary for creditors, correct?
A. That is my number one interest and number one task.
Q. What have you done to investigate the intercompany transactions that were not disclosed on the original schedules?
A. At this point my primary goal has been to make sure all the requirements of the cash collateral order, the transition to the management company, as well as monthly operating reports, bank accounts. I have not gone deeply

into the affiliate transactions that you're referring to.
Q. So is it fair to say you haven't investigated the affiliate transfers?
A. I have not investigated them in detail. I've reviewed what was submitted. And I have not been able to dig into all of those, or -- again, not a good word. Have not been able to investigate all of those.
Q. What happens if the interest of creditors on the one hand and the interest of Mr. Dhillon or other affiliates in the Galaxy enterprise are not aligned? Can we really trust you to make decisions?
A. Based on all of the other cases I've done, I have been -- taken that duty very -- that fiduciary duty and the responsibilities very serious. I've always abided by those. And so that is the interest that I would do. Always in the interest of the entity and creditors.
Q. So if you had to instruct Mr. Stanford, hypothetically, to sue Mr. Dhillon because he took money out of the company, you would do that, right?
A. That's calling for speculation, I think. But if I found out that there was anything done incorrectly during the investigation, I would absolutely bring it to counsel's attention.
Q. And you would sue your boss, right?
A. Again, you're asking for speculation. I would

bring it to counsel's attention and then the proper course of action would have to be determined.
Q. Okay. Understood.
Are you familiar with a lender called Underground Lending?
A. I've seen that name, yes.
Q. Are you familiar -- are you aware that Underground Lending alleges in a complaint that this debtor owes it $2 million?
A. I believe I've seen that. I think the -- this particular situation also involves other properties. And San Jose is one of the entities involved in this matter.
Q. And Underground alleges that this debtor is on the hook for $2 million, right?
A. I don't recall the exact figure. I'd have to look at that to be sure.
Q. Okay. And you're aware that none of those proceeds of the $2 million proceeds went to this debtor, right?
A. I'm not aware of that situation. Again, I have not delved deeply into the Underground situation that you're referring to.
Q. Have you seen the Underground lending documents?
A. I was on some phone calls with counsel. I don't recall seeing the documents.
Q. I've seen the documents and you've notarized them.

Does that sound right to you?
A. That's possible. In my course as a notary, I've notarized many documents. I don't recall those exact documents.
Q. Mr. Williams, isn't that a bit of a conflict for you and for Mr. Dhillon?
A. At the time I would have notarized those I'm not aware of that or realizing it to be a conflict to do the notary, no, sir.
Q. Well, what you're acknowledging is that you notarized loan documents and Mr. Dhillon signed loan documents for a $2 million debt that this debtor did not receive the proceeds for, it went to other entities. And you don't think that's a conflict?
A. I guess someone would have to help explain to me the -- what a conflict would be in that matter. Again, I was just notarizing signatures for a document at the time. And I don't recall exactly when that was or what day that took place.
Q. Okay. I would like you to go to Choice's cash collateral, Exhibit -- oh, I'm sorry.
MR. ALFANO: Permission to approach the witness with the exhibits.
THE COURT: You may. You need to wrap up in about 10 minutes today.

A. Can I have two books, or I guess which exhibit number do you need me to look at?
Q. Book number 2.
A. Okay. I have book number 2.
Q. Okay. Cash collateral exhibit book number 2, Exhibit Number 35.
A. Yes. I have Exhibit 35.
Q. Okay. I'm going to read this out loud and you can read it to yourself.
THE COURT: Oh, please don't read it.
MR. ALFANO: Don't read it?
THE COURT: It's been admitted, right?
MR. ALFANO: Yeah.
THE COURT: I can read it. I don't need you to read it to me in front of a witness. You can reference it in your closing, et cetera. But I don't need to be read to.
MR. ALFANO: Sure.
Q. Does this look familiar to you?
A. I do believe, yes, sir. It's an email to Mr. Stanford from Choice.
Q. And it provides five-day's notice and opportunity to cure for the failure to provide a weekly budget due by December 18th, right?
A. Yes, I do.
Q. And it says, Please cure by December 24th, correct?

A. Yes, sir, it does.
Q. Okay. Now I would like you to turn to Exhibit Number 36.
A. I have Exhibit 36.
Q. Okay. Now the second paragraph after it opens with John Paul, it says, termination of cash collateral use, right?
A. That's what it says, yes.
Q. And when is this email dated for?
A. This email is dated December 29.
Q. And it says, Choice Hotels issued a default notice on December 19th regarding the debtor's failure to comply with the orders, correct?
A. That's what this email says, yes, sir.
Q. Next sentence says the applicable cure period has lapsed without cure, correct?
A. That is correct.
Q. And it says the debtor's authority to use cash collateral is subject to termination, right?
A. Yes.
Q. Okay. And the paragraph that comes after that, that's another default, correct?
A. Yes. I see a secondary default.
Q. And what's that default for?
A. It says failure to provide required weekly budget

reports, including the report of December 26.
Q. Okay. And I'd like you to go to Exhibit Number 38.
A. I have Exhibit Number 38.
Q. Is this another default notice?
A. That's what the subject line says, yes.
Q. And what are those defaults for?
A. One was referring to adequate protection. And this email is dated January 7th. The second one is referring to the daily reports, or night audit reports. And the third on refers to a deposition.
Q. Okay. I'd like you to turn to Choice's cash collateral Exhibit Number 27.
A. It's in the other book. Excuse me.
Okay. I have Number 27.
Q. You're aware of the obligation to make adequate protection payments to Choice, correct?
A. Yes, sir, I am.
Q. And how much are those adequate protection payments?
A. I'm sorry, can you restate?
Q. How much are those adequate protection payments?
A. $80,000. And then for the month following, by the 10th of the month any excess funding under certain guidelines must be provided.
Q. Okay. And I'd like you to go to Debtor's cash

collateral Exhibit L, as in lima.
A. I have Exhibit L.
Q. Okay. This is for, I believe -- well, middle column is for the month of November, 2025, correct?
A. That is correct.
Q. And last row, middle column, what's the net operating income for the month of November?
A. It says it was projected to be 1,012 -- 1,124.33.
Q. And how much did, in fact, Choice pay as adequate protection for the month of November?
A. I'm sorry, how much was the adequate protection paid to Choice?
Q. I'm sorry. The debtor made an adequate protection payment of $80,000, right?
A. Yes. And then by December 10th an excess payment of $10,000 was paid.
Q. So that's $90,000 in total, right?
A. Yes, sir.
Q. And there's a $5,000 holdback under the cash collateral order, correct?
A. That's what the guidelines said, yes, sir. I mean, the -- I think the interim order. I may not be referring -- I want to make sure I'm saying that correctly.
Q. Okay. So when you account for the $80,000 payment, the $10,000 true up, and the $5,000 holdback that's allowed

under the order, there's still, I believe, $17,000 left, right?

A. The situation always comes in, you have pending invoices and other items that need to be paid. And so I -- I'm sorry, are you asking me --

Q. Based on this report there's $17,000 of net NOI that was not paid to Choice, correct?

A. That would be the difference of the 112 versus the 90 --

Q. Plus 5, 95.

A. Yes. So I would agree with your figure, yes.

Q. Okay.

MR. ALFANO: No further questions.

THE COURT: Okay. All right. The witness may step down for now. We're -- I can't give you any more time today.

MR. STANFORD: I understand.

THE COURT: Let me look here and see.

All right. So I have some first day hearings and such in the morning, but I think we can continue this to 10:30 tomorrow morning.

MR. RAY: Thank you, Your Honor. We'll be back at 10:30.

May we leave our binders in the courtroom?

THE COURT: I'm going to have other hearings

going on in the morning. If you want to put it in the corners or something out of the way so that the -- whoever we have in tomorrow comes in, they'll have --

MR. STANFORD: Your Honor, there is a 341 Meeting tomorrow at 10:00 that involves another case in this court that also involves Mr. Williams and Mr. Dhillon. It starts at 10.

THE COURT: Oh, okay. Is it your actual 341 Meeting, or is this amassed with multiple --

MR. STANFORD: Well, it's a Chapter 11 case so it would be just us.

THE COURT: Okay. I just wanted to make sure.

How long do you think --

MS. SCHMIDT: Your Honor, this is Erin Schmidt. I can continue that hearing or stop it right at -- I can continue that hearing tomorrow if the parties prefer, because it's the same parties involved that are here in the courtroom right now.

THE COURT: Okay. Is it the 341 Meeting in this case?

MR. STANFORD: No. No.

THE COURT: Oh, it's a different case.

MR. STANFORD: Different case.

THE COURT: Okay. Gotcha. Do you have a preference?

MALE SPEAKER: I'm sorry, I wanted to make sure I was hearing. We're saying we're continuing until tomorrow.

THE COURT: How long --

MR. STANFORD: Whatever is more convenient to the Court.

THE COURT: How long is that case going to take? How long is the hearing going to take?

MR. STANFORD: The 341 Meeting?

THE COURT: Uh-huh.

MR. STANFORD: I believe she set aside two hours for it.

THE COURT: Okay. Now tell me this, how much more time do you need on this docket, on these matters?

MR. STANFORD: I only have a few questions for Mr. Williams. Only a few questions for the appraiser. And then Mr. Dhillon will testify. I don't have a very long presentation for him. But I suspect that he probably will be on the stand for a long time.

THE COURT: Okay. And that's with respect to all of the matters before the Court, both matters? You're not talking about just one?

MR. STANFORD: All of the matters, yes, that's before the Court, yes. Both areas, both motions.

THE COURT: Mr. Ray.

MR. RAY: Yes, Your Honor, thank you.

I have spoken with the senior secured creditor in that other case that is set for tomorrow. Choice is also a creditor. But both Choice and the senior secured lender would prefer if the U.S. Trustee continued the 341 Meeting that is set for tomorrow. We would much rather continue this hearing tomorrow morning as early as possible so that we can conclude.

THE COURT: Okay. All right. Ms. Schmidt, if you can take care of that in getting it continued to tomorrow -- getting the hearing tomorrow continued on the 341 Meeting and then we will continue this matter to 10:30 tomorrow morning, okay. And then we can take care of these issues.

MS. SCHMIDT: I'm happy to continue that matter, Your Honor.

THE COURT: Thank you so much.

MR. CATUOGNO: Your Honor, can I confirm that the same remote login will be available for tomorrow's hearing?

THE COURT: It is not. You're going to have to contact my courtroom deputy to get an email for the new information. Okay?

MR. CATUOGNO: Thank you very much, Your Honor.

THE COURT: Okay. All right. Anything

further?

All right. Thank you. Parties are excused.

MR. STANFORD: Thank you, Your Honor.

THE COURT: And we stand adjourned.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

/s/Cindy Sumner

______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2026
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196