IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

IN RE: ) BK. NO: 25-43157-BTR
)
D SAN JOSE, LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 14th day of January, 2026, before the HONORABLE BRENDA T. RHOADES, United States Bankruptcy Judge at Plano, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

# I N D E X


| | PAGE |
|---|---|
| **LARRY WILLIAMS** | |
| REDIRECT EXAMINATION | |
| BY: Mr. Stanford | 5 |
| RECROSS-EXAMINATION | |
| BY: Mr. Alfano | 9 |
| **JAGMOHAN DHILLON** | |
| DIRECT EXAMINATION | |
| BY: Mr. Stanford | 13 |
| CROSS-EXAMINATION | |
| BY: Mr. Alfano | 29 |
| BY: Mr. Castillo | 46 |
| BY: Mr. Ray | 56 |
| **LUIGI MAJOR** | |
| DIRECT EXAMINATION | |
| BY: Mr. Stanford | 92 |
| CROSS-EXAMINATION | |
| BY: Mr. Ray | 95 |
| **ANWER AZAM** | |
| DIRECT EXAMINATION | |
| BY: Mr. Ray | 108 |
| **JASON RAE** | |
| DIRECT EXAMINATION | |
| BY: Mr. Ray | 112 |
| CROSS-EXAMINATION | |
| BY: Mr. Stanford | 140 |
| BY: Mr. Castillo | |

E X H I B I T  I N D E X


| | PAGE FIRST REFERENCED |
|---|---|
| Exhibit S | 21 |
| Exhibit T | 24 |
| Galaxy-M | 52 |
| Galaxy-N | 51 |
| Galaxy-O | |
| Exhibit Number 4 | 33 |
| Exhibit Number 5 | 36 |
| Exhibit Number 13 | 34 |
| Exhibit Number 15 | 34 |
| Exhibit Number 16 | 6 |
| Exhibit Number 18 | 36 |
| Exhibit Number 19 | 58 |
| Exhibit Number 20 | 72 |
| Exhibit Number 24 | 67 |
| Exhibit Number 25 | 70 |
| Exhibit Number 43 | 83 |
| Exhibit Number 57 | 86 |

P R O C E E D I N G S

COURTROOM DEPUTY: Page 3, number 6, D San Jose, LLC, 25-43157. Final hearing on motion for authority to use cash collateral and motion for appointment of Trustee.

THE COURT: Okay. Appearances.

MR. STANFORD: John Paul Stanford appearing for the debtor, D San Jose, LLC. And my associate --

MR. NEALON: Rian Nealon also for the debtor.

THE COURT: Thank you.

MR. CASTILLO: Mark Castillo on behalf of Mr. Jagmohan Dhillon. And Mr. Dhillon is also here. Good afternoon.

THE COURT: Thank you.

MR. RAY: Your Honor, Hugh Ray, R-a-y, III on behalf of Choice Hotels International.

MR. ALFANO: Good afternoon. Andrew Alfano from Pillsbury Winthrop Saw Pittman also on behalf of Choice.

THE COURT: Okay.

MR. STENHJEM: Good afternoon, Your Honor. Joshua Stenhjem, Pillsbury, on behalf of Choice.

THE COURT: Okay.

MR. STROMBERG: Mark Stromberg, local counsel for Choice.

THE COURT: Thank you.

All right. Do we have a telephonic appearance?

MR. CATUOGNO: Yes. Good afternoon, Your Honor. David Catuogno, K&L Gates on behalf of Super 8 Worldwide.

THE COURT: Thank you.

All right. So --

MS. SCHMIDT: Your Honor, Erin Schmidt for the U.S. Trustee.

THE COURT: Okay.

All right. Do we have any other appearances?

All right. So where are we?

MR. STANFORD: I believe when we left off yesterday Mr. Williams was on the stand and Choice had finished their cross-examination of him. I was about to do a very brief redirect.

THE COURT: Okay. If the witness will retake the stand. Or let's swear him in.

(The witness was sworn by the courtroom deputy.)

THE COURT: Okay. You may proceed.

MR. STANFORD: Thank you.

LARRY WILLIAMS

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. STANFORD:

Q. Mr. Williams, you previously testified that you are

involved working on other hotel projects around the country. Could you identify the ones which do not involve Mr. Dhillon or Galaxy Management?

A. Yes. I'm currently chief -- excuse me, chief reorganization officer for Thornco Hospitality, LLC. The bankruptcy plan was confirmed but I've been directed to stay on during the life of that plan confirmation period. I'm also currently Receiver for the State of Texas 471st District in Collin County on a hotel that's in Allen, Texas. I'm also handling two -- those are ones currently that I'm doing that do not involve Mr. Dhillon.

Q. And you've done others previously, correct?

A. Yes. I've done many others over the past few years involving in the State of Ohio, Arkansas, Texas, and Colorado.

Q. Okay. So you're not dependent on Mr. Dhillon for a paycheck?

A. No, sir. I'm an independent contractor.

Q. Okay. If you would find the Choice exhibit binder for cash collateral.

A. Do you know whether that's Exhibit 1 through 29 or 30 through 75?

Q. That would probably be the 1 through 29. You see cash collateral at the top of that page. But turn to Exhibit 16.

A. Exhibit 16's he schedules.
Q. Right. If you would -- at the very top of the page you see page 1 of 31. Go to page 23 of 31.
Let me know when you're there.
A. I'm on page 23.
Q. Okay. At the top of the page what's identified as 3.22, who's the creditor listed there?
A. There's two listed; Underground Lending and Velocity.
Q. Okay. Well, the one at the top is 3.22. Do you see that?
A. Yes, I'm sorry, 3.22.
Q. Okay. And the debt amount is how much?
A. $2 million.
Q. Okay. Now if you look in that middle column where you see several boxes one is checked. Which one is checked?
A. It says, This is a disputed claim.
Q. Okay. And do you know why this claim is disputed by the debtor?
A. Because I believe the funds were never provided to the debtor in this instance.
Q. Okay. Well, they were listed because Underground asserted a claim?
A. Correct.
Q. Okay. You can put that aside.

Okay. Yesterday you were asked about an account at AB, American Bank. Since yesterday did you investigate what that was about?

A. Yes. Yesterday afternoon I checked right away. It was closed. I believe the closure date was January 23rd of 2025.

Q. Okay. And that was within one year of the bankruptcy, correct?

A. Yes, it was.

Q. Okay. And you're aware, of course, that question 18 on the statement of financial affairs asks for any closed bank accounts within one year of the bankruptcy petition, correct?

A. Yes.

Q. Okay. And it wasn't listed because --

A. I did not realize at the time that had been closed. We will certainly have to make an amend -- an amendment to that particular issue.

Q. Okay. You understand the debtor needs to amend the statement of financial affairs for that issue?

A. Yes. And that will be done.

Q. Okay. You were asked a series of questions yesterday about $27,000 left over at the end of November, yet even with the $5 holdback you only -- the debtor only paid $10,000 for the overage amount from cash collateral. Did you

double check to see how -- why only $10,000 was paid?
A. Well, there were a couple of factors, one of which was the property tax escrow amount was understated because I believe when we initially did the property taxes, there's a second parcel of land. And when you factor that in, the proper escrow amount should be $35,465. And in the cash collateral we had it at about 29,000.
Q. Okay. And did the agreed order, or interim order and cash collateral require you to set up an escrow account?
A. Yes, it did.
Q. And required you to fund it in the amount that you did?
A. Yes, I did.
Q. And does that bear any relation to why only $10,000 was paid instead of 17 or 27?
A. Yes, sir.
Q. Okay. All right.
MR. STANFORD: I will pass the witness, Your Honor.
THE COURT: Thank you. All right. Does anyone have any further examination for this witness?
MR. RAY: One second, Your Honor.

RECROSS-EXAMINATION

BY MR. ALFANO:
Q. Hi, Mr. Williams. Good afternoon.

A. Good afternoon.
Q. With respect to AB Bank, which you said was closed in January of 2025, correct?
A. Yes, that's correct. I thought the exact date was January 23rd, but I don't have that in front of me.
Q. What investigation did you do to identify all of the debtor's bank accounts when you signed the schedules and statements?
A. When I did that I checked on all of the bank accounts that were open. I thought we had looked back to make sure there were any other closures. And I did not find the American Bank. I was also working with the Galaxy office at the time.
Q. And have you seen the bank statements to verify the closure of the account in January of 2025?
A. Yes, sir. Pardon me. I didn't mean to step over you.
There was about six or seven statements that came in this morning. And I saw that the account was closed in January.
Q. And does the debtor plan to produce those accounts to Choice?
A. I believe that -- yes, counsel will, of course, provide that.
Q. Just one second.

And so, Mr. Williams, you don't have any explanation for why didn't see it earlier when you checked for the debtor's bank accounts, do you?
A. As stated, I was checking. I thought we had checked for all of those. I cannot explain at that particular moment why that was missed.
Q. Okay.
A. Because it had been closed. And the time it was closed, that didn't come to my attention. And I apologize for that mistake.
Q. And could there be other bank accounts?
A. I have checked after we heard about that and there are no other bank accounts.
Q. Okay. How do we know that?
A. Well, I checked with the Galaxy office and their head of finance and their administrator which opens all of the accounts and they've assured me that was all the ones that we'd taken care of that were from Chase from East West Bank and now American are, indeed, closed. And the only operating account is the debtor-in-possession account.
Q. Okay. And could you provide the name of that administrator at Galaxy's office?
A. Yes. Cindy Silivant.
Q. Okay.
MR. ALFANO: No further questions.

THE COURT: Thank you.

MR. STANFORD: Your Honor, I'm going to ask, if the Court will grant -- allow Mr. Williams be excused from these proceedings. He's not going to leave right away, but he does have a plane to catch this afternoon.

THE COURT: That's fine. All right. You may step down.

THE WITNESS: Thank you, Your Honor.

THE COURT: And you may be excused as needed.

Anything further?

MR. STANFORD: Ready for my next -- ready for my next witness.

THE COURT: You may call your next witness.

MR. STANFORD: Okay. At this time the debtor calls Jagmohan Dhillon to the stand.

THE COURT: Mr. Dhillon, if you'll step forward and be sworn.

(The witness was sworn by the courtroom deputy.)

MR. STANFORD: May I proceed?

THE COURT: You may.

MR. STANFORD: Okay.

(no omission)

JAGMOHAN DHILLON

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. STANFORD:

Q. Sir, would you state your name, please.

A. Jagmohan Dhillon.

Q. Okay. And many times you go by the nickname Jag; is that correct?

A. Yes.

Q. Okay. What is your relationship to D San Jose, LLC?

A. The 50 percent owner of D San Jose.

Q. Okay. Who are the owners of the debtor, D San Jose?

A. Amandeep Dhillon, my wife, and myself.

Q. Okay. You might need to speak into the microphone a little bit closer. Thank you.

Okay. How many hotels do you own?

A. 32.

Q. Okay. Describe Galaxy -- Galaxy Management.

A. Galaxy Management manages hotels, all 32 of them. Operations, HR. We have AP department. We have audit departments. And then also renovation department. And then also we have people in the field, operations, vice president

looking over the GMs and day-to-day operation for the properties, assisting the managers and (indecipherable word), all the employees as needed.

Q. Okay. And what was Galaxy Management's relationship to the debtor before the bankruptcy was filed?

A. As a management company to manage the asset.

Q. Okay. What was the benefit to debtor, or this debtor for using a central management company?

A. So cost -- cost effective. We have other properties in the area. So it's easy for one vice president to manage more than three or four properties and assist them. Where if we have different management companies and the costs would go more up.

Q. Okay. Describe briefly how it handles its recordkeeping.

A. So we have a central office in Frisco. And we have a back office in India Deli. And then all the -- everything is on the server. All the invoicing, bank statement, all the front desk -- the software system, all the revenue reports daily, weekly, monthly, all the STAR reports. We keep them on the server on a weekly basis.

Q. Okay. And does Galaxy maintain separate records for each of the different hotels?

A. Yes. We have separate files. We use QuickBooks as software. So each LLC has separate folders and software for

that.
Q. And did it maintain separate records for this debtor, D San Jose?
A. Yes. Separate bank accounts and separate folders, yes.
Q. Okay. Did you authorize the filing of this Chapter 11 case?
A. Yes.
Q. Okay. Describe the property briefly.
A. It's a 204-room property in San Jose on Highway 101 on Tully and Highway 101. It has two buildings. It is a two-story exterior motel. It's not a fancy property, but it is an older hotel.
Q. How is it currently flagged?
A. It is currently -- first building, around 99 rooms is a Motel 6. The back building close to 105 rooms is Super 8.
Q. Okay. And when did you acquire this property?
A. May of 2022.
Q. Okay. When did Choice Hotels become involved?
A. Summer of 2024 I started talking to them. I think in August somewhere, July or August we changed the flag from Motel 6 to Park Inn by Choice Hotels.
Q. Okay. And what kind of problems were encountered when the property was re-flagged, Choice?

A. Before we change it we were promised we would have dedicated sales people because we -- we had more than 20 properties as Park Inn at one time. So we were going to get two sales people to help in the sales from Choice. And the revenue system would bring a lot of reservation, guests to their property. And also since Park Inn was a new flag -- and I was also worried to Choice that if this does not work, Choice promised me they can convert it to other brands that Choice has, Quality Inn and other flags they had within their system. And once we changed the flag, I think in July or August of 2024, we did not get -- I mean, it was not one. It was like 24 hotels at one time. And we didn't get much help on the sales team from Choice that was promised. And then also the reservation system was not that strong. And the walk-ins was not there because it was new flag and our revenue started dropping. And we were trying to -- I had multiple contact with Choice. I need help. We are struggling. The revenues are going down. And there was not much help given. At one point I think over winters of '24 and '25 I requested if we could change the flag to Quality Inn so it has a better exposure than Park Inn to help this property and the other properties to increase the revenues. And that was not also given.

Q. Okay. Are all or most of the hotels that you own economy hotels?

A. Correct. Most of them are economy. They were Motel 6 then I got into Park Inn. Then last year, 2025, I changed the flags from Park Inn back to Motel 6 and Super 8.
Q. Okay. What kind of problems are common running an economy brand hotel? And I'm referring to the type of unwanted activity that might occur there.
A. The clientele is different in Motel 6 or Super 8 versus Marriott or Hilton. We get some construction company. We have some people housing displacements. Some walk-ins. So the clientele is different. And we do -- it's not much, but there are issues at the property. Not in San Jose, but also in other states we have seen issues are happening more than versus Marriott and Hilton.
Q. Okay. In your experience does this property encounter more than its fair share of undesirable activity?
A. No.
Q. Okay. Has the City or County issued any warnings or citations to the debtor because of any type of criminal activity taking place there?
A. No.
Q. Okay. What type of instructions have you routinely provided your staff at the property if there's any type of disturbance on the property?
A. The GM or the front desk staff or the housekeeping, they're fully aware if they see any trouble or any issue

going on at the property, they're supposed to call the cops and let the cops deal with it. And they need to be in a safe place, not to get involved with the customers.

Q. Okay. What kind of problems, financial problems, did this debtor encounter that required it to have to file a Chapter 11 bankruptcy?

A. A couple of stuff happened. When I bought the property in 2022, May, interest rates at that time were decent. Few months later interest rates started going up. And in '23 payments were close to -- I had two loans on the property. One interest rate went to 12 percent and the other one to 18. Payments -- our monthly payment became 300,000. And revenues were close to 350 a month versus in hotel industry, whatever your top revenues are, your payments should be under 20 percent. But instead this property was doing 350 a month, mortgage payments should have been around 70k. And this property was (indecipherable word) issue. The payments were higher. And the economy in Northern California also started struggling back, I think, in '23 and '24. Not my property, but the full area. And I have talked to multiple owners. We have checked the STR reports. The economies have (indecipherable word) down. And then we started talking to Choice hoping, you know, this would be a new brand. It will be a new pick, you know. And then Choice agreed to refinance the property at lower interest rate so

payments would be lower. So Choice did refinance 2024 and there was more equity was infused. But even though interest rates went down, but the revenues dropped more. That's the main issue we started having at this property.

Q. Okay. You referenced STR report. Just for the benefit of everyone in the courtroom, what are those?

A. That is Smith Travel Report done by third party from London. They do across U.S. and other cities. It's -- they monitor each property, each hotel in U.S. how they're performing (indecipherable word), so then we can get the report. We check how the -- which city and what area in particular, how (indecipherable word) are doing. That's STR Report.

Q. Okay. All right. When this bankruptcy was filed, who was debtor's counsel at that time?

A. Joyce Lindauer.

Q. Okay. And then you understand that our firm was asked to substitute in as debtor's counsel?

A. Yes.

Q. Okay. What do you understand -- at the time of the filing of the bankruptcy, what is the debtor's obligation in a Chapter 11 to its creditors, to its shareholders, member interests?

A. To the creditors after the bankruptcy is filed.

Q. Okay. Do you understand that the debtor in

possession has a fiduciary role?

A. Yes.

Q. Okay. And who do they owe that fiduciary role to?

A. Larry.

Q. I'm sorry?

A. I'm sorry. Can you repeat your question?

Q. The debtor in possession, the debtor has a fiduciary role. Who do they owe that fiduciary to?

A. To the creditors.

Q. Okay. Who is Ghazal Abbas?

A. She's a (indecipherable word). I asked her help last year in 2025 to help us and just focus on this property so we can maintain, you know, get more revenue in and focus more on the operations side. So --

Q. What was her -- what was to be her relationship to the debtor? What was her role?

A. Manager. She was coming as a manager helping to run the property and oversee. I was busy with other properties because I was having issue with all the locations for Park Inn and the revenues were being dropped. So as soon as she started her health really went bad and --

Q. How quickly after you put her on did her health start to fail?

A. Like she didn't perform any duties because of her health. We did a couple of three weeks she was down. As of

today she -- I did went to her house multiple times. She is on bed rest. She needs help even to go to restroom and bed and all that stuff. She has a full-time caretaker.

Q. So did you continue to fulfill the obligations of a manager?

A. She did not do anything. I continued, yes.

Q. Okay. Why did you decide to engage the services of Larry Williams to handle this reorganization?

A. As I said, I was involved and busy with other properties and Larry has experience in this one. So Larry can handle day-to-day matters with the Chapter 11. And he has -- he has done and he's doing other owners, so he has more experience and I thought he can help in this matter.

Q. Okay. There should be an exhibit binder in front of you with the debtor's exhibits. They have letters. Can you find that?

A. There's two binders, which one?

Q. It should be debtor's with letters, A, B, C, D. It could be on the corner here.

MR. STANFORD: May I approach, Your Honor?

THE COURT: You may.

Q. Okay. If you would turn to Exhibit S, as in Sam.

A. Yes.

Q. And how is that document titled?

A. Owner's representation agreement.

Q. And is this the agreement that you entered into with Mr. Williams to fulfill his duties as debtor representative?
A. Yes.
Q. Okay. The first paragraph, who is defined as owner?
A. D San Jose, LLC.
Q. Okay. So owner doesn't refer to you, it refers to the debtor LLC?
A. Right.
Q. Okay. Thank you. You can close that up.
So have you agreed that the operational and bankruptcy related decisions of the debtor are to be made by Mr. Williams and the new management company, American Hospitality?
A. Yes.
Q. Okay. And they both are allowed to consult with counsel in making decisions?
A. Yes.
Q. Well, let me rephrase that. Mr. Williams is allowed to consult with counsel to make decisions?
A. I'm sorry, I'm having a little hard hearing --
Q. Okay. Mr. Williams may consult with legal counsel in making his business decisions for the debtor?
A. Yes.

Q. Okay. And you're okay with that?
A. Yes.
Q. Okay. Even if some of his decisions may not be consistent with your desires?
A. Yes, whatever for the debtor.
Q. Okay. Choice pointed to some omissions in the original bankruptcy schedules and statement of financial affairs, including affiliate transactions. How did those omissions come about, from your perspective?
A. Originally when Joyce Lindauer filed Chapter 11, I think they were overlooked. With your law firm it was amended and then it was filed properly.
Q. Okay. And you understand why the debtor amended the schedules, correct?
A. There was information missing on those.
Q. Right. Okay. Who is Underground Lending?
A. I took a loan from Underground Lending on other properties. And they wanted to list D San Jose as additional renter on the loan docs.
Q. Okay. And the -- you understand that Underground Lending has asserted a claim against this debtor?
A. Yes.
Q. Okay. Does Underground Lending have a lien on the property?
A. No, they don't.

Q. Okay. Did you investigate that?
A. I did through a title company.
Q. Okay. And what was your conclusion?
A. They don't have a lien on the property.
Q. Okay. If you would open up again the binder for Debtor's Exhibit T, as in Tom.
Are you there?
A. Yes.
Q. Okay. And is that the title report that you obtained?
A. Yes.
Q. You can flip through the pages, if you need to.
A. Yes.
Q. Okay. And after reading the title report you came to the conclusion that Underground Lending does not have a secured claim against the property; is that correct?
A. Correct.
Q. Okay.
THE COURT: Where is this conclusion?
MR. STANFORD: He came to the conclusion after reading the title report, which is Debtor's Exhibit T.
THE COURT: Okay. Is his conclusion --
MR. STANFORD: It's his conclusion after reading the title report.
THE COURT: And the relevance of his

conclusion is what?
MR. STANFORD: There was a series of questions earlier to Mr. Williams that Underground Lending should be listed as a secured claim on Schedule D of the schedules. And we're showing that they should be listed as an unsecured claim and disputed.
THE COURT: Okay.
MR. STANFORD: And that an investigation was made to reach that conclusion.
Q. Okay. Do you understand the reason to remove Galaxy Management as manager of the hotel?
A. Yes.
Q. Okay. And do you support that decision?
A. Yes.
Q. Okay. Do you have any -- do you or Galaxy have an relationship with American Hospitality Services?
A. No.
Q. No relatives?
A. No.
Q. No trading of business or anything?
A. No.
Q. Okay. Did you make yourself available for a deposition by Choice Hotel?
A. Yes.
Q. Okay. Do you recall about when that was?

A. December 9th.
Q. Okay. You're aware of the inter-affiliate transfers that this debtor participated in over time?
A. Yes.
Q. Okay. What was the reason for those type of transfers?
A. When we bought the property, as I said earlier, interest rate went up, payment almost went to, between the two loans, close to 300,000 a month. And the hotel was not supporting the mortgage payment, payroll. There was not enough revenues to cover everything, so we had -- we had to go and take a high interest loan. That was not beneficial to the property, so other properties that I have support it to transfer and make payroll, make mortgage payment and whatever was necessary to keep the lights on.
Q. So the debtor borrowed some money from the other affiliates?
A. Yes.
Q. And the debtor paid back some of those loans to those affiliates?
A. Yes. Some of them, not all of them.
Q. Okay. And you're aware of the schedule of those inter-affiliate transfers as being attached to the schedules now?
A. Yes.

Q. Okay. So did the debtor borrow more money or loan out more money?
A. Borrowed more. Total it was around 7 million came in and 3 million went out, so close to -- the difference was borrow more money.
Q. Okay. You're aware of the Chapter 11 plan the debtor's filed in this case?
A. Yes.
Q. Okay. And are you aware that those inter-affiliate transfers have been in a class subordinated to the unsecured creditors?
A. Yes.
Q. Okay. So they can't receive any distribution unless the unsecured creditors are paid in full?
A. Correct.
Q. And that makes it very likely they will never receive anything from this debtor?
A. Yes.
Q. Okay. And you're okay with that?
A. Yes.
Q. Okay. Do you believe a Chapter 11 Trustee is necessary to move this case forward?
A. No.
Q. Okay. And why not?
A. It's going to hurt more of asset and the value and

employees for the -- for the debtor.
Q. Do you have confidence in Mr. Williams to shepherd this case through a Chapter 11 bankruptcy?
A. Yes.
Q. And he has your full commitment to be a fiduciary to the creditors in this case?
A. Yes.
Q. And not to yourself?
A. Yes.
Q. Okay. Would shutting down this hotel, even for a short period of time, hurt its value?
A. 100 percent.
Q. Okay. And why is that?
A. Because the value for the hotel is measured by NOI, operating revenue. If you shut down that that's going to, you know, revenue should be not there and then NOI would drop. And then also it has been really challenging after COVID in California for employees. We had very hard time retaining employees. So when you shut down, you let employees go and bringing them back will be -- it's a big hotel, 204 rooms. You need a lot of housekeepers, two front desk system, manager to manage those guys. It would be very difficult to bring them back.
Q. So you understand that you need authorization to use cash collateral?

A. Yes.
Q. And you understand that authorization can come from Choice Hotels or it can come from the Court?
MR. RAY: Objection, Your Honor, leading.
THE COURT: Sustained.
MR. STANFORD: Okay. I'll pass the witness, Your Honor.
THE COURT: Thank you.
Cross?

CROSS-EXAMINATION

BY MR. ALFANO:
Q. Good afternoon, Mr. Dhillon.
A. Good afternoon.
Q. With respect to the $21.7 million loan that Choice provided in 2024, you signed the loan documents for that transaction, correct?
A. Yes.
Q. And you also signed the pledge agreement for that transaction, right?
A. Yes.
Q. And you signed on behalf of Jose Motel, LLC, right?
A. Yes.
Q. You also signed it as a manager of D San Jose, LLC on the acknowledgement page, correct?
A. Yes.

Q. Okay. I'm going to ask you to please turn to Exhibit Number 41 for the Choice's Trustee motion exhibits.
MR. RAY: Your Honor, may I approach with exhibit binders?
THE COURT: Yes.
Which exhibit did you say, 41?
MR. ALFANO: Yes, 41, Your Honor.
THE COURT: Okay.
A. This is right after 40, right? After 41 is empty.
I have it.
Q. Okay. And you recognize this agreement?
A. Yes.
Q. Okay. And this is the agreement where Jose Motel, LLC pledged 100 percent of its equity interest in the debtor to Choice, correct?
A. Yes.
Q. And you executed this agreement on behalf of Jose Motel, LLC, right?
A. Yes.
Q. And page 1, recital C represents that pledgor owns 100 percent of the outstanding equity in the real property owner, right?
A. Yes.
Q. In other words, that's a representation that Jose Motel, LLC owns 100 percent of the interest in the debtor,

correct?
A. Not actually. When we did -- when I sent the documents to Choice, we sent them D San Jose, LLC documents. And also we emailed all the documents to Choice, they prepared franchise agreement. And I talked to the legal department, I don't remember the name, and also Choice representative. We also told them when we bought the hotel the lender at that time in 2022 made us open a new LLC under Jose and we have two LLCs. So we are sharing both of them with you guys. But the operations of the hotel and the bank accounts, everything is being ran under D San Jose. Jose Motel don't have any bank account or we're not running very efficient since we bought the property in 2022.
And back in 2022 when we got the franchise agreement, even those two LLCs were open, G6 acknowledged it and gave us a franchise agreement under D San Jose, LLC and Choice Hotels did same thing. They gave us 20 year franchise agreement under D San Jose, LLC. That's what the acknowledgment was done and then we got the franchise agreement under that. And this was additional LLCs we had. And Choice didn't want it, but we offered -- it was open in '22 so Choice said, we want pledge that. And we said, okay, whatever you want. We signed all the documents as Choice wanted.
Q. So the document that's in front of you, Exhibit Number 41, that document represents that Jose Motel, LLC owns

100 percent of the interest in the debtor, right?
A. So I'm not a --
Q. Mr. Dhillon, it's a yes or no question. Does it represent that Jose Motel, LLC owns 100 percent interest in the debtor?
A. See, that's the part I also don't understand because when we bought the property --
THE COURT: Okay. Can I stop both of you?
Is this exhibit admitted?
MR. ALFANO: Yes.
THE COURT: It says what it says, right?
MR. ALFANO: Yes.
THE COURT: And it represents -- it has a representation in the recitals?
MR. ALFANO: Correct.
THE COURT: So what does it add to have him say yes or no it's in there?
MR. ALFANO: Well, he's representing something different, I think.
THE COURT: Well, that's a point you can make. But asking him what this document says doesn't add anything to the evidentiary value, right? Am I missing something?
MR. ALFANO: Okay.
Q. So the representation that you're making on the record about ownership in the debtor is different than what

this document says, correct?
A. In 2024 --
THE COURT: The answer is a yes -- the question is a yes or no question. Yes or no?
THE WITNESS: Ma'am, it is confusing because we had given both LLCs to Choice and they took one and gave me a franchise agreement on other one. They made me sign this document, so I don't know.
THE COURT: Again, the question is a yes or no question. The question is, does your position today, is that consistent with what you said in Exhibit 41, paragraph C?
THE WITNESS: No, ma'am.
THE COURT: Yes or no?
THE WITNESS: No.
THE COURT: Okay.
You may continue.
Q. Okay. I want you to turn to Choice's Exhibit 4.
One second, sorry.
I apologize, Mr. Dhillon. Can you turn back to 41 for a second? The last page of that exhibit.
Is that your signature?
A. Yes.
Q. Okay. Now you can move on to Exhibit Number 4.
Exhibit Number 4 is the first amendment to the operating agreement for D San Jose, LLC. Do you see that?

A. Yes, I see that.
Q. And this document identifies Jose Motel, LLC as the sole member; is that right?
A. Yes, I see that.
Q. It also references an assignment with respect to its 100 percent membership interest, correct?
A. Yes.
Q. Okay. Now I want you to return -- I want you to turn to Exhibit Number 13, which is the original statement of financial affairs.
This document was signed under penalty of perjury, correct?
A. Yes.
Q. And you understand what that means?
A. Yes. You are signing this document that everything is truth in there.
Q. Okay. And can you please turn to part 28 of the statements? That's on page 11.
That lists Jose Motel, LLC as the owner of the debtor, correct?
A. That's what it says.
Q. Okay. Now I'd like you to turn to Exhibit 15, which is the amended SOFAs.
A. Yes.
Q. You understand that this was also filed under

penalty of perjury, correct?
A. Yes.
Q. And this was filed on December 30th of 2025?
A. Yes.
Q. And question 28 on the SOFAs, that lists you and Amandeep Dhillon, your wife, as 50 percent owners in the debtor, correct?
A. What page that is on?
Q. That's page 12.
A. Yes.
Q. And that's different from what the original statements said, right?
A. It is. It is different.
Q. And is that different from what the pledge agreement said?
A. It is different from the pledge agreement, yes.
Q. And is that different from what the operating agreement said?
A. Yes.
Q. Okay. Sticking with Exhibit Number 15, question number 29, within one year before the filing of the case did the debtor have any officers, directors, members in control or other shareholders? There's a Mody, Bhanot, Ghelani Holdings, and Sudha Potia and Vijay Mathur listed, correct?
A. Correct.

Q. And that's different from what the original SOFAs said on question number 29, correct?
A. Yes.
Q. Okay. Now I'd like you to turn to Exhibit Number 5.
A. Yes, I have it.
Q. Do you recognize this document?
A. Yes.
Q. It's dated July 24, 2024, right?
A. Yes.
Q. And it's the amended and restated operating agreement of the debtor, correct?
A. Yes. That says on the top.
Q. Okay. And if you turn to the last page of that document, is that your signature?
A. Yes.
Q. And it says, Jose Motel, LLC is the sole member and manager of the debtor; is that correct?
A. Correct.
Q. And that's different from what's on the amended statements, correct?
A. Yes.
Q. I'd like you to turn to Exhibit Number 18.
A. Yes, I have it.
Q. Exhibit Number 18 is the 2024 tax returns for D San

Jose, LLC, right?
A. Yes.
Q. Okay. And if you turn to page 13.
THE COURT: Okay. Where is it labeled page 13?
MR. ALFANO: I'm trying to find that myself. I apologize, Your Honor. One second.
Okay. So at the top of the page I see page number 6 in the right -- upper right-hand corner. If you go to the following page, that will be the page I will ask questions about next. It is not labeled from what I can see.
THE COURT: It's the one that's titled Schedule K-1, 2024?
MR. ALFANO: That's correct.
THE COURT: Okay.
A. I'm here.
Q. Okay. And information about the partner, that's your wife listed there, right?
A. Yes.
Q. And it shows a 12 percent ownership interest in the debtor, correct?
A. Yes.
Q. And that's different from what the original and amended statements say now, correct?
A. Yes.

Q. The next K-1, six pages later. That lists you as having a 12 percent interest in the debtor, correct?

A. Yes.

Q. And that's different from what the statements say filed in this case?

A. Yes.

Q. And that's different from what the Choice loan documents say, correct?

A. There are a lot of loan documents from Choice. They have D San Jose different because the franchise agreement was differently done for D San Jose.

Q. Are they -- are these tax forms different in terms of the ownership in the debtor than what the pledge agreement and the other loan documents say?

A. No, sir. What we have done is operations for D San Jose are ran under D San Jose, LLC, not under the Jose LLC. That's how we used it. We did inform Choice at that time. And that's why we got the franchise agreement from Choice. And there are a lot of loan docs under D San Jose, as well. All of them, I don't know if you got it or not.

Q. Okay. Just to expedite this a bit. The 2024 tax returns also say that Milan Mody owns 30 percent in the debtor, correct?

A. Yes.

Q. Sanjeev Bhanot, 5 percent ownership in the debtor,

correct?
A. Correct.
Q. Vijay Mathur, 5 percent ownership in the debtor, correct?
A. Yes.
Q. And these 2024 K-1s do not show Jose Motel, LLC as 100 percent owner in the debtor, correct?
A. No, it does not.
Q. And that's different from these statements that were filed in the case as well as the pledge, correct?
A. Yeah. But, again, operations were under D San Jose.
Q. Now can you turn back just a few pages to page 6 of the 2024 returns?
A. Yes.
Q. Schedule M-2, line 2 --
THE COURT: Okay. Where are -- what page?
MR. ALFANO: Page 6, if you go to the bottom it's title Schedule M-2 analysis of partner's capital accounts.
THE COURT: Okay.
A. Yes.
Q. Line 2 lists $2.985 million contributed from partners, correct?
A. Correct.

Q. And as you sit here today you have -- you cannot identify any transfers in 2024 from the partners listed in the K-1s to this debtor in any amount?
A. No. What it is, the AB account that counsel show you, in 2024 when Choice was refinancing the property, the loan amount payoff was close to 26 million. Choice only gave 21.7. So at that time more -- at that time more money was contributed from Choice fee money into the property. You'll see the wire going from the AB Bank down to hotel company to close Choice transaction because Choice shortened the loan amount. So that was close to 2.6, 2.7 -- I don't know the exact amount -- that was wired in to pay off the old loans and close the new loan with Choice Hotels.
Q. As you sit here today you cannot identify contributions in 2024 from those partners into the debtor's accounts, can you?
A. Not from partners, but money went -- money was contributed into the LLC to pay down the loans and refinance with Choice.
Q. Also on page 6 of the 2024 tax returns, line 7-A, loans to partners. Is there any amount listed there?
A. Under M-2?
Q. No. It's about 25 percent down that -- down the page, line 7-A. The title is Schedule L.
A. Loans to partners. Yeah, there's nothing listed

there.

Q. There's nothing listed there.

And line 19-A, loans from partners, is there any amount listed there?

A. No.

Q. And that's inconsistent with the statements that have been filed in this case that purport to show approximately $7 million in loans.

A. Sir, I'm not a CPA. I don't prepare the tax returns. How he did it, I don't know. But what actual happened in the bank account that we have showed you, money coming in. And then if there was shortfall, we put the money in, we showed that. We have given every bank account statement to you -- to Choice Hotels when it was requested. And we have a ledger that money was went in. The bank statement has a backup. And when money was transferred. And we sent a separate list for them.

MR. ALFANO: Objection, Your Honor. That was not responsive to the question.

THE COURT: Sustained.

MR. STANFORD: Your Honor, I'm going to object to the mischaracterization of the prior testimony. The prior testimony dealt with affiliates not these partners.

THE COURT: Sustained.

Q. Mr. Dhillon, line 19-A says, Loans from partners or

persons related to partners, correct?
A. I read that, yes.
Q. And the amount listed there is zero, correct?
A. Yes. There's no amount listed there.
Q. Okay. I would like you to go to the Debtor's Exhibit S, as in snake.
A. Yes.
Q. Go to the second page, please.
That's your signature there, right?
A. Yes.
Q. And is this agreement dated October 22nd, 2025?
A. I don't see a date on the back there. There's a signature. There's no date in the back.
Q. Turn to the front page, please.
It's dated October 22nd, 2025, right? But this agreement wasn't --
THE COURT: It's not. It says it's entered as of October 22nd, right? It doesn't say it's dated October 22, 2025, right?
MR. ALFANO: Yes.
THE COURT: Okay.
Q. Was this signed on October 22nd, 2025?
A. That's what I remember, yes.
Q. Do you recall your testimony during your deposition when you said that there was no written agreement with

Mr. Williams?
A. I don't recall it.
Q. Do you recall when Mr. Williams testified during his deposition that he had no written agreement yet?
A. I was not there present at that time.
Q. Where were you when you signed this agreement?
A. I don't sitting here remember. Usually I'm in the office in Frisco. And some time I do travel too.
Q. And do you know where Mr. Williams was when he signed this agreement?
A. He was not in Frisco, as far as I remember, because he lives in Tampa, Florida. So he works from there most of the time.
Q. Okay. Just one second.
And to your knowledge there hasn't been any application filed in this bankruptcy case to employ Mr. Williams, right?
A. I'm not aware. (Indecipherable word) to handle -- I don't handle that part.
Q. Okay. With respect to the AB Bank account, you haven't -- or the debtor hasn't produced bank accounts, those bank accounts to Choice, correct?
A. No. I think as -- like I said earlier. Counsel has it and it will be produced per the counsel.
Q. Okay. Just one or two more questions.
The -- on the 2024 tax returns, your Schedule K-1, it

says, Capital contributed $358,000 -- $358,000 approximately.

A. Okay.

Q. Does that sound right?

A. So, again, I'm not a CPA and I don't know how he does tax returns. All I know in 2024 there was close to 2.8 million contributed to the LLC to reduce the debt so we could refinance Choice Hotel loan, because Choice did not give enough loan amount to pay all loans we had on the property. So how he characterized, I'm not a CPA how he does it. I don't know.

Q. And as you're sitting here, can you identify a cash contribution from you of $358,000 to this debtor in 2024?

A. You will see on the AB Bank accounts close to 2.6 million was wired in and then it was wired out to a title company to close the loan, 2.6 or 2 -- I don't remember the exact amount. But we have a closing statement that will reflect same amount went to the title company and then we closed the Choice Hotel loan. Again, it was not enough loan. So I -- that money did go to D San Jose account, then wired to title company to close that Choice Hotel loan in 2024.

Q. So yes or no, as you're sitting here today, can you identify your cash contribution in 2024 to the debtor for $358,000?

MR. STANFORD: Your Honor, I believe that's been asked and answered.

THE COURT: Sustained.

Q. So, Mr. Dhillon, regular debt service payments to Choice under the note is about $168,000 per month, correct?

A. Correct.

Q. And the debtor can't afford to make those payments, right?

A. Since filing of Chapter 11 I think it was 80k plus extra that has been paid. And before filing Chapter 11 -- that's the reason we are in Chapter 11 because it cannot -- cannot be paid because Park Inn was not producing enough revenue to support the loan payment. There was not enough revenue being produced or help from Choice Hotels. Since we have changed the flag to Super 8 and Motel 6, we have two different agents on the property. The revenues are going up. We are seeing a difference. And after some time I think it will be able to perform better than Park Inn flag.

Q. So the answer to that question is, no, right? As it -- as of today, the debtor cannot afford to make regular debt service payments to Choice?

A. What I know is under cash collateral 80,000 was approved. That is being paid. And I think there's extra being paid. But that money was approved under cash collateral.

Q. And you're aware that the debtor has -- has filed a plan within the last two days, right?

A. Yes.
Q. And what are the proposed debt service payments to Choice under that plan?
A. I think close to 128, close to 130. Don't have the exact, but around that number.
Q. And that's less than the 168 that's currently required under the loan?
A. Yes.
Q. And that's based on the set of projections that the professionals for the debtor have prepared, right?
A. Well, I believe when you're talking about 168 payment a month, it is based on 9 percent interest rate. And the reason why interest rates have gone down, the current Fed rates are close to 7 percent. So with that -- that 2 percent drop, payments do go down from 168. Because that is the -- banks are giving us 6.5, 6.75, to 7 percent rate.
Q. Okay.
MR. ALFANO: No further questions.
THE COURT: Redirect?
MR. STANFORD: I believe there are some additional cross.

CROSS-EXAMINATION

BY MR. CASTILLO:
Q. Mr. Dhillon, I'm going to ask you about that Jose Motel, LLC. What is that company?

A. When we got -- we bought the property in 2022, we took out a loan from Stabless, that fund, and another LLC, DM Funding. DM Funding required to have a separate LLC. while the loan remain on the place. It was a standstill inactivity on that LLC.

Q. Who owns Jose Motel, LLC?

A. I think it's me. I own it. I have documents (indecipherable word).

Q. Does Jose Motel, LLC have any operations?

A. No. Zero operations.

Q. Has it ever had any operations?

A. No.

Q. Why did you sign the documents and exchange them with Choice Motel -- Choice that were discussed earlier about Jose Motel?

A. We disclosed to Choice all the LLC that we open when we bought the property. And we also -- we told Choice that we are doing business under D San Jose, all the bank accounts. And (indecipherable two words) -- even Choice produced (indecipherable two words) under D San Jose. That's the operation. And since that LLC was there from starting when we bought the property, they wanted to sign. And we were desperate to sign, take the loan and refinance the old loan, so we just signed whatever documents they give us.

Q. So Choice went through a pledge agreement and a

first amended operating agreement. Do you recall going through that testimony just a bit ago?

A. Yes.

Q. Were those the only two documents that you exchanged with Choice at the time of your loan?

A. Oh, no. There were a lot of documents.

MR. CASTILLO: Your Honor, may I approach the witness?

THE COURT: You may.

MR. RAY: Your Honor, I object to these exhibits. I don't know where they came from.

THE COURT: Well, he hasn't offered anything yet, so why don't we wait until if and when he does offer them, okay. I don't even know what, quote/unquote, these exhibits are.

MR. CASTILLO: Yes, Your Honor. And these -- what I've handed to the witness is Galaxy-M through O. What I'm going to do is offer these as rebuttal exhibits concerning the Jose Motel issue.

THE COURT: Okay. Hold on.

MR. CASTILLO: Yes.

THE COURT: Galaxy-M through O, they've been marked for identification as Galaxy-M through O. They have not yet been -- they were not yet offered before now, right?

MR. CASTILLO: Correct, Your Honor.

THE COURT: Okay. And you're offering them as rebuttal exhibits?

MR. CASTILLO: Yes, Your Honor. The reason being that when Choice Hotel was negotiating its deal with the debtor, numerous documents together formed one agreement. It wasn't just a single pledge agreement or a single first amended operating agreement. There were a lot of documents that created one agreement. And at the time in May these exhibits will show that Choice Hotel knew that Mr. Dhillon and Mrs. Dhillon were the members of the debtor. And Exhibit O will show, in fact, Choice Hotel's own franchise agreement has an Exhibit A that says that Mr. Dhillon and Mrs. Dhillon are the 50/50 -- 51/49, the only owners and members of the debtor. And that this hotel -- Jose -- excuse me, Jose Motel, LLC was just additional documents. These documents will rebut the inference or implication that Choice is making to say they didn't know it was the Dhillon's.

THE COURT: Okay.

MR. RAY: Your Honor, we object to the admission of these. They lack authentication. One of them is incomplete.

THE COURT: Well, I'm not going to admit them yet. You -- but we'll see if the evidence will support it.

So, Mr. -- so for right now, we've marked them as identification Galaxy-M through O.

You may proceed, Mr. --

MR. CASTILLO: Thank you, Your Honor. I'll try to prove them up.

Q. So, Mr. Dhillon, will you look at what's been marked as Galaxy-M? You'll see a from Cindy Sillivant. Is that the same Ms. Sillivant that you referenced earlier in your testimony?

A. Yes.

Q. And who is that?

A. She's an assistant at the office.

Q. Okay. And it's sent to a Casey Gemunder and an Alyson Markovich, who are they?

A. Casey Gemunder works for Choice. Alyson was my attorney closing the company with Choice.

Q. Okay. And you see the date of May 28, 2024. What was going on at that time?

A. We were doing formation documents, exchanging Choice -- there was a list of documents. So we were giving them the LLC documents and everything they required.

Q. And your name is on here as the CC. Did you actually receive this email yourself?

A. Yes.

Q. Is this a true and accurate copy of the email sent by Ms. Sillivant to Choice and yourself on May 28, 2024?

A. It is.

Q. You'll see there's attachments to this email.
A. Yes.
Q. And one of them says, Operating agreement. Do you see operating agreement D San Jose, LLC? I'd like you to flip to Exhibit -- or what's marked as Exhibit Galaxy-N. It says, Operating agreements, D San Jose, LLC at the top.
A. Yes.
Q. Okay. If you'll flip through this, please, just briefly. And you'll see at the page 11 you'll see it's got your name and Ms. Amandeep Dhillon's names and signatures there, correct?
A. That is correct.
Q. And you see it says, Members for you and Ms. Dhillon; do you see that part?
A. Yes. 49/51.
Q. Okay. Now, if you -- as you look at this, is this an operating agreement that was attached to the email that Ms. Sillivant sent to Choice and yourself?
A. Yes.
Q. It's a true and correct copy of that document?
A. It is true and correct copy.
Q. And if you look at Section 3.1 on page 4 it says -- the members are listed on Exhibit A. So flip me to the last page of this Exhibit N. And do you see an Exhibit A, it's got yourself and Ms. Amandeep as the sole members of the

debtor?
A. Under the operating agreement?
Q. Yes, sir, on the back of it.
A. Yes.
Q. Well, now last -- I wanted to look at what's been marked as Exhibit Galaxy-O. Do you see this is dated June 23, 2024 and then what follows is two pages in it says, Choice Hotels International, Inc., franchise agreement June 28, 2024? Do you see that, sir?
A. Yes.
Q. As you flip -- if you will, please flip through this document to see if you're familiar with it.
A. Yes. This is a franchise agreement we entered in San Jose property with Choice Hotels.
Q. Okay.
A. The only -- this is only franchise agreement that was signed.
Q. Okay. Now as you flip through this document, you'll see at page 35 of what's been marked as Galaxy Exhibit -- Galaxy-O, turn to page 35. It says, Entity ownership breakdown. And it's got yourself and Ms. Amandeep Dhillon. And you see some other signatures on this document. Is this a true and correct copy of --
A. Can you show me the 35? I'm so sorry.
Q. Page 35, Schedule A, entity ownership breakdown.

A. There's no page listed. I'm sorry.
Q. On the very bottom, middle.
A. 35, yes, I see it. I'm sorry. 34 and 35, Schedule A, entity ownership, yes.
Q. Okay. So as you look at these signatures and -- throughout this document, is this a true and correct copy of the franchise agreement that you agreed to with Choice Hotels?
A. Yes. And it's also signed by Choice Hotel counsel, general counsel and by me. And it lists ownership on the next page, Amandeep and Jagmohan Dhillon, 51 and 49 percent.
Q. Are these three documents, M, N, and O documents that are regularly kept in the ordinary course of business of Galaxy and the debtor?
A. Yes. Not just -- all of the 32 locations, yes, same franchise agreements and operating, yeah, they're kept in the server.
Q. And is Ms. Sillivant a custodian of documents for Galaxy?
A. She has access to those documents, plus other employees, also.
Q. Okay. Is she a custodian that keeps those documents regularly?
A. Yes.
Q. Are you a custodian that keeps those documents

regularly in the ordinary course of business?
A. Yes. She (indecipherable word) them. I know they're there.
Q. Were these documents created at the time that these dates are shown in these documents?
A. Choice sent this to us. We did not create this. Choice created it and sent it to us.
Q. At the time of the dates in these documents?
A. Yes. And they were DocuSigns, most of them.
MR. CASTILLO: Your Honor, I'd offer Rebuttal Exhibit Galaxy-M through O to rebut the inference, or implication, rather, that -- concerning Jose Motel, LLC being the member that Choice Hotels believed owing the debtor.
MR. RAY: Your Honor, I object. Exhibit M is incomplete. It is also in-authentic -- not authenticated. And it is missing the attached. It literally says, Zoning report attached. It's not attached.
THE COURT: Okay.
MR. RAY: As for O, O is a matter of -- to the extent there's a contract attached, the contract is a matter of independent legal significance. So we do not object to O, except for the fact that it is a surprise. And with regard to N, under the rule of optional completeness, this is the original March operating agreement. The amended operating agreement --

THE COURT: Okay. Exhibit M?

MR. RAY: N, as in Nancy.

THE COURT: Nancy, uh-huh.

MR. RAY: N, as in Nancy is a March 23rd operating agreement. But Exhibit 4 is the amendment to the operating agreement signed in May.

THE COURT: Exhibit 4?

MR. RAY: Exhibit 4 in the Trustee motion binder of -- of Choice.

THE COURT: Okay. Choice's Exhibit 4 --

MR. RAY: Is a first amendment. So this one is a March operating agreement, but the first amendment is already in evidence. So I would need to cross the witness again on the -- on how one became the other.

MR. CASTILLO: And we would stipulate that this is the original, but Choice's document was an amendment.

THE COURT: Right, okay. So Exhibits N and O are admitted as rebuttal only. Exhibit M is admitted subject to the debtor -- to Mr. Castillo completing that document. So it needs to be a complete document, okay?

MR. CASTILLO: Understood.

THE COURT: So all of the attachments need to be submitted. And the rebuttal exhibits are only admitted as rebuttal to the issue of whether Choice has reason to know the -- the interest of the members. Now I understand you're

going to be arguing that after this operating agreement that there was a change, okay. I understand that. But it's simply offered for the issue of Choice's knowledge, okay.
Now, what else?
MR. CASTILLO: I'm not going to read from the document. We can mention it at closing. So I pass the witness. Thank you, Your Honor.
THE COURT: Thank you.
MR. RAY: I have three questions.
THE COURT: You may.

CROSS-EXAMINATION

BY MR. RAY:
Q. Mr. Dhillon --
MR. STANFORD: Your Honor, point of order. The cross-examination of my witness was done by Mr. Alfano. So if Mr. -- I'm always interested to hear what Mr. Ray has to say --
THE COURT: Mr. Ray -- Mr. Ray.
MR. STANFORD: I'm always interested to hear what Mr. Ray has to say, but he did not conduct the cross-examination of this witness at the time he was presented. He should at least ask for leave of the Court if he's going to step in and tag team my witness.
THE COURT: Well, when he asks I'm going to say, yes. So, you know, that's kind of where we are.

MR. STANFORD: Okay. Thank you.
THE COURT: So, Mr. Ray, you may proceed.
Q. So, Mr. Dhillon, is it 51 percent that you own or 50 percent?
A. This document says 51 percent. And matches with the franchise agreement.
Q. And the schedules say 50 percent, right?
A. Yeah. This was 2024. This document when we sent to Choice was 2024. The schedules were done in 2025.
Q. When did the 1 percent move?
A. It's been a year and a half. I think 15, 16 months after this -- the schedules were filled.
Q. So I have your story straight. You own 51 percent June of 2024. You still own 51 percent, regardless of what was said in the documents. And then the bankruptcy was filed and then you amended to say 50/50 percent. Is that about right?
A. Yes.
Q. Okay. And there was no one else that owned it in the middle, just you and your wife and still you and your wife, right?
A. On the -- for the operating agreement, yes.
Q. I'm sorry. What did you say?
A. On the operating agreement, that's what it says, correct.

Q. On the what? On the operating agreement?

THE COURT: The operating agreement.

A. Correct.

Q. Can you turn to Trustee's Exhibit 19 -- or the Trustee Motion Exhibit 19?

A. Which folder is that?

Q. It's in the big binder.

MR. RAY: I can assist the witness, Your Honor, if he needs it.

Q. It should be that big binder that says, Trustee motion.

A. Yes.

THE COURT: Are you talking about Exhibit 19 of your Trustee motion?

MR. RAY: Yes, Your Honor.

THE COURT: Okay.

Q. First of all, flip through Exhibit 19. These are minutes that you have produced to us of D San Jose, LLC. It says, D San Jose, LLC meeting minutes.

Is your signature on every one of these minutes?

A. Yes.

Q. Okay. So I just asked you 30 seconds ago if the number was always 50 percent, 51 percent, and it still is, and there was no one in the middle and you said, yes. The first talks about admission of a silent owner, right?

A. Yes.

Q. 25 percent. Who's that -- when was this document actually signed?

A. I don't remember. This -- Cindy does the meeting minutes and we have meeting with the partners on this LLC. So she does that and then makes me sign those documents. So I don't recall when --

Q. Was it in the last --

THE COURT: Hold on. Hold on. Hold on. Hold on.

Which page -- are you talking about the second page?

MR. RAY: Yes. The very first page of Exhibit 19 that's Bate's labeled Galaxy 242748.

THE COURT: Right. There's no signature on that page. It's on the second page, right?

MR. RAY: Yes, Your Honor.

THE COURT: Okay. All right. But it says 23 percent, not 25 percent. So I wasn't sure where you got the 25 percent.

MR. RAY: I don't -- these are not my reading glasses, Your Honor, I apologize.

THE COURT: You're old enough to need reading glasses, too?

MR. RAY: Your Honor, I get an AARP discount.

THE COURT: Okay.

MR. RAY: I remember Casey Kasem. That's how old I am.
Q. Mr. Dhillon, it says 23 percent silent owner, right?
A. Yes. I see that, yes.
Q. And you signed it. And was it in the last six months that you signed this?
A. Again, no. I remember when it was signed. But I think in the meeting minutes Cindy takes them and she prepares them and sign it right off, but I don't remember what date.
Q. Let's look at 2752.
THE COURT: Okay. Hang on just a second.
When did this meeting take place?
THE WITNESS: Ma'am, end of the year the partners --
THE COURT: End of what year?
THE WITNESS: Every year.
THE COURT: So this particular meeting took place when? What year? When?
THE WITNESS: I don't see a date.
THE COURT: I don't either. Now you know why I'm asking. Okay. Keep going.
Q. Could you turn to the page Bate's labeled 2756?
This is a meeting minutes -- 2757 is your signature,

correct?
A. One second.
Yes, I see that.
Q. Okay. This says that the ownership of Mr. Mody has increased to -- in 2023 by 1 percent, right?
A. Yes, I see that.
Q. When did you sign this document?
A. Again, I don't sitting here recall. I mean, I signed a lot of documents. I don't remember what date.
Q. Was it in 2023?
A. So each year we have meeting and Cindy makes me sign those documents after that.
Q. Who makes you sign the documents?
A. Cindy. She prepares them and she brings to me. I sign those documents then.
Q. So in December of 2023, is that when you think you signed it?
A. I don't know. I can't even remember.
Q. Can you turn to the page labeled Galaxy 2764?
A. You no doubt remember the testimony at the Section 341 Meeting, but I want to recap it and make sure we're on the same page about this document.
THE COURT: Where is 2764?
MR. RAY: It's Exhibit -- it says -- at the bottom right-hand corner it says, Galaxy --

THE COURT: Okay. Your pages on all of this stuff is out of order, so -- on the exhibits you handed up to the Court, just so you know.

MR. RAY: Oh, my goodness. You're right, Your Honor.

THE COURT: It goes from 63 to 42 to 5 -- to 42 to 43 to 58 to 59, 61, 60, 61, then to page 44, then to page 45. Now I found something that's marked page 66.

MR. RAY: 66 is fine, Your Honor. We can start with that.

Q. Are you looking at 2766? Can you turn to that page? And I can assist if you need me to.

It says, Meeting minutes of members of D San Jose, LLC, December 31, 2024.

A. I don't see 2766.

Q. It's about halfway through. I can find it, if you'd like.

It's 10 -- if you start at the back and go forward 10 pages.

A. 2769?

Q. 66.

Just keep going back.

MR. RAY: And we should have put these in Bate's order, Your Honor. I -- you are --

THE COURT: Well, apparently the record copy

is also out of order like that. It has a bunch of pages that are in whichever order they are.

MR. RAY: So they may be in alphabetical order. I don't know how we organized. I have no idea how this happened, Your Honor. I apologize.

THE COURT: I don't know. But I'm just telling you so you know why we're having trouble following your questions because the exhibits aren't in order.

Q. Mr. Dhillon, have you found that page yet?

A. Yes, 266.

Q. 2766.

A. 2766, I'm sorry.

Q. All right. Remember in the 341 Meeting we asked you about this. You didn't have a physical meeting in 2024. And there's no -- there was no written meeting. There was a phone call; is that right?

A. What I said on 341 Meeting that we have a not in-person meeting, but we call the partners every year and talk to them, what's happening. And then follow up. And when you asked for documents I said I had to go check. I don't remember that time.

Q. Okay. And then afterwards the -- you were able to produce these meeting minutes.

A. When I went back, yeah. There were in the -- Cindy had kept them in the office.

64

Q. When was this meeting held?
A. We -- I think there's a date on it. I don't remember. But Cindy usually keeps up with records for it. She handles the recordkeeping of the minutes.
Q. Was it held in 2024 or 2025?
A. Document said 31st, 2024. I think I remember talking to all the partners about the Park Inn situation we had going on. So they wanted to find out how it was going. And I told them we might looking to replace the flags with different entity from Park Inn.
Q. You don't know when the meeting was, do you, sir?
A. So I'm -- I know it was around that time. Exact day, I don't know. But Cindy has -- she has a better recollection than me. But she kept it and I signed the document.
Q. To be clear, who were the members at the meeting that you held? Who were those people?
A. The same people that listed -- Mr. Bhanot. His father-in-law. And then Dr. Mody and Plyush Ghelane.
Q. Anyone else?
A. I was there. And I think my wife was there. I don't remember.
Q. Anyone else?
A. Sudha usually. She's in the office, so she was -- she works there, so she was there, too.

Q. So your testimony is today that you had a unanimous meeting some time in late 2024, right?

A. We -- on this particular property, we do. And then sometime randomly I'll get a call from what's going on, where are you heading, and all of that stuff.

Q. Okay. And the meetings -- the members agreed that -- can you turn to page 2767, the next page?

What was going to happen to JAV Ghelani Holdings, LLC membership interest? What was going to happen to it?

A. What do you mean?

Q. JAV Ghelani Holdings' membership is cancelled, right?

A. Yes.

Q. All right. Then on the next page it says -- under ownership interest it say, The members acknowledge that JAV Ghelani Holdings' membership interest shall be handled as follows; transferred to remaining members.

Who's that?

A. What page -- you are still on 67?

Q. Yes.

A. Yes.

Q. Who's that?

A. So it would be me and Amandeep.

Q. Okay. So that's how you got your 50 percent ownership; is that right, because it was transferred

effective January 1 of 2025?

MR. STANFORD: Objection. I believe counsel meant 2024.

Q. December 31, 2024 is that when you got your membership interest, the 50 percent; is that right?

A. Yeah. That's what the document says, yes.

Q. And that's the truth, right? You got it -- you got it within a year of the bankruptcy, right?

A. No. These are nonworking owners. They are just -- they are doctors and other professionals. They are not active operation like running the property.

Q. I'm sorry, can you say that again? They weren't -- they weren't members or they were members?

A. No. What I'm saying is, they were not active role -- they were not running the property. They didn't have any management rights. Galaxy was managing the property.

Q. Okay. Okay. So -- but your testimony under oath today is that all of the meeting minutes that are Exhibit 19, those actually happened and they were real meetings, right?

A. Not in person. They were meetings over the phone, yes.

Q. So let's -- about JAV Ghelani Holdings, which is the one that we were just looking at. Did Mr. Ghelane or his entities, did he give you -- did he give the debtor money?

A. I think you guys have subpoenaed him and he has

produced documents. He did wire, I don't remember how much. I think close to 1.5, 1.4 million.
Q. Is there an account at AB Bank or -- sorry, American Bank of Dallas, is there an account there ending in 9047 that is a Galaxy Management account?
A. We do have a Galaxy Management account. I don't know the account number.
Q. Okay. And there's a separate account that's 1887 at American Bank that we learned about recently that hasn't been put on the schedules yet, right?
A. That was closed. We talked about earlier.
Q. And that other American account had over $3 million in it within the year preceding bankruptcy, right?
A. That was used for refinancing Choice Hotel debt, correct.
Q. Okay. So can you turn to Trustee's Exhibit -- of the Trustee Motion Exhibit 24? And turn to the last page.
Now this is the K-1 for D San Jose issued to JAV Ghelani Holdings, correct?
A. Yes.
Q. And it says $835,000 -- $835,952 was contributed as capital during 2024 from JAV Ghelani Holdings, correct?
A. Again, as I said earlier, the property was infused by 3 plus million. And I don't know -- I don't prepare the tax return, the CPA does. You're asking how he categorized

that amount.

Q. Okay. Well, let's -- let me ask you a different question, then. Do you control the Galaxy Management Company account?

A. I'm a signer on that, yes.

Q. Okay. Can you look at the second page of -- the third page, rather, of Exhibit 24?

You understand Mr. Ghelane responded to a subpoena and gave us these wires, right?

A. I believe so.

Q. Okay. So this shows in 2022 Mr. Ghelane gave $240,000 to an account under Galaxy Management's name, right?

A. I'm sorry. Yes. From DCU Banking -- or DCU is the Bank, yes.

Q. And then if you turn to the next page, another $190,000 December 23rd, 2022 to the same account?

A. Yes.

Q. And if you turn the page again, it looks like wire transfer to Galaxy Management of $570,000 December 2022, right?

A. Yes.

Q. There's no subscription agreement from JAV Ghelani Holdings, is there? There's no prospectus, is there?

A. I'm sorry. I'm not understanding what you -- what do you mean by that?

Q. Mr. -- the JAV Ghelani Holdings wired you -- wired Galaxy millions of dollars. Did you have -- did you issue a prospectus to get that money?

A. No. Mr. Ghelane's a long-time friend and he wanted to invest. And he got -- I think there are some documents and I don't remember. But he usually handles with attorneys how he does it.

Q. So you're handling money of JAV Ghelani Holdings as an investment?

A. No. He wanted to invest in the properties. And then we talked about it. He wired into Galaxy Management. He said, okay. I want to invest. And then we talked about it, what locations I have. And that he wanted to be part of the Jose property in California.

Q. Invest in all of the various properties, right?

A. No, sir. We -- when I -- we wired the money. Mr. Ghelane wired the money. I talked to -- he wanted to know which properties will I have, the locations. And he picked San Jose one, that he wanted to be part of that location.

Q. And is that -- he did other ones too, right?

A. No. He's not on any other entity, no.

Q. Oh, okay. So the first one that was 2022. The second, if you look at the exhibit it says 12 -- 2/21/2023, $300,000.

A. What -- what page is that?

Q. I'm looking at the page -- we just turned -- you were at 570. The next page is 2023, it's 300,000, right?

A. 240 then 570 then 300,000, yes.

Q. Right. Okay. That's a total -- let's do the math. Isn't that $1.3 million total?

A. I can do it again.

Q. 300, 570, 190, 240.

A. Yes.

Q. Okay. And he held an equity interest in some -- or he was some kind of silent investor through Galaxy, but he never sent the money to the debtor, did he?

A. No, sir. He wired the money to Galaxy, as you say on this record. And then he came to my office. And then he wanted -- he lives in Dallas Metroplex. He came to my office and he said, which entities I have? I showed him all the P&Ls, all the locations I have. And he wanted to be in San Jose because he owns a tech company and he goes a lot to San Jose. He goes, I'm there. I can stop by. And I like that area. So he wanted to be just partner. And he's not on any other -- any other entity.

Q. Okay. So let's look at general ledger. There it is. So let's look at Exhibit 25 real quick. Can you turn to Exhibit 25?

Do you see that?

A. Yes.
Q. Are these the loans that you were talking about that the debtor borrowed from -- just earlier you talked about borrowing and loans?
A. Yes.
Q. Okay. So these are actually loans and they always have been loans, right?
A. Other LLCs transferred their money to cover, again, payroll and all other stuff. And there was, yeah, there were loans to the company. But, again, they are sitting here today as attorney said that they're subordinating the creditors.
Q. But there's a class of creditors -- these are loans. These have not ever been anything but loans, correct?
A. Yeah. We have to keep the lights on. We have to keep going or we will (indecipherable two words).
Q. And these are not the investments of JAV Ghelani Holdings, these are loans from other entities, right?
A. The other entities that we transferred funds, yes.
Q. Right. And you know that because you're in control of Galaxy. You're in control of the entities that make the loans. And you're also taking in Mr. Ghelane's money. So you know these are loans and not equity investments, right?
A. No, sir. This is different -- it has listed the name of the entities and the date the money was deposited.

It's not saying that was from Mr. Ghelane to show their -- Mr. Ghelane's account money came in.

Q. Can you turn to Exhibit 20? Sorry, make it 21. Can you turn to Exhibit 21? Nope, I'm going to make you go back to 20. I've got to get my better glasses.

Can you look at Exhibit 20? Oh, my goodness, I need a magnifying glass.

THE COURT: Here you go.

MR. RAY: Thank you. May I approach, Your Honor?

THE COURT: I guess you wouldn't know, but this is not the first case where we've had tiny microscopic print on documents.

THE WITNESS: Can I get those glasses?

MR. CASTILLO: May I approach with some --

THE COURT: You may.

THE WITNESS: Too small to read.

THE COURT: Does that help?

Q. All right. So, sir, this is from your general ledger and it's dated as of December 2024. It was printed in the upper left-hand corner in December of 2025. It shows an account on the left-hand side that says AB Bank 1887. Do you see that, AB Bank 1887 on the left-hand side?

THE COURT: Okay. Are we talking about Exhibit 21 or 20?

MR. RAY: 20, Your Honor.
THE COURT: Okay.
A. Well, I don't -- where do you see that?
Q. It's on the left-hand side.
A. Okay, 1887, yes.
Q. And that's the account that we didn't know about until recently, right?
A. The account had been shut down, yes.
Q. And that's American Bank of Dallas; is that the account?
A. I believe, yes.
Q. And then this account it shows 1. -- it looks like $1.8 million coming in on July 26th, 2024, right?
A. Yes. All entries from 150 to 20,000 all came in.
Q. And it looks like a $2.2 million distribution is made on 8/6, August 6th, right?
A. Yeah. That was wired to a title company very close to loan with Choice Hotels.
Q. Okay. So -- and it looks like the in and out of these contributions and distributions is $3 million, thereabouts, right?
A. So there was -- hold on. Yeah, so this 2.2 plus additional money. I don't remember, but it's in the closing statement. It was close to 2.6 that was wired to Choice closing.

Q. And at the bottom of the page -- sorry, bottom of that entry it says, Transfers to Galaxy December 2024. And then it has a sum total of contributions and distributions. All contributions equal $3 million. All distributions equal $3 million. Is that right?

A. Yes. Three came in, 3 went out, yes.

Q. Okay. Those contributions were to Galaxy Management, Aurora, Dhillon Hotel. That's what the -- distributions, rather. Galaxy Management, Dhillon Hotel, DCAP, LLC, those are the -- that's the distributions, right?

A. That was kind of loan paying. If you look at the other letter that you showed me earlier, it shows the loans back to those LLCs. That's -- they are coming from the bank statement, correct.

Q. And during 2024 we now have three different sets of claims. We have a claim that you are a 51 percent owner. We have a claim that Jose Motel was 100 percent owner. And we have a claim that JAV Ghelani Holdings and numerous other people were also members, right?

A. On the tax return.

Q. Right. There's no money on this list of contributions and distributions on this general ledger from JAV Ghelani Holdings, right?

A. If you -- that account you showed me he wired in 2022, not in '24.

Q. JAV Ghelani Holdings never gave you any money -- gave the debtor any money in 2024, correct?
A. No. It came in 2022. It's on his bank statement that he showed you.
Q. It never came in 2024. We would know that because it would be in a bank statement, right?
A. Yes.
Q. Can you turn to Exhibit 18?
Okay. The way to find this is --
MR. RAY: Your Honor, may I approach the witness? I'm going to show him the K-1 from JAV Ghelani Holdings, which is right smack in the middle of this. It's -- from the front --
THE COURT: Exhibit 18?
MR. RAY: Exhibit 18, yes, Your Honor.
THE COURT: Okay. And let's just count pages. Can we just count pages so I can be on the same page as you all are, or are the labeled?
MR. RAY: 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, almost there, 22, 23, 24, it's 24 pages back.
Q. Have you found the JAV Ghelani K-1, sir?
A. That 28 percent?
Q. Yes.
A. Yes.

Q. And it indicates that JAV Ghelani Holdings contributed $835,952 in capital in 2024, doesn't it, sir?
A. So, again, I am not a CPA. How he does the tax return, I have no idea. But what I know is on the ledger and on the (indecipherable two words) there was 2.6 million invested in the company to pay down the loans and refinance with Choice Hotels. How the CPA categorized, I don't know that.
Q. Well, sir, you did know that JAV Ghelani Holdings didn't give $835,000 in 2024. You know that.
A. Yeah. You saw that activity was in 2022.
Q. And you saw that he didn't give money to the debtor. He gave it to Galaxy Management, right?
A. No. He sat with me and he agreed -- we both mutually agreed that he wanted to be in this particular property in 2022.
Q. And you have no documentation of any kind of subscription agreement, prospectus agreement, share, pledge, loan, investment, nothing at all, other than this K-1 and the wires, right?
A. It is same thing like how me an Amandeep does investment. We don't have any agreement between us. We just buy the property and the K-1s are distributed. Same way Mr. Ghelane's a long-time friend. He wanted to invest in the property. And wired the money to Galaxy and then it was

transferred to D San Jose.

Q. And that's true with all of your investors, isn't it, sir?

A. I don't have any investors. Only in this property I have -- most all other 31, 30 hotels is me and Amandeep, most of them. Plus my other immediate family members like my mom and dad and my brother and sister.

Q. Isn't one of these people a dentist in Shreveport?

A. Dr. Mody, no. He's not a dentist. He's a surgeon.

Q. Surgeon in Shreveport, Louisiana?

A. Correct.

Q. And you got -- if you just flip back a couple of pages, you'll see Milan Mody's K-1, 30 percent interest. $895,000 in 2024, right? That's what it says on that K-1.

A. Yes. That's what the tax return says, correct.

Q. So that's not right. There wasn't any $895,000 contribution from Mr. Mody in 2024, was there?

A. Again, I'm not a CPA. How he categorized it. But Dr. Mody did wire the money to the -- that's how he got the shares.

Q. He wired -- he didn't wire money to the debtor, did he?

A. No, not to the debtor, correct.

Q. So these people are owners?

A. They -- they wanted to invest because they wanted

to see which property can, you know, have more potential. That's how they come in and they want to invest in different properties. There are only -- I only have a few handful people. Not to everybody. So they just close friends. Known them for long time.

Q. And you -- okay. Can you turn to Exhibit Number 4? This is the amended and restated operating agreement signed in 2024, right? Sorry, Exhibit 5. Turn to Exhibit 5.

A. Yes.

Q. Exhibit 5 says -- first of all, you agree with me Exhibit 5 is actually the governing amended and restating operating agreement of the debtor, correct?

A. It's for Jose Motel, not for D San Jose. So I don't know what is --

Q. No, Exhibit 5. Look at Exhibit 5.

A. Tab Number 5, right?

Q. Tab 5. It says, Amended and restating operating of D San Jose, LLC, right?

A. Yes.

Q. Okay. So this is the current operating agreement. It even states that there was a March 22nd -- March 23rd, 2022 original agreement. It says that at the first recital, right?

A. Yeah, I see that, yes.

Q. And then it says there was an amendment in May 17,

2022, right?

A. Yes.

Q. And this is the -- this is the current operating agreement of the debtor, D San Jose, right?

A. I've gone through that. Again, this was a requirement by Choice. They were giving us a loan. And they sent us a lot of documents. I don't know how many thousands of paper. So we signed most of them. And we had attorneys for both sides to do that.

Q. Did you -- I'm sure you gave your accountant the operating agreement so he could do the taxes, right?

A. I have never personally provided him, my office paperwork with the accountant/CPA to do the tax returns.

Q. And this operating agreement says on page 4, the debtor has not had any indebtedness other than the permitted indebtedness pursuant to the loan documents in matter 14, right?

If you turn to page 4 you see some things that are restrictions on what the debtor can do. It's a special purpose entity.

A. Again, so there were thousands of documents, loan docs came. My attorney reviewed it and then she asked us to sign. We signed those docs.

Q. So your attorney reviewed it. What was your attorney's name?

A. If you look at the email that was showed earlier, Alyson Markovich was the closing attorney for -- at that time.

Q. So even assuming that the special purpose entity provisions in Exhibit 5 prohibit things like intercompany loans, commingling of money, having other affiliates at anything other than arm's length, dealing with not having any pledges, being managed by the same entity, maintaining its assets in a way that is not difficult to segregate, even if those provisions are in this document, you don't really know -- you've never thought about it. Is that fair?

A. No, sir. We kept the records. Money was put in where it was needed to make payment, mortgage payment or anything that was shortfall. That's when we transferred the funds to cover the payroll or mortgage payment, any expense at that time. So it's not that we were just using the funds and taking out and doing whatever. We were just paying those bills and needs for the hotel -- motel.

Q. Sorry, just real quick I want to confirm. Did you even know what Exhibit 5 said or cared about it when you -- after you did the deal with Choice?

A. So, again, there were thousands of documents that Choice send us. I had attorney who viewed them and she asked us to sign them. I personally didn't review every document.

Q. So did you -- you didn't -- you're saying you might

have signed Exhibit 5 and not even read it; is that your argument?

A. I relied on my attorney. We hired attorney for that --

Q. And that would go for Exhibit 41, too, which is a pledge agreement of Jose Motel that says it owns the debtor and an agreement at the back from the debtor that says it acknowledges it is owned?

A. Yes. Again, we had an attorney at that time. She was helping to close the transaction.

Q. And your attorney had all the information necessary to make good contracts for you, right? You wouldn't give your attorney half truths, you'd tell your truth to the attorney, right?

A. I mean, she has all the records from us.

Q. So when you told your attorney the truth -- I can't ask you what you told your attorney.

Did you believe August 7th, 2024 -- let's just turn to Exhibit 41 and I'll show you what I'm talking about. Exhibit 41, turn to the Exhibit A attached, which is the back of it.

Do you see Exhibit A attached that's part of Exhibit 41? It's the last three pages of Exhibit 41.

A. Exhibit A, yes, I see that.

Q. It's an acknowledgement and consent, right?

A. That's what the document says.

Q. Okay. And it says, Real property owner hereby acknowledges receipt. Do you see that starts with those words, real property?
A. Yeah, I see that.
Q. Okay. All right. And then if you'd turn to the last page. Who is the real property owner? Is it D San Jose, LLC?
A. That's what it says.
Q. And it's acknowledged and agreed to by Jose Motel, LLC, the manager, right?
A. Yeah, that's what the document says.
Q. Okay. So is there some confusion in your mind as to how the ownership morphed or changed over time?
A. There's no confusion in my mind.
Q. Do you think that there might be claims by -- by D San Jose, LLC against other people, lawsuits against investors or managers? Do you think there might be such a lawsuit claim?
A. If you can tell me what kind of. I'm not aware of any.
Q. Okay. And do you think it would help the creditors in the case if a neutral person who wasn't you or related to Galaxy could oversee the process of this bankruptcy?
A. Since the bankruptcy has been filed I have removed myself from the bank account. Not (indecipherable word) the

bank account. It's very transparent. And I think Choice Hotels, somebody -- I don't know the person has access, view access to the bank account. And also asked a question by Choice Hotels, they want a different management company. That has been agreed and put in there. So it's not being managed by me. And everything is transparent of what's going on in the property or the bank account. And also weekly or daily reports are being sent to Choice Hotels as requested since filing our bankruptcy.

Q. All right. Can you --

A. So I don't see any reason overseeing because everything is transparent and there are a lot of eyes looking at it. I mean, if there is an issue, you should let us know, hey, this is the issue we see. Can you apply that, or can you answer this? I would assume that you are the counsel, or in operation level the management company can answer you what is going on. It is straight up, simple business going on. There is nothing -- no different bank accounts are being opened or -- everything is straightforward here.

Q. All right. Since everything's straightforward, could you turn to Exhibit 43, please?

A. Yes.

Q. This is the balance sheet, correct?

A. This is before it filed Chapter 11 in 2024.

Q. Okay. It looks like it was -- so the $7 million of

borrowings are not on the list of liabilities payables, right? On this balance sheet, on page 2, I don't see any short or long-term liabilities of $7 million, or $3 million, or any number.
A. I think if you look at the (indecipherable word), I think that has gone up, if you look at every year, to 10 million, 10.5 million on page 2nd.
Q. So -- I'm sorry. Are you saying now that the loans that are insider loans that are Class 6 of your proposed plan are put on your balance sheet as -- as -- that they're actually put on the balance sheet as equity?
A. I'm not -- what I'm saying is, you showed me where the loans. I said, there's none. But I think when this transfer happens, there's no money coming back because entity's losing money every year.
Q. All right. So there's no loans on that for the insiders, it's not on the balance sheet, right?
A. Like (indecipherable word), you'll see there is a 1.5 million. Choice has a loan and DM Funding still outstanding.
Q. Other than that. Other than that there are no loans, right?
A. Correct.
Q. Okay.
MR. RAY: Your Honor, I'd like to mark

Rebuttal Exhibit Number 57.

THE COURT: Where is it?

MR. RAY: Your Honor, may I approach?

THE COURT: You may.

Okay. Number 57?

MR. RAY: Yes, Your Honor. I believe -- yes, Your Honor, the last exhibit of the Trustee's motion is 56, so 57 would be a blank one.

THE COURT: All right. Let's take a 10-minute recess right now so that my staff can have a brief break, but also so we can add this new exhibit to the exhibit notebook.

We stand in recess.

(Brief recess ensued.)

COURTROOM DEPUTY: Recalling D San Jose, LLC, 25-43157. Final hearing on a motion for authority to use cash collateral, a motion for appointment of Trustee.

THE COURT: Okay. All right. We were in the middle of the examination of Mr. Dhillon. If you'll retake the stand, sir.

Mr. Dhillon, you understand you are still under oath?

THE WITNESS: Yes, ma'am.

THE COURT: Thank you.

You may continue.

MR. RAY: Thank you.

Q. Very briefly before we get back into that I saw

that Mr. -- very briefly before we get back into that I saw that, Mr. Dhillon, you were -- you were speaking with Anwer Azam earlier today and just now; is that correct?

A. Not in this break.

Q. Okay. But you've spoke with him today, you sat next to him and you two had conversations, right?

A. Yes, when I came in. That time I sat next to him.

Q. And did you -- did you and your lawyers have discussions with Mr. Azam during the most recent break?

A. No.

Q. Okay. All right. And what did you talk about earlier today with Mr. Azam?

A. We were talking about -- I'm going to India this weekend. And there was an (indecipherable word) around the hall where the Pakistani border is there's a (indecipherable word) border. And I told him did he visit that? And we were talking about that he was there and he never went to Golden Temple. That he asked me, do you go? I said, yes. I might go on this visit. So we were talking about that.

Q. Okay. But you did not talk about this case at all?

A. Not at all. Nothing.

Q. Okay. All right. Looking at Exhibit 57, which is a page from the general ledger that you have produced to us, this is the debtor's general ledger as of November 30th, 2025. Do you see this page, 57?

A. Yes, I see that.

MR. RAY: Your Honor, this is the general ledger page from the entire general ledger. We'd rather produce just this one page rather than all 260 pages -- 122 pages, Your Honor. We move for admission of Exhibit 57.

MR. STANFORD: We're going to raise an objection at this time until this can be proved up. Like counsel said, it's just one page. We don't know what context this is in. We don't know if this is a preliminary run or a final run.

THE COURT: Okay. Objection sustained until it's proven up.

Q. Okay. Mr. Dhillon, did you give instructions to your lawyers to produce the general ledger and all documents requested by -- by Choice's counsel?

A. I'm sorry, can you repeat that?

Q. Did you give your lawyers instructions to give Choice the information requested by them?

A. Whatever documents are requested, office staff send it to the attorneys.

Q. Okay.

MR. RAY: Your Honor, I received this document in an email attachment form based -- using a link from Mr. -- as part of a greater exhibit that is the actual entire general ledger from Mr. Stanford. And I can -- I can provide

the email, if necessary to the Court.

THE COURT: So you're representing to the Court that this is a page out of one of the exhibits produced by the debtor to you?

MR. RAY: Yes, Your Honor.

THE COURT: Okay. I'm going to admit Exhibit 57 for rebuttal purposes, you said only, right?

MR. RAY: Yes, Your Honor, I understand.

THE COURT: What exactly are we rebutting?

MR. RAY: That -- Your Honor, there have been post -- Mr. Dhillon says these are contributions and the money has never been a loan. But the document is a reclassification post-petition from contributions to make the post-petition contributions pre-petition loans. And I'm about to prove that the change was made post-petition.

THE COURT: I'm not sure that's what this shows, but I'll let you continue.

Q. This general ledger has a print date on the top that says December 8th, 2025, correct?

I have the magnifying glass. It's hard for me to read. Would you like --

A. No. I can see that, yes.

Q. The general ledger states, general journal entries changing contributions to loans as contribution numbers decrease and -- loan numbers -- sorry, contribution numbers

decrease and become loans.
Do you -- is that how you read this?
A. So I've not prepared this document. I've not seen it. I think it must be by error. If you look at the date it's 1/1/25. We weren't even open on 1/1. We don't work --
THE COURT: What do you mean it says, 1/1/25?
THE WITNESS: On the left-hand side date.
THE COURT: Oh, the date of the --
THE WITNESS: Yeah. So we don't -- we're not -- office are closed on 1/1. So that must be an error. I've not seen this. I don't -- I'll go back and check if this is correct document or not. This from software, it might be internally. So I can't testify to this.
Q. I understand.
Let me go ahead and -- let's just move forward.
Can you look at Exhibit 56, please?
Exhibit 56 is a ballot sheet as of October 31st, 2025, right?
A. I'm sorry. Is this in the same binder?
Q. It's the -- it's a smaller binder, no. It's --
MR. RAY: Your Honor, may I approach?
THE COURT: You may.
THE WITNESS: Yeah, I don't have that.
Q. This is the balance sheet, right?
A. Yes.

Q. Exhibit 56 from October 31st, 2025?
A. Yeah, that's what it says.
Q. Okay. And it's printed December 16, 2025, right?
A. Yes.
Q. Okay. And if you turn to the second page it shows contributions of $10 million.
A. Yes, that's what it says.
Q. Okay. And Exhibit 57 shows contributions.
A. There's nothing in 57 here in the book.
Q. Okay. Never mind. I'll handle this with Mr. Rae's testimony.
So just to be clear, the October 31st, 2025 balance sheet does not show insider loans, correct?
A. You're talking about the balance sheet?
Q. Yes. Exhibit 56. As of October 31, 2025 on the debtor's books there are not $7 million of insider loans payable, right?
A. I see on the first page 955 intercompany loan transfer. 21005 on the balance sheet.
Q. Okay. So there's an intercompany loan transfer that is a negative liability, right?
A. Well, I just told you the loan transfer --
Q. And a negative liability is an asset, right?
A. Yeah. Once the money comes in, it's a loan, right?
Q. So there's not $7 million of liabilities to

affiliates on the balance sheet, is there, sir?

A. No, sir. What we showed other -- like on the other one that earlier you showed me, that is from 2022 to '25. Each year is different. It's not same every year.

Q. Okay. So just to square the circle on this, or close the circle, Exhibit 56 is the balance sheet from the month of the bankruptcy and that balance sheet doesn't show $7 million of insider loans, does it?

A. I don't see it there.

Q. Okay.

MR. RAY: Pass the witness, Your Honor.

THE COURT: Any redirect for this witness?

MR. STANFORD: No further questions for this witness.

THE COURT: All right. Thank you. The witness is excused. You may step down.

All right. Any other evidence you wish to present?

MR. STANFORD: Yes, Your Honor.

At this time we're going to call Mr. Luigi Major to the stand. He is sequestered outside the courtroom. I can leave and retrieve him.

THE COURT: All right.

If you'll step forward and be sworn, sir.

(The witness was sworn by the courtroom deputy.)

MR. RAY: Your Honor, if it will expedite

things, we will stipulate that Mr. Luigi -- I forgot his last name -- Major is an appraiser and he is an expert for purposes of giving an appraisal. We don't need to have that time spent.

THE COURT: Okay. All right. So noted.

MR. STANFORD: Okay.

LUIGI MAJOR

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. STANFORD:

Q. Will you state your name, please.

A. Luigi Major.

Q. What is your professional designation?

A. I'm an appraiser, State Certified Appraiser and member of the Appraisal Institute, MAI Appraiser.

Q. Okay. Were you asked to prepare an appraisal for the property at 2560 Fontaine Road in San Jose, California?

A. Correct.

Q. Okay. And what was the date that appraisal was completed?

A. The appraisal was completed December 30th, 2025.

Q. Okay. Can you describe the property?

A. The property is a dual branded Super 8 and Motel 6.

Q. Okay. And in preparing the appraisal, did you take

into account the hotel industry in this region of California?

A. Correct.

Q. And what is the trend of hotel values in the years before this hotel filed bankruptcy? I'm talking about years '22, 2023, and 2024.

A. So this particular market, as with the rest of the country, was affected by COVID in 2020. And 2022, 2023, 2024 were still considered recovery years for the market.

Q. And what impact would that have on the value of this hotel?

A. Well, the impact on the value depends on the changes in the income. And for this particular hotel, the income has stayed relatively flat or decrease, which has negatively affected the value.

Q. Okay. Have you also taken into account the current trend in hotel values and hotel performance in the region?

A. Yes. So as of 2025 the market appeared to be on a recovery trend so -- so, yes, things are improving.

Q. Okay. Based on your appraisal and your knowledge of the market as of the effective date of your report, do you have any reason to believe the market value of this property is likely to materially declined over the next three to six months, assuming no material adverse changes in market conditions?

A. Yeah. Assuming that market conditions continue on

the current trajectory, the value should not decline.

Q. Okay. And do you have an opinion whether the value that you reached at conclusion of your appraisal is stable over the next three to six months?

A. Correct. Assuming that the market continues on the current trajectory, then the value should stay stable. The only thing that would change that is if there is an adverse situation that we have not foreseen.

Q. Okay. Do you have an opinion as to whether shutting down this motel, even for a short period of time, would result in a loss in value of the property?

A. Yes. So typically when a hotel is closed, that negatively affects the value.

Q. Okay. In what ways?

A. So any potential investor looking to acquire a closed hotel would then have to assume a ramp up restarting the property. And it takes a while for a property to regain that business. So the ramp up is slower than as if the property were -- continued to operate. So that affects the value negatively.

MR. STANFORD: Okay. I'll pass the witness.

THE COURT: Okay. Cross?

MR. CASTILLO: No questions.

<u>CROSS-EXAMINATION</u>

BY MR. RAY:

Q. You said a shut down would negatively affect value; is that correct?

A. Correct.

Q. It's currently being managed -- when did you visit the property?

A. I visited the property on December 15th, 2025.

Q. Okay. Who was -- that was after December 12th, right?

A. That's correct.

Q. Okay. Did you know that there was a Court order that required management company from Galaxy switch out to a new management company that's now called American Hospitality on December 12th, three days before you joined -- you went there?

A. No.

Q. Did you know that American Hospitality is now running it, not Galaxy?

A. Not as of the date of my visit.

Q. Okay. Did you -- when did you learn that American Hospitality's operating the property?

A. Just now from you.

Q. Oh, okay. And -- so a Chapter 11 Trustee would have the same American Hospitality company running the hotel as the debtor, right?

A. I -- I'm not familiar with that process.

Q. I want to talk to you about your appraisal.
A. Uh-huh.
Q. Which I believe is Debtor's Exhibit -- Debtor's Exhibit O, as in Oscar. And it's been admitted.
I want to talk to you about some of the assumptions you've made.
A. Sure.
Q. Can you turn to page 32?
A. I am there.
Q. Okay. When you were there did you see any deferred capital expenditures, or deferred maintenance?
A. The property does not appear to have been renovated in a while, so we did assume a property improvement plan which is Exhibit -- or Figure 35. The deferred maintenance that was pointed out to me is that there were a selection of rooms that -- where the water was not fully heating up in the showers. So that was something that was pointed out.
Q. Just curious, would you ever stay in a hotel room that didn't have hot water?
A. No.
Q. Okay. And you have computed a capital expenditure requirement of $1.25 million rounded out, right?
A. Correct.
Q. Okay. Did you know that money had been given to this debtor for product -- for capital improvements and

product improvements?
A. I'm just going to repeat the question. Did I know that money had --
Q. Did you know that this debtor had already received money for that purpose?
A. No.
Q. Okay. Do you know what happened to the money?
A. I'm not aware.
Q. Okay. So in paragraph -- on page 32 you assume an ongoing preventative maintenance program, and appropriate management, and appropriate oversight as part of your appraisal, correct?
A. Correct.
Q. What if that wasn't true, what would that do to the value of the -- of the property?
A. If there's no proper management or oversight, typically a hotel is negatively affected in its performance which then could result in lower revenues.
Q. Okay. And what does that do to the value of a company if it's not run right?
A. Because an appraisal is tied to the revenues and the profitability of the hotel, if the revenues decrease, the value decreases.
Q. Okay. And the next sentence on page 32, investors recognize that additional capital may be required over the

holding period. And this expectation is factored into their return requirements.

What did you mean by that?

A. So when -- when a property's valued there's typically a valuation parameter that's used, such as return on equity or return on the debt. And those returns, such as, let's say, cap rates or interest rates tend to factor in investment risk.

Q. Did you actually talk to any particular investors relating to this valuation that you did?

A. We spoke to brokers in the market. And we are constantly valuing property. So we have that -- that is illustrated in the report as to what those valuation parameters are.

Q. Do you have any understanding one way or the other of who owns the debtor?

A. Who?

Q. Owns the company, the debtor?

A. Who owns the debtor. I do not have an understanding of who owns --

Q. Okay. That's fine.

You said that there were -- isn't that around 20 rooms that didn't have hot water?

A. Correct.

Q. What else did you see that was -- that was

dilapidated or deteriorated or otherwise undesirable at the property? Did you see anything like broken furniture? Missing paint? Disgusting swimming pool? Broken pool furniture? Safety issues with the fence? Anything like that?

A. Well, the property is an economy hotel. And naturally the quality's inferior to more upscale properties. So that's reflected in typically the quality of the furniture or the quality of the finishes. But I did not see anything that -- besides the rooms that were out of hot water that was significantly detrimental. So the property was operating and had guests staying at the property.

Q. The property was what, operating?

A. And they had guests at the property.

Q. Anything dilapidated that you saw when you there?

A. I mean --

Q. Run down?

A. The hotel is generally in need of renovations.

Q. It's run down, isn't it?

A. As most economy hotels across the country are, yes.

Q. I don't know that that's true, but I understand your point.

Did you see any deferred maintenance like anything wrong with the fencing?

A. I did not. I did not inspect the fence in detail.

Q. What about the lighting?
A. The lighting?
Q. Yes.
A. What type of lighting?
Q. Did you see any lights that were broken?
A. So I was there during the day so the lights were not on.
Q. How many rooms did you go in?
A. I went into at least four to five rooms.
Q. Who selected the rooms?
A. The general manager that was on the property.
Q. Who did you go with besides the general manager?
A. Only the general manager.
Q. Have you ever spoken to Mr. Dhillon individually?
A. For this particular property, no. He was not there. I was just meeting with the general manager.
Q. Have you spoken with Mr. Dhillon about other properties?
A. Yes.
Q. Have you evaluated his other properties?
A. Yes.
Q. Are any of them run down?
A. They're -- the ones that I have inspected are all economy hotels. And right now most economy hotels are in inferior condition.

Q. Okay. Can you turn to page 93?
A. I am there.
Q. You say, In review of operating history because the subject property is an existing hotel with an established operating performance, its historical income and expense -- experience can serve as a basis for projections.
Is that what you did, you looked at the historical income and expense to serve as a basis for projections?
A. Correct. And we look at the subject property, as well as market data on how hotels should operate.
Q. But what you did not do was audit the books or in any way challenge the financial books that were given to you by management, you accepted them at face value?
A. No. We assume that the information provided to us in regards to the financials is true.
Q. Okay. So you don't know if the information you were given is accurate?
A. I do not have a way. But we cross-checked it against the STR data that was provided, which is typically provided by the brands. And at least the top line matched both in the financials provided by the owner, as well as the data provided by the brands.
Q. Now I want to ask you two questions and I don't want them to be trick questions. I'm just going to tell you what they are in order. I'm going to ask you if the $1.2

million contribution, PIP, whatever you want to call that, if the improvements are not made, what that would do with the value and where the value is going to land. And then the second question I'm going to ask you is, if -- if -- well, I'm just going to ask you that question. I'll start with that one.

So if the PIP, the $1.2 million didn't happen, what's the value of the property?

A. So the value of the property is -- it's the asset's value. The asset's value is what's in the report.

Q. That's 16.4?

A. That's 16. -- I believe so. Let me just double check.

That's 16.4, because that -- I don't know if you want me to point you to the page?

Q. No. I -- I'm just getting -- the story's simple.

A. Okay.

Q. To get to the 16.4 you have to put in 1.2 to get that value, right?

A. The 1.2 is deducted already from the value to get to the 16.4.

Q. But if that money isn't paid, if those improvements aren't made, then the property's not worth 16.4?

A. No. The asset's value is 16.4.

Q. Okay.

A. Otherwise it would be the number that is above that on page 109. So the -- if the improvements are -- once the improvements are made, it will be 17.6.
Q. Okay. And it's 16.3 --
A. After the deduction.
Q. -- after the deduction.
THE COURT: 16.3 or 16.4?
THE WITNESS: It's rounded.
THE COURT: Okay. I just want --
Q. So back to my question. 17.6 -- let me put it this way. Sometimes I get asked by my spouse to redo the kitchen because it will increase the value of the house. And I disagree vehemently with the concept of redoing my kitchen because (inaudible word) value. But if you spend $1.2 million, the value goes up more than $1.2 million, right?
A. That's the idea, yes.
Q. Right. And if the $1.2 million isn't spent, the value is lower than 16.4, right?
A. Well, the number -- the 1.2 is already deducted.
Q. You already said that and I understand that. Your -- my point is, to get to any valuation, including your 16.4 number, you have to presume the debtor's going to spend $1.2 million and that will -- like if you spend $100,000 renovating the kitchen, the house might go up $300,000. I see that on the House Hunter shows on the tv set.

THE COURT: You believe that, do you?

MR. RAY: I've never -- I've never believed that, but I see it.

THE COURT: Well, I think most of the expert testimony we've heard in this courtroom over the years is that you don't get back what you put into it, at least in homes, home renovations no matter what renovation you make, for the most part. So it doesn't increase the value. But that's beside the point.

I think his testimony is clear. His testimony is, without the -- without the renovations it's worth 16.4 rounded, and with the renovations it's worth 17.6.

Is that your testimony, sir?

THE WITNESS: That's correct. But we didn't -- the scope did not include a when complete value.

THE COURT: Right. I understand.

THE WITNESS: But it may be higher than the 17.6.

THE COURT: I understand. Okay.

Q. So let's go to page 135, if I could.

A. Uh-huh.

Q. These are some of your assumptions.

A. I'm there.

THE COURT: 135?

MR. RAY: 135, Your Honor.

THE COURT: Okay. Uh-huh.

Q. As an expert appraiser you always make certain assumptions, right?

A. Correct.

Q. Okay. And one of the assumptions you made, I think we touched on earlier is in Number 8. It says, All information, financial operating statements, estimates, and opinions obtained from parties not employed by you are assumed true and correct. We can assume no liability resulting from misinformation.

So you assumed all information was true and correct that you received, right?

A. Correct.

Q. Did you look at a balance sheet?

A. No.

Q. Did you look at a cash flow statement?

A. No.

Q. Okay. Number 17, The quality of a lodging facility's onsite management has a direct affect on property's economic viability and value. The financial forecast presented in this analysis assumed responsible ownership and competent management. Any departure from this assumption may have a significant impact on the projected operating results and the value estimate.

So back to the question I asked earlier. Bad

106

management will decrease this value, right?
A. If bad management results in lower revenue and profitability, yes, the value would decrease.
Q. Let's talk about that for one more second. You have an understanding of how many rooms at this -- at this hotel are rented for cash?
A. I do not have because it should be accounted for in the P&L.
Q. Is 40 percent rational?
A. That seems -- I don't know, but that seems extremely high in most hotels.
Q. In fact, 40 percent cash rentals would be really, really suspicious to you, wouldn't it, if that was true?
A. Yes.
Q. Okay. And what about guests staying more than five days? If a majority of the guests stayed more than five days, would that be suspicious to you?
A. No.
Q. Okay. Did it look like that was going on at this hotel, that people were basically residing there?
A. Many economy hotels, especially in California, have longer term guests.
Q. So it looked like it was basically tenants, right?
A. I wouldn't call them tenants, but they're known typically as extended stay guests.

Q. How long was your visit?
A. Two hours.
Q. Okay. You saw four Inns in two hours and you walked the outside of the premises, correct?
A. Uh-huh.
Q. And you were there during the daytime?
A. Correct.
Q. You didn't stay at night?
A. No.
Q. You wouldn't stay in that hotel, would you?
A. No.
Q. Okay.
MR. RAY: Pass the witness, Your Honor.
THE COURT: Redirect?
MR. STANFORD: No more questions for this witness.
THE COURT: Thank you. The witness may step down and the witness is excused.
Any other witnesses you wish to call, Mr. Stanford?
MR. STANFORD: Just a moment.
The debtor at this time rests.
THE COURT: Okay.
Mr. Castillo, did you have any evidence you wish to present?
MR. CASTILLO: No. Thank you, Your Honor.

THE COURT: Thank you.

All right. Mr. Ray, or who's going to be handling this?

MR. RAY: Your Honor, Choice Hotels would call Anwer Azam, the debtor's certified public accountant.

THE COURT: Okay. He's --

MR. RAY: He's out in the hallway.

THE COURT: If you'll go get him, then.

Thank you, Mr. Castillo.

(The witness was sworn by the courtroom deputy.)

ANWER AZAM

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. RAY:

Q. Sir, can you introduce yourself to the Court by giving your name.

A. My name is Anwer Azam. I'm a CPA.

Q. And, Mr. Azam, you do not work for Galaxy Hotels, you are an independent certified public accountant, correct?

A. Yes.

Q. And you have -- you have assisted the debtor by preparing and compiling tax returns and having them filed with the IRS, correct?

A. That's correct.

Q. And when you do that, you get information from the debtor, from San Jose or Galaxy, right?
A. Yes.
Q. You do not provide tax advice of any sort to the debtor, you just compile the returns; isn't that correct?
A. That is right.
Q. You have not given Mr. Dhillon any advice on what to put in his tax returns, he tells you what the information is and you then put it in the returns, right?
A. That's correct.
Q. You have no way of checking if his returns are accurate or inaccurate because you rely entirely on the truthfulness of the information given to you; isn't that --
A. Yes.
Q. So did Mr. Dhillon come to you and ask for advice on how to do these returns and you gave him accounting advice?
A. No, we don't.
Q. Mr. Dhillon says he doesn't understand taxes and that he -- if Mr. Dhillon didn't understand taxes and he wanted you to give him advice, you would need to do some due diligence before you gave that advice, right?
A. Yeah. That would be separate engagement.
Q. And you've never done that, you've just taken the information and prepared the tax returns, correct?

A. That is right. That is correct.
Q. Who gives you the information?
A. From the client's office, Jag's office.
Q. Who at Jag's office does this?
A. I think his staff, employees, maybe.
Q. You don't remember their names?
A. The employees come and go so I just -- I just have contract with Jag.
Q. I got that. Is that the office in the United States or is that the office in India?
A. I guess -- I think this is local, in Dallas.
Q. Have you -- do you remember ever having communications with the office in India anywhere?
A. No, never.
Q. How many tax returns do you do for Mr. Dhillon's companies?
A. Close to 35.
Q. Do you do tax returns for affiliates like Mr. Dhillon himself, or do you mostly just do the hotels and the management company?
A. We do personal also, personal tax return.
Q. Okay.
MR. RAY: One minute, Your Honor.
Q. So just to be clear, you never looked at any of the debtor's operating agreements or any operating agreements --

A. No.
Q. -- correct?
And you never -- and you didn't have any information about where or whether contributions were made to a debtor entity, correct?
A. No, that's correct.
Q. And the same thing with ownership interest. You just took the information Galaxy gave you and --
A. That is right.
MR. RAY: Pass the witness, Your Honor.
THE COURT: Cross?
MR. STANFORD: We have no questions for this witness.
THE COURT: Thank you. The witness may step down. And the witness is excused.
Any other witnesses you wish to call, Mr. Ray?
MR. RAY: I want to call Jason Rae, Your Honor.
THE COURT: Okay. Mr. -- the other Mr. Rae, please come forward and be sworn.
You may step down, sir.
(The witness was sworn by the courtroom deputy.)

JASON RAE

The witness, having been duly sworn to tell the truth, testified on his oath as follows:

DIRECT EXAMINATION

BY MR. RAY:

Q. Mr. Rae -- Mr. Rae, you are a certified fraud examiner and distressed business valuation expert, are you?

A. Correct.

Q. Sorry. Should have asked you to state your name for the record. Can you state your name for the record.

A. Jason Rae.

Q. Is that your real name?

A. That's my real name. Last name is spelled R-a-e.

Q. And we are not kin?

A. We are not.

Q. All right. You are -- you were retained by whom?

A. Choice Hotels.

Q. And for what purpose?

A. To conduct an analysis and assessment of the accounting information that was provided.

Q. Okay. Do you commonly provide services in bankruptcy matters?

A. Yes, I do.

Q. What sorts of work do you do?

A. I do forensic accounting work, distressed business valuations, restructuring, advising, both in and out of court.

Q. How many times have you done that in your career?

A. Many, many times.
Q. How many times have you testified as an expert?
A. Over 10 times.
Q. How many times in the bankruptcy courts?
A. About the same. Most of my work is in the bankruptcy courts.
Q. So what materials did you generally review in developing your opinions?
A. I looked at the general ledgers, the statement of financial affairs, the schedules, the monthly operating reports, the cash collateral information, operating agreements, ownership agreements, tax returns. Basically the books and records that were produced.
Q. Just real quick, what professional licenses do you hold and certifications?
A. I'm a Certified Public Accountant credited in business valuation, Certified Insolvency Restructuring Advisor. I've got a certification in Distressed Business Valuation. I'm also a Certified Fraud Examiner, and hold a Master Analyst in Financial Forensics Degree.
Q. And when you say you're a distressed business valuation -- what's that certification again?
A. CDBV.
Q. What does that mean?
A. Certification in Distressed Business Valuation.

Q. Okay. You saw the testimony of Mr. Dhillon, the testimony of Mr. Luigi Major, the testimony of Mr. Azam, and the testimony of Mr. Williams that have been given in this matter, correct?
A. Correct.
Q. Do part of your opinions come from what you have seen today and yesterday?
A. Yes.
Q. Okay. So did you -- did you compare the bankruptcy disclosures against the accounting records?
A. I did.
Q. And did you compare the accounting records against the tax reporting?
A. Yes.
Q. And for capital contributions or insider loans, or intercompany loans, what sort of documentation would you normally expect to see?
A. For capital contributions I'd expect to see subscription agreements, capital calls, documentation of dollars contributed, schedules that support the capital roles. Similarly for loans you'd expect to see intercompany ledger or documentation of the nature of the transactions.
Q. Did you see any of that?
A. I did not.
Q. What do you conclude, based on the absence of that

kind of information?
A. A very concerning pattern of entries that I've seen with the accounting. And that there's really an inconsistent treatment on multiple sets of the documents.
Q. Did you look at the debtor's operating agreement that makes special purpose entity provisions in June and July of 2024?
A. Yes, I did.
Q. Did you ever see any evidence that the debtor --
THE COURT: Hold on. Which document are we talking about?
MR. RAY: Sorry, Exhibit Number 9, I believe. Sorry, it is Exhibit Number --
THE COURT: 5?
MR. RAY: -- 5, Your Honor.
THE COURT: Okay.
Q. Let's go ahead and look at Exhibit Number 5 real quick.
A. Okay.
Q. Can you turn to page 3 of Exhibit 5?
Let's turn back to page 2 and look at paragraph number 10. Do you see paragraph number 10 of page 2?
A. Yes.
Q. What does paragraph number 10 say?
A. It's the special purpose entity provisions.

Q. Have you seen the special purpose entity provisions in other operating agreements in your career?
A. Yes.
Q. Okay. So they're pretty much all the same everywhere, right?
A. They're very similar.
Q. So like on page three (xi), or 11, for those of us who speak Roman, it says, The debtor has -- The entity has maintained and will maintain an arm's length relationship with its affiliates.
Did you see this debtor maintain an arm's length relationship with its affiliates?
A. No, I did not.
Q. How about the next page, (xiii), Has observed and will observe all -- in all material respect all limited liability company formalities. Did that happen, as far as you can tell?
A. From what I've seen the treatment's inconsistent with --
Q. Okay. How about 14, Has not have and will not have any indebtedness other than any permitted indebtedness pursuant to the loan documents, if any. Has the debtor incurred debt outside of the loan documents?
A. Yes, it has.
Q. How about 21, Has maintained and will maintain its

assets in a manner such that will not be costly or difficult to segregate, ascertain, or identify its individual assets from those of any other person. Is there a problem here with segregation of assets?

A. Yes, there is.

Q. Is that -- are the intercompany loans part of that problem?

A. Yes.

Q. Look at (xxiv), 24 on the next page, Has not entered into or been a party to any transactions with its members, managers, or affiliates except in the ordinary course of its business and on terms which are intrinsically fair, or in connection with the loan documents. And I'm shortening that for time. Did the debtor have outside the ordinary course of business transactions with affiliates?

A. Yes. The intercompany transactions are not consistent with that.

Q. Of the debtor's current books, have you looked at the requirements to pay monthly the loan obligations? Historically the loan obligations to Choice Hotels have run about $168,000 a month; is that right?

A. That's right.

Q. Okay. Can this debtor today afford to pay $168,000 a month?

A. Not based on the recent activity.

Q. Okay. Did you read the notices of default under the cash collateral order that are Exhibits Number 32 to -- Exhibit Number 32 to 40, did you look at those?
A. Yes, I did.
Q. Okay. Are you -- if -- let me -- I'm going to transition here.
Did you review the interim cash collateral order in the case?
A. Yes.
Q. Did you review the debtor's weekly reports and debtor's accounts payable reconciliation, or invoices pending payment?
A. Yes.
Q. And those are types of business records and financial -- financial reports people in your field commonly would review; is that right?
A. Sure.
Q. And if you've looked at the interim cash collateral order, which is Exhibit Number 27 in the cash collateral notebook -- well, you know what, I'm going to skip this. I'm just going to ask you a global question so that we shorten this hearing.
Is it true that under the interim cash collateral order the debtor was required to pay $80,000 a month and then all of the net operating income, less a reserve of $5,000

security over month to month? Is that your understanding?
A. That's correct.
Q. Okay. And there was a miss in November, right?
A. Correct.
Q. Okay. That's not cured, as far as you know?
A. As far as I know, it has not been cured, fully cured at this point.
Q. Okay. So if an LLC is taxed as a partnership -- I'm going to switch over to the LLC tax issues real quick. I'm just going to try to move this hearing along. So if I give you whiplash, I apologize.
THE COURT: Okay. Which LLC?
Q. If any LLC is taxed as a partnership, does the LLC usually pay federal income tax itself?
A. Generally, no. It's generally passed along to its members.
Q. Okay. And the document that passes those along, is that called a K-1?
A. That's correct.
Q. Now in your opinion as an accountant and forensic accountant, if the ownership documents and the K-1 disagree, which one would you look at to determine who legally owns the company?
A. The ownership documents.
Q. Okay. And you heard the testimony of Mr. Azam just

a few minutes ago. He did not look at the ownership documents, right?
A. Right.
Q. Okay. If the -- now, let me just ask you this basic accounting here. But if an LLC has a loss for the year, can that loss get allocated to the owners on the K-1?
A. Yes.
Q. Okay. But is there a limit on how many losses you can take on a K-1? Can you take a loss forever and ever, even if you made a small investment?
A. Once your basis goes to a negative position, then your losses become at risk. And your ability to take those ad deductions could be suspended or held.
Q. Okay. So for the debtor and these tax returns, the debtor lost, let's say 2 million in 2022, 2 million in 2023, and -- sorry, 3 million in 2023 and 3 million in 2024. Let's assume those numbers. In order to keep taking losses, how would you make -- how would you avoid that limitation of at risk basis?
A. If the basis is approaching zero, then there would have to be capital contributions to bring the capital account back up to a net neutral position.
Q. So if you report the capital contribution, then you can keep taking -- on the K-1, then you can keep taking the losses, right?

A. Those losses are still available.
Q. Okay. So the accountant doesn't need to know that the loss -- that the contribution -- the accountant, as you heard Mr. Azam, he didn't look to see if contributions actually happened, did he?
A. That is correct.
Q. Okay. And did you look to see if the contributions for 2022, 2023, 2024 on the tax returns came in? Did you look at that?
A. Yes, I did.
Q. Okay.
A. Well, we didn't have the information for '22, but I did for '23 and '24.
Q. Okay. And what happened there?
A. The -- the support for the contributions from those individuals are not reflected in the ledgers.
Q. Okay. Can you look at Exhibit 17 real quick? And turn to the third page from the last. And I'm in the Trustee's -- this is Trustee's -- the Trustee exhibit binder, 17.
THE COURT: You mean the motion for a Trustee?
MR. RAY: I am so sorry, Your Honor. I represented Trustees too long working in Houston for many years, the Chapter 7 Trustees. I default to Trustee. But the motion for the Trustee, Your Honor.

THE COURT: Okay. So you want to look at the third to the last page on Exhibit 17?

MR. RAY: Yes, Your Honor. It's called capital account reconciliation.

THE COURT: Okay.

Q. So what can you tell me about this capital account reconciliation page I'm looking at?

A. This is a summary of the K-1s for each of the individual partners. It's reflected so it will show the beginning capital account, the capital contributed during the year, whether there were net income, net loss, in this case net loss, and then the ending capital for each partner and the total ending capital.

Q. So if these contributions did not actually occur in substance, would that create a risk that the loss deductions were improperly supported?

A. Yes.

Q. Okay. And would that also raise reliability concerns about the partnership's books and records?

A. Yes, of course.

Q. And what does that do to the value of an entity when there is irregularities or reliability concerns about a partnership's books and records?

A. It's -- the question is really driving at a bigger overall impact of the reliability of the books. But if a

buyer is going to look to a reliable set of information to base their projections on -- so if you don't have reliable information, it's going to be a discounted value that's assessed.

Q. Okay. Can you turn to Exhibit -- in addition to the tax returns, did you also look at records of payments from the hotel company to its manager, Galaxy?

A. Yes, I did.

Q. Okay. Can you look at Exhibit 44, please?

Are you there?

A. Yes, I'm there.

Q. The -- first of all, it's kind of an interesting point about this. It says, This agreement is executed as of blank, between -- by and between Galaxy, a Texas company, and D San Jose. Do you see that in the management agreement?

A. Yes, I do.

Q. This is called a management agreement, right?

A. Correct.

Q. And if you turn to the last page it's signed by Mrs. Dhillon and Mr. Dhillon; is that right?

A. Yes.

Q. Okay. Is that an arm's length agreement?

A. No. That's a related party transaction. It's a related party agreement.

Q. Okay. Does this agreement describe a manager's

compensation structure and role?
A. Yes, it does.
Q. If a hotel is losing money but still pays its management fees, what does that do to the hotel's taxable income?
A. The -- well, it would be an expense on the books. So it would bring the taxable income down.
Q. And if it's already losing money, it would increase the loss, correct?
A. That's correct.
Q. And those fees -- but those fees could also create income on the side of Galaxy, the management company, right?
A. Yes.
Q. And if the same person owned the management company and the hotel, could that person use the hotel to lower the taxable income from the management company? Could he use the hotel loss if he was the owner, he could use the hotel loss to offset the gain in the management company?
A. The losses -- yes, they would pass through to the individual owner. And losses could go to offset other gains in other LLCs or other ownership interests.
Q. Can you turn to Exhibit 41?
This is a document called pledge and security agreement. Is this one of the documents you reviewed?
A. Yes, it is.

Q. And did you understand there were ownership restrictions in this document? Did you look at that?
A. Yes.
Q. Who is your understanding of the sole member under the operating agreement -- or, sorry, under the pledge agreement?
A. The sole member would be Jose Motel, LLC.
Q. And you did look at the original statement of financial affairs, right?
A. Yes, I did.
Q. And who did it list as the sole owner?
A. It listed the same entity, Jose Motel, LLC.
Q. Okay. And then later did that number -- did the statement of financial affairs change?
A. Yes, it did.
Q. And then who says they're the owner?
A. At that point it was 50/50 between Mr. Dhillon and his wife.
Q. Okay. But you've also compared that to the tax accounting, correct?
A. Correct.
Q. Okay. The pledge agreement's in 2024, right?
A. Yes.
Q. The amended operating agreement is also July 2024, right?

A. Yes.
Q. Second amended.
And the -- and the first schedules -- oh, and the -- so those are both in 2024. And then you looked at the 2024 partnership tax returns for the same year, right?
A. I did.
Q. Okay. So did that have a different set of owners?
A. It did.
Q. Okay. We've already been over that. I don't need to replow that ground with you. You sat here and you saw it, right?
A. Yes.
Q. Okay. But I do want to ask you as an expert, what affect would it have if a buyer was sitting in this room and saw these inconsistencies? What would that do to the value of this company if a buyer was sitting in this room and saw different ownership claims and different restrictions?
A. Well, to me as a forensic accountant, it's indicia of potentially separate sets of books, two sets of books. And that brings into question the reliability of the underlying financial information as a whole, which is going to bring into question the reliability of the earnings and income and expenses, which that's going to impact the value.
Q. So we learned yesterday that the debtor does, in fact, have an unidentified bank account called the AB, or

it's American Bank of Dallas, I think. That's the bank; is that right?
A. It's referenced in the ledger as AB 1887, I believe.
Q. All right. And that was closed within a year of bankruptcy and we just found that, right?
A. Yes.
Q. Okay. And can you tell me -- let's find that exhibit and look at it. It's Exhibit 20 in this book. So if you can go to Exhibit 20.
All right. And that has -- Exhibit 20 has the AB 1887 on it, right?
A. Yes, it does.
Q. All right. And this is for 2024, right?
A. This is a 2024 general ledger.
Q. Were changes made in 2025 to the contributions and distribution ledger?
A. Yes.
Q. What were those changes in 2025?
A. The '25 -- 2025 changes recharacterized the nature of whether they were equity contributions, distributions, and moved them into intercompany related party loans.
Q. Did that happen before or after the bankruptcy?
A. I believe it happened after the bankruptcy.
Q. Why do you believe that?

A. Because of the date stamp on multiple balance sheets. They're inconsistent with -- with the timing of the reports. And the October balance sheet is after the bankruptcy and it still reflects the activity as contributions/as distributions. So the entries had not been made yet at that point.

Q. Good point. So if the October 2025 balance sheet did not show the loans but the general ledger shows that the loans are put back on as of January 1, 2025, your conclusion is that the changes to the general ledger were made to be post-petition retroactive to January 1; is that what you're saying?

A. That's one potential. The other potential is there's two sets of books. There's two versions of the sets of books for this debtor entity.

Q. Okay. Who's the best person to investigate that Mr. Dhillon or a third-party neutral?

A. That's unfortunately going to be third-party neutral fiduciary.

Q. Okay. If I was a buyer and someone had violated their single purpose entity restrictions, would that increase or decrease what I would pay for the company, for the entity?

A. That's going to decrease based on the management, the quality of the management.

Q. Okay. You heard the appraiser. The appraiser said

the value of the company would decrease with bad management, right?
A. Yes.
Q. As a distressed business valuation expert, do you agree or disagree that bad management decreases the value of the company?
A. Oh, agree.
Q. Is that almost axiomatic?
A. Almost.
Q. All right. The money moving in and out on Exhibit Number 21, is that it -- no, it's 20, Exhibit Number 20. The money moves in and out right at the closing of the Choice loan, right?
A. Yes.
Q. So -- okay. And it comes in for the purpose of closing -- I'm not going to recreate Mr. Dhillon's testimony.
Let me ask you some very basic questions, then. This is -- Exhibit 20 is a bunch of distributions. It says distributions, right?
A. Yes.
Q. Can you have distributions when you don't even own the company?
A. I don't believe you can.
Q. Is it common to make unequal distribution on an ad hoc basis to non-owners?

A. Not common.
Q. When did you find or not find any documentation supporting the characterization of these funds as loans or distributions or contributions? When did you -- when did you see -- let me back up. Did you ever see a promissory note between these entities?
A. No, I did not.
Q. Maturity date?
A. No.
Q. Interest rate?
A. No.
Q. Research on creditworthiness?
A. No.
Q. Any kind of diligence that is shown that they're trying to make money on the time value of the money as opposed to just propping up an enterprise?
A. Saw none of that in the file.
Q. All right. From a value preservation standpoint, what is the impact when loan proceeds from people like Choice or others are routed out to affiliates or insiders?
A. The value of their asset is being diminished. There's potential -- their cash proceeds are leaving the entity.
Q. Okay. Can you turn to Exhibit 18, page 6?
A. Okay. I'm there.

Q. You heard Mr. Anwer -- Mr. Azam testify that he did not get his own information. He did not look at his own -- his own work, his own research, and he never gave a tax opinion. All he did was compile information given to him. You heard that, right?

A. I did.

Q. Okay. And he prepared -- he did this based on what was given to him. Look at page 6, line -- Schedule L, line 7-A of the 2024 tax return and line 19-A of the 2024 tax return. It shows no loans to partners from either to or from partners, or persons related to partners, right?

A. It's completely blank.

Q. Okay. And it also says $2.9 million of cash was capital contributed, right?

A. Yes.

Q. Not property, not sweat, cash, right?

A. Correct. That's in the lower schedule at Schedule M-2.

Q. Right, okay.

And then let's look at Exhibit 17 and turn to page 6 of Exhibit 17, line 7-A, line 19-A, loans to partners or persons related to partners. No assets or liabilities. Same issue '23, right?

A. They're both blank.

Q. Okay. Let's look at the '22 -- the 2022 return,

page 6. Actually, it's page 5 in the 2022 return. 7-A, nothing in there about loans to partners. 19-A, nothing in there about loans to partners or those related to partners, right?

A. Completely blank.

Q. Okay. Here we are. Can you turn to page -- Exhibit 25? Can you turn to Exhibit 25, please?

A. Okay. I'm there.

Q. Okay. What's Exhibit 25?

A. This the debtor, D San Jose's listing of affiliate transfer details.

Q. Can you describe what types of transactions are described here and how they are described? For example, are they described as deposits are paybacks or loans?

A. Yeah, they're either described as a loan from, what appears to be a related party hotel, or a loan to, or loan payback.

Q. Okay. Did you ever look at a 2025 trial balance about this?

A. Yes, I did.

Q. Okay. So how did the affiliate intercompany loan detail -- we're looking here at Exhibit 25 -- how does that compare with the tax return Schedule L?

A. It's inconsistent with the tax returns.

Q. How did this -- how does this document that's

Exhibit 25 compare with the 2024 general ledger structure and accounts that we've seen?
A. Also inconsistent with the general ledger.
Q. Why does that matter from an accounting and forensic standpoint that their books are inconsistent?
A. Well, again, it's an indication that they're -- the books are unreliable. That there's additional scrutiny that needs to be done on these books. That there's recharacterization of the activity that was done previously and even reflected and commemorated on the tax returns.
Q. Speaking of which, I'm going to shift gears now because I really see the time is flying away from us and I want to get this done quickly. So I apologize if I just jump around like a person at a Madonna concert. But I'm going to do it.
Credit cards, did the debtor list any credit cards that it had that it owed money to?
A. Yes.
Q. No. It paid money to credit cards?
A. It paid money to credit cards.
Q. But the debtor doesn't have any credit cards?
A. No.
Q. Okay. And within the 90 days before bankruptcy did it make -- how many significant payments did it make to credit cards, like American Express and Chase?

A. I believe it's hundreds of thousands of dollars in catch-up payments.
Q. Was it 170 or something like that?
A. Yeah.
Q. In the 90 days?
A. The 90 days only.
Q. Do you know why? Why would you pay credit cards that you don't have?
A. Well, there are reasons for that that they were business expenses incurred by other parties that relate to the operations of the hotel, so those are being allocated to the hotel. But there would need to be some additional scrutiny on those transactions.
Q. What sorts of substance -- what kind of -- if you were going to have a non-debtor credit card run the debtor's expenses through it, what sorts of accounting would a legitimate business keep to ensure that those were reimbursed properly?
A. There would be documentation sufficient to support the business purpose of each of the transactions. And that would be -- there would be a process to identify and aggregate those on a regular basis. But they would be documented and stored and maintained.
Q. And if there are any that are unexplained, how do those unexplained credit card transactions affect stability,

buyer confidence, financing ability, and valuation?

A. Well, it speaks to the actual operating income if there is additional expenses that have been put on the entity that are not the entities. That it depresses value because it depresses NOI.

Q. Based on your review, how would you describe the current quality of the debtor's financial reportings and controls?

A. They're very poor. The financials as they are are unreliable. They need additional scrutiny.

Q. What indicators do you see that suggest weak controls or unreliable reporting?

A. Well, we start with the documentation and the treatment of the ownership records. That's a very fundamental aspect of a set of books. And there's clearly a lot of confusion with that. And the treatment of the related party funds flowing back and forth without much guardrails on it.

Q. In your experience, how do credibility and transparency affect stakeholder cooperation in a Chapter 11 case?

A. Well, it makes it very difficult. You -- the Chapter 11 process is open kimono. It's open - it's very transparent. So that -- an unreliable set of books makes it very difficult.

136

Q. In your experience, how do credibility and transparency affect vendor terms, lender behavior, and franchise relationships and hospitality?

A. It's all damaged. It's hurtful to potential lenders, to potential vendors. It's just not helpful in the process.

Q. And what is the -- what does that do to value when the books and ownership structure are not reliable or verifiable?

A. Again, it speaks to the overall quality of the books and the -- the amount of reliance that you can place on the operations.

Q. What is the risk to estate value when the same insiders who did this pre-petition remain in control of the books under these conditions?

A. I believe it's a substantial risk.

Q. From a restructuring professional perspective what problems does an independent fiduciary solve in a case like this?

A. They bring credibility to the process. They bring a fresh confidence to the other constituents in the process.

Q. What immediate steps would an independent fiduciary typically take regarding bank accounts, cash controls, and disclosures?

A. They would immediately take over the cash accounts

and the reporting and gain an understanding of the cash cycle. So they would take immediate control.

Q. By the way, you heard the appraiser earlier say he was surprised that 40 percent could come from cash, 40 percent of room revenue could be cash.

A. Yes, I heard that.

Q. Is it hard to control cash compared to credit card payments?

A. Yes. It's a much more difficult process to control.

Q. If 40 percent of your rooms come from cash, what can happen to the money, the currency?

A. It's much easier to divert cash. It could -- and if it is diverted and not properly reflected on the books, again, that's a decrease to revenues which would be a direct impact to the value.

Q. Would -- how does, in your experience, Trustee appointment affect creditor confidence in the ability to obtain consensual relief?

A. I believe that Trustees are integral in that process, particularly there's very talented Trustees in this District that can do that.

Q. In your opinion what is the likely affect of estate value if an independent Trustee takes control of the books and implements transparent reporting and supervises the

restructuring of this debtor?

A. I believe that -- that that's a -- gives this the best chance to reorganize and maximize the value.

Q. So what about the expense of a Trustee? Is there -- there is some expense of a Trustee, right?

A. Yes, there is.

Q. Okay. And how would that typically be dealt with in a situation like this?

A. They would either be paid upon a reorganization or -- based on disbursements to the creditors.

Q. And creditors like Choice are almost -- well, Choice, specifically, would be out there willing to use cash collateral and pay for the Trustee, right, within reason?

A. That's my understanding.

Q. Okay. And I would like you to summarize, if you can, the key inconsistencies that you have identified regarding the ownership across, A, the operating documents; B, the bankruptcy disclosures; C, tax reporting; and D, what you heard today.

MR. STANFORD: Your Honor, I'm going to object that this is cumulative testimony. He's already asked all of these questions already and now we're just going over them a second time.

MR. RAY: Your Honor, he's made a point that I am hesitant to agree with. I think I want to conclude and I

did want to -- and I was doing summaries --

THE COURT: Okay. I'll allow you to do a brief summary question.

Q. Okay. So could you just summarize for me without -- those five things are interesting. But tell me globally your view of what needs to happen in this case and what has happened in the reporting failures.

A. I'm concerned that there are multiple sets of books that are with the debtor. There's, at best there's very large discrepancies amongst the owner accounts and their related party entities which bring into question the entire integrity of the books. I think an independent party coming in, a fiduciary coming in to oversee the process from here would be very valuable in this.

Q. If the property is run down, would a neutral fiduciary have a fiduciary obligation to make the property better?

A. Well, that all depends on the money that's available. That's going to be quite a real dollars. We've heard there's substantial Cap X that needs to be put into this. So a Trustee would have to have some access to capital to do that.

Q. And conversely based on your experience in distressed valuation and fiduciary work, what is your opinion on the value consequences of continued insider control over

the books and governance over the debtor?

A. Well, here where there's been a significant loss of confidence by the key constituencies, I think that's going to make it very difficult to get to a consensual plan.

MR. RAY: I pass the witness, Your Honor.

THE COURT: Cross?

MR. STANFORD: Yes, Your Honor.

CROSS-EXAMINATION

BY MR. STANFORD:

Q. Just briefly a couple of issues. Are you being paid to be here today?

A. Yes, I am.

Q. And who's paying you?

A. Choice Hotels.

Q. Okay. And are you able to speak as a professional, as a fiduciary to this Court without worrying about the desires of Choice Hotel?

A. Yes.

Q. Okay. Fair enough.

Are you a CPA?

A. Yes, I am.

Q. Okay. Have you ever actually -- have you ever worked as an auditor?

A. Yes, I have.

Q. Okay. So you understand the purpose and reason for

an audit?
A. Yes.
Q. Okay. And is it common when a company's being audited to interview people who keep the books and records and run the company?
A. Yes.
Q. Okay. Did you talk to Mr. Dhillon in preparing for your report today?
A. No, I did not.
Q. Did you talk to Mr. Larry Williams?
A. No, I did not.
Q. Okay. Did you talk to any staff members at Galaxy Management?
A. No, I have not.
Q. Okay. Did you talk to any of the K-1 partners which you saw on the 2024 tax return, I believe there were eight of them?
A. I did not have discussions, no.
Q. Okay. Would you agree that your opinion that you've expressed today could be influenced if you had had the opportunity to interview those people?
A. Possibly. But I think from what I've seen so far, that would be -- that would be difficult.
Q. So you don't think it's possible that anyone could have explained something to you that you had a question about

that would have changed or influenced your testimony today?
A. The inconsistencies are very concerning to me.
Q. Did you interview the CPA, Mr. Azam?
A. No, I have not.
Q. Okay. Would you agree there's two different ways a buyer might buy this hotel; it could buy the ownership interest, or it could buy the property?
A. I'd agree with that.
Q. Okay. Now, if a buyer wanted to buy the membership shares, it seems to me your testimony you believe there could be some concern with some of the chaos that's in the books and records?
A. That's true.
Q. Okay. If a buyer just wanted to buy the property, just the ground and the bricks, then they could do their own separate due diligence as to determine what they think the value of the property is; is that possible?
A. But I think from what we heard today that there's -- from the normal due diligence process, there's a great deal of reliance that's placed on the underlying financial information and the historical financial information. And if there's questions about the reliability of that that speak to the operations of the property, that's going to impact the value.
Q. Are you familiar with the STR report that was

discussed earlier in Mr. Dhillon's testimony?
A. Yes.
Q. Okay. And you understand those are maintained by an independent third party that does that information for hotels all over the world?
A. Yes.
Q. Okay. And would that be a reliable source, one of the reliable sources that a potential buyer could look at to determine what they were willing to pay for this motel?
A. That's -- that's a potential source, yes.
Q. Okay. You're familiar with selling properties in bankruptcy?
A. Yes.
Q. You're familiar with the term 363 sale?
A. Yes.
Q. Okay. If a buyer buys -- if a buyer bought this hotel in a 363 sale, then would they get some kind of protections free and clear of all liens, claims, and encumbrances?
A. Yes.
Q. Okay. And could that also be achieved in a Chapter 11 plan?
A. It could.
Q. Okay. Have you ever served as a Chapter 11 Trustee?

A. Yes, I have.
Q. Okay. How many times?
A. Six or seven.
Q. Ball park?
Okay. Okay. And what's the first thing you do when you take over -- well, let me withdraw the question.
Have any of those been apartments or hotels?
A. I was a post-confirmation Trustee for a hotel.
Q. Okay. And -- that was post-confirmation, though?
A. Yes. It was operating.
Q. All right. Okay. It absolutely would take a Chapter 11 Trustee some time to get up to speed; would you agree with that?
A. There's always a transition period, yes.
Q. Okay. And you testified how a Chapter 11 Trustee might be compensated if -- when they're appointed. Is it common for a Chapter 11 Trustee also to hire legal counsel?
A. Yes.
Q. And will that result in additional administrative expenses?
A. I think that's probably a wash based on debtor's counsel -- typically debtor's counsel is not doing as much. Really the Chapter 11 Trustee's counsel takes the place of debtor's cost.
Q. Fair enough. Would a Chapter 11 Trustee also hire

an accounting firm?
A. Often they do.
Q. Okay. And that would be another layer of administrative expenses?
A. Well, it depends on this situation, if the management company that the Chapter 11 Trustee would retain could perform those services.
MR. STANFORD: Just a moment, Your Honor.
Q. Did you talk to anyone at Choice Hotel, that actually works for Choice Hotel in preparing your report today?
A. No, I did not.
Q. So by process of elimination, the only parties you spoke to were Choice's legal counsel?
A. Well, I reviewed depositions. I reviewed all of the materials that were produced in the case. And I believe that formed a sufficient basis for my opinion.
Q. Okay. But when did you first become employed to prepare your report today?
A. At the beginning of this year.
Q. Okay. So you are aware that on December the 12th a new management company has taken over for Galaxy Management?
A. Yes.
Q. Okay. Have you talked to anyone at that management company?

A. I have not.
Q. Okay. Isn't it true that many of the problems that you pointed out today in your opinion will be taken over by the new management company?
A. I don't think so, no.
Q. Okay. And if a Chapter 11 Trustee was appointed, it likely would stay with the same management company?
A. It's possible. It's possible for a -- that would allow for a smooth transition, at least initially to allow the property to continue to operate.
MR. STANFORD: All right. Pass the witness, Your Honor.
MR. RAY: No questions, Your Honor.
THE COURT: Anything?
MR. CASTILLO: Just a few.
THE COURT: All right. Mr. Castillo, you may proceed.

CROSS-EXAMINATION

BY MR. CASTILLO:
Q. Mr. Rae, on the intercompany loans, have there been any intercompany loans to affiliates by the debtor post-petition?
A. Not that I've seen post-petition.
Q. And have there been any intercompany loans by affiliates to the debtor post-petition?

A. Not that I've seen post-petition.
Q. Have you seen any unauthorized loans borrowed by the debtor post-petition?
A. Not post-petition.
Q. I want to get the number right. I want to say you said 168,000 is the monthly interest payment --
A. That's the amount that I've seen.
Q. For the debtor to pay to Choice to cover the interest on its loan?
A. Correct.
Q. And what is that amount, the monthly amount based on? What's the loan number? What's the amount?
A. I believe that's 21 million.
Q. Okay. And at what interest rate?
A. I believe 9, 9 percent.
Q. So if the -- if the -- if a plan were confirmed and the value of the hotel was less and the secured claim had a lower amount and possibly a lower interest rate, that $168,000 a month would be less, right?
A. It would come down, yes.
Q. You mentioned there was a miss in November on the adequate protection payments. I want to be sure. Was that just the 27,000?
A. That was the portion that's based on the net operating income for the month.

Q. Okay. So you would agree that the 80,000 a month for November and December were made?
A. Yes, I would.
Q. Okay. And then there were some overages above that, but you think about maybe 17 grand --
A. About 17,000, yeah.
Q. -- is still due for November?
A. Yes.
Q. At the end you said there was a loss of confidence by key constituencies. Is that Choice?
A. Yes.
Q. Okay. Anybody else?
A. Not that I'm aware of.
Q. Okay. Thank you very much.
MR. STANFORD: Pass the witness.
THE COURT: Okay.
MR. RAY: This time I have no questions, Your Honor.
THE COURT: Okay. I have a question.
THE WITNESS: Sure.
THE COURT: I thought you testified that based on your review of the documents that you believed that there was a potential that these loans were recharacterized as loans post-petition. Is that not your testimony?
THE WITNESS: That is my testimony, yes.

THE COURT: Okay. I just want to confirm that in light of the line of questions by Mr. Castillo.

All right. You may step down.

THE WITNESS: Thank you.

MR. RAY: And with that, Your Honor, Choice Hotels rests.

THE COURT: Okay. Is there any other evidence any other party wishes to present?

MR. STANFORD: Not from the debtor, Your Honor.

THE COURT: Okay. So we only have closing, right?

MR. STANFORD: Correct.

THE COURT: Okay. How long is your closing going to take, each of you?

MR. STANFORD: 7, 8, 9 minutes, maybe.

THE COURT: Okay. Pretty quick, as well?

MR. RAY: 5 minutes, unless I get frisky and then it will be 7, Your Honor.

MR. STANFORD: I'll see if I can beat that.

THE COURT: Okay. We're not doing Name That Tune, I can name that tune in less than X minutes.

Let me kind of -- as I'm digesting all of the evidence, because we've had a lot of information and you all have been living with all of this stuff but the evidence has sort of

come to us fairly fast and furious if you -- well, so I do have some focusing that I would like both of you to do in the context of your closing.

For the debtor and for the debtor's principal, I need you to walk me through the evidence about the ownership structure of this debtor, who owns what and went and the actual evidence in the record. Because as it was coming in during the course of the trial, it appeared to the Court that there were inconsistencies, as well as the alleged contributions to the debtor and/or loans to the debtor. And I'm not talking about after the fact accounting. I want to see in this evidence when the money came in, who the money came in from, how -- et cetera. And then when the money went out and who the money went out to. I need you to actually walk me through the evidence itself.

MR. STANFORD: And you're referring to contributions from the partners?

THE COURT: Yeah. Yes.

MR. STANFORD: Okay.

THE COURT: And then -- those are some of the specific questions I have. And I'm sure I'll have some specific questions for you, as well, Mr. Ray. But I will -- it will probably relate to some of the same topic.

MR. STANFORD: Okay. Your Honor, I would like leave from the Court. I will summarize the facts to the

Court just now. My associate, Rian Nealon, who's a new member of the bar, relatively, would like to address the Court on the legal standard for -- and what the case law says the legal standard should be for the appointment of a Chapter 11 Trustee. But if Your Honor's ready, I can proceed.

THE COURT: Okay.

MR. STANFORD: Did you want to start -- do you want to start with that?

MR. STANFORD: He will -- he will follow me.

THE COURT: Oh, he will follow? He's going to tell me the legal standard after you tell me what the evidence is, or what your arguments are?

MR. STANFORD: Okay.

THE COURT: That's fine. I can follow either direction, I'm just asking you all.

MR. STANFORD: Would you like to go?

Okay.

THE COURT: Okay.

MR. NEALON: Thank you, Your Honor. I appreciate the opportunity.

Okay. So as my colleague, John Paul, has stated, he's going to go over some of the facts. And as you pointed out earlier yesterday, the facts really are intertwined in this case and so I think it's important the debtor explain some of the legal standards that may be at issue between the motion

and the objection.

I guess first the burden of proof. The debtor would like to submit that Bankruptcy Courts in the Fifth Circuit continue to apply the burden of proof for a Chapter 11 Trustee appointment as clear and convincing evidence. As identified in Ford Steel, 629 Bankruptcy Reporter 871 and Ironside, 2002 -- or 2022 Westlaw 509890 in 2021 and 2022 in the Southern District of Texas, the United States Supreme Court has never squarely addressed the issue of burden of proof in appointment of a Chapter 11 Trustee case.

The cited cases in the motion that are in the context for the burden of proof for exception to a discharge case in a civil commitment hearing. The Eighth Circuit Bankruptcy Appellate Panel decision cited in the motion in Kelly, 455 Bankruptcy Reporter 153 is merely a persuasive decision that discusses how this is a Circuit split on the burden of proof. And even in that case it demonstrated to the Second Circuit and the Third Circuit both still apply clear and convincing evidence. And I guess the second sort of decision in the Fifth Circuit is the matter of Cajun Electric, 69 Federal Reporter Third Series 746 applied the clear and convincing standard to an appointment of a Chapter 11 Trustee case. And I believe Choice's motion mentioned that it was later withdrawn, but it was based on the Low Court's decision that it correctly appointed a Chapter 11 Trustee and adopted the

descent of the original opinion. And the descent did not speak to any incorrect burden of proof applied. As this makes sense because, as I've mentioned before, both Ford Steel and Ironside in the Southern District of Texas continue to apply clear and convincing evidence after 25 years of that opinion being withdrawn.

And it makes sense because even in Evans, 48 Bankruptcy Reporter 46 in the Western District of Texas, appointment of a Chapter 11 Trustee is an extraordinary remedy which grants a strong presumption to the debtor in possession to maintain control of their affairs. Therefore, the appointment of a Chapter 11 Trustee is an extraordinary remedy and Choice, as the movant, must satisfy the stringent burden of clear and convincing evidence that appointment of a Chapter 11 Trustee is warranted before displacing the debtor.

I guess sort of the two options that Choice has before it is for cause under (a)(1) and then the interest test under (a)(2). (a)(1) includes some statutory fraud, dishonesty, incompetence, or gross management. And then case law also discusses -- specifically in Silverman, 605 Bankruptcy Reporter 631 from the Southern District of New York identifies other factors that could constitute cause, including failure to comply with provisions of the Bankruptcy Code, failure to require -- make or require filings, abide by Court orders, conflict of interest, and failure to discharge

fiduciary duties. However, Bankruptcy Courts, such as Sundale in 400 Bankruptcy Reporter 890 in the Southern District of Florida demonstrates that the poor management alone does not warrant the appointment of a Trustee. And I think the record reflects -- and if it's most clear in most all the cases that have come before this Court and any other Courts that file for bankruptcy --

THE COURT: Let me stop you for just a moment.

MR. NEALON: Of course.

THE COURT: Apparently the Webex has disconnected some folks. We need to get them back online here.

MR. NEALON: No worries, Your Honor.

THE COURT: Give us just two minutes. We're not even -- we're just going to go off the record for a moment so they can be connected.

MR. NEALON: Okay.

(Brief recess ensued.)

THE COURT: Sorry, Your Honor.

MR. NEALON: Thank you, Your Honor.

I think I last came off of discussing how poor management alone does not warrant the appointment of a Chapter 11 Trustee, but rather, as it's clear through most of the debtors that have come before this Court and filed for bankruptcy, they have made some financial mis-steps. And

rather the correct inquiry, as the Court knows the appointment of a Chapter 11 Trustee, 1104(a)(1), it discusses the management of the affairs of the debtor in current management. And that's also identified in St. Louis Globe-Democrat, 63 Bankruptcy Reporter 131 in the Eastern District of Missouri.

And then I guess on the second part of the interest of the creditors as discussed also in the Ironside case in the Southern District of Texas, the Court considers whether the appointment of a Trustee is in the interest of creditors, equity holders, or other interests of the estate based on four different things. One is the trustworthiness of the debtor. Two, the debtor in possession's past and present performance. And prospects for the debtor's rehabilitation. Number three, confidence or lack thereof on the business community and of creditors in the present management. And, number four, the benefits derived by the appointment of a Trustee balanced against the cost of the appointment. And Ironside states that because this standard is flexible, the Court ultimately considers the realities and the necessaries of the case and the totality of the circumstances in determining whether to appoint a Chapter 11 Trustee.

I guess in the first point of considering the trustworthiness of the debtor the Court, such as in New Orleans Paddlewheels, 350 Bankruptcy Reporter 667 in the

Eastern District of Louisiana looked to see whether the debtor has been transparent with the Court as well as maybe other creditors, or maybe other equity holders. And made appropriate disclosures when required. When considering creditor confidence the Northern District of New York in Marshall, 635 Bankruptcy Reporter 509 perfectly squared the issue that this is an objective fact rather than personal animus. The Northern District of Illinois in Woodlawn, 613 Bankruptcy Reporter 671 found this factor to be satisfied when, one, the Office of the United States Trustee; two, secured creditors; three, unsecured creditors; and, four, debtor's clients support appointment of the Chapter 11 Trustee not when one sole creditor was requesting this relief.

The cost benefit analysis, as discussed in Marshall, requires the Court to assess the likely logistics of and the prospect for rehabilitation and considers whether and how those logistics and prospects would be impacted by the appointment of a Chapter 11 Trustee. And as discussed in 103 Tax Group for the Southern District of New York, 374 Bankruptcy Reporter 74 the Court took into consideration testimony that the appointment of a Trustee would, A, impose time delays while the Trustee obviously situates themselves with the debtor. Two, additional cost to the estate. Three, affect on ongoing progress. And, four, without adding any

value to the process. And I think it's clear from this record before this Court, as my colleague John Paul will go into detail that Choice, as movant, has not satisfied their burden of clear and convincing evidence to show that either, one, there is cause for appointment of a Trustee or, two, whether it's the interest of the creditors, equity holders, and other interest holders of the estate.

Thank you, Your Honor.

THE COURT: Thank you.

All right. Mr. Stanford.

MR. STANFORD: Okay. To summarize what we have heard here today, it should be clear to the Court from the evidence that the debtor has taken its responsibility seriously, worked in good faith to comply with this Court's interim cash collateral order from removing Galaxy Management and employing a new management company on schedule. Paying adequate protection payments. There's some disagreement of a few thousand dollars, but those payments were made. Giving Choice Hotels full read only access to the DIP account. Daily Dropbox information from the daily receipts. All of this adds to the transparency that the debtor has been happy to give to Choice and this Court.

The debtor, in fact, has already -- in fact has filed its plan and disclosure statement ahead of schedule. And continues to operate the property responsibly. Choice's

counsel announced an ambitious game plan when in their opening instead of really harping on the issues that were raised in their motion, such as conflict of interest, past and present performances, property mismanagement, they shifted to a new and unpled topic of behavior by the managing member as part of a scheme to defraud the other investors. That was not part of their original motion. But we have heard that today.

But many of the factual allegations that they did plead in their motion have been easily rebutted here today. The reoccurring crime at the property they described is no worse than any other property -- a property of this nature. And there's no showing how a Chapter 11 Trustee would make any difference in that respect.

The allegation that Mr. Dhillon remains on the debtor's bank account, that's been rebutted. Mr. Williams is the only signatory on the DIP account. And all the old accounts have been closed.

There was an allegation the debtor failed to list a secured claim to Underground Lending. But the testimony here today that was not rebutted is that a disputed claim for Underground Lending is listed on Schedule F as an unsecured claim. It's listed as disputed.

There were allegations that there were manufactured or backdated entries in QuickBooks. And although there were

some allegations made here in the court today, there was nothing to really show that anything was backdated.

THE COURT: Well --

MR. STANFORD: We heard the opinion --

THE COURT: Hold on.

MR. STANFORD: Sorry.

THE COURT: I seem to remember Mr. Williams testified in his testimony that the ownership representation agreement was -- that it was not in place and it was put into place later effective as of the beginning of the case.

MR. STANFORD: I do recall --

THE COURT: On the other hand, Mr. Dhillon testified that he remembered signing it on October 24th, is it? So there is inconsistent testimony, even amongst the debtor's own representatives.

MR. STANFORD: There is inconsistent as to the agreement, but not inconsistent testimony that Mr. Dhillon did hire Mr. Williams before the bankruptcy was filed.

THE COURT: I know. But you know what, that kind of sloppiness when you're under oath testifying about those things causes a lot of heartburn.

MR. STANFORD: I understand that, Your Honor.

THE COURT: So there is, in fact, just the testimony presented in open court about those kinds of issues creates some great concern. And, frankly, as I sit here

160

today, I can't tell the difference between sloppiness and fraud. It looks -- it could be either. But I can't really tell. And that's one of the reasons I was asking about the ownership interest, because that's another issue where the documents are inconsistent.

MR. STANFORD: Uh-huh.

THE COURT: And it does -- I think that the issue raised by Mr. Ray that, you know -- and I guess there's a third issue which he didn't state. It could be -- it could be that there's a separate set of books, it could be. But there's an, or it could be that the books are not reliable. Or the third is -- or maybe it's a subset of not reliable. It's just sloppy and therefore not reliable. But either way, there's some concerns here. And if I'm not supposed to be concerned, I want you to walk me through it, because I really do see an inconsistency in the documentary evidence itself, inconsistency with the testimony and the documentary evidence. So I'm concerned.

Again, at this moment in time, I'm not sure I'm convinced that it's somehow fraudulent, or rises to the level of fraud. But it certainly raises the issue about the reliability of the information. And so that's why I'm trying to get to. And kind of broad brushing it isn't going to do it for me. I need to kind of actually see how this all -- how all the pieces fit together and why it's not

inconsistent, or why it's, I don't know, sloppy bookkeeping.

MR. STANFORD: I will speak to that.

THE COURT: It's a concern.

MR. STANFORD: I'm sorry. I didn't mean to speak over you, Your Honor. I will speak to that. I believe Mr. Castillo is going to walk the Court through the ownership issues.

THE COURT: Thank you.

MR. STANFORD: But I do want to mention that, you know, even some of the allegations that were true in the pleading that some of the weekly reports were late. The Court heard testimony that it was really difficult. The debtor probably over promised at the time of the agreed order to get those reports in by Thursday. But they all have been updated. And I'll point out that Thursday reports -- December 25th was a Thursday. January 1st was a Thursday.

THE COURT: I'm less concerned about the slightness in time. I am concerned about the books, themselves, being inconsistent.

MR. STANFORD: Okay.

THE COURT: Okay. That's the issue that I'm kind of focusing in on, particularly with respect to a Trustee. If I appointed a Trustee every time somebody missed a time deadline in bankruptcy, we might as well start with a Trustee. So I don't think that that alone is sufficient.

The issue to the Court that raises concern is the issue of whether the documentary evidence presented, which apparently were disclosed to the creditors, whether that is consistent, okay. That's what I'm concerned about.

MR. STANFORD: Okay. Okay.

Well, then let me address it this way. What is the debtor doing now to relieve some of the concerns that what has happened in the past isn't going to filter through into this bankruptcy case? And the debtor's done several things. Of course hiring Mr. Williams was, I believe, a very smart move of this debtor. He's very experience. He's competent. He's ethical. He understands --

THE COURT: Well, let me ask you about this, as well. Okay.

I do understand that Mr. Williams has been hired. And he certainly testified in a manner that was -- that showed that he understands the obligations and that he's got some level of control on the reigns in terms of what he's doing. He clearly is an expert on the matters for which he's been hired. Okay?

But it's not clear to me -- again, I come back to so he was hired by D San Jose, according to the document itself.

MR. STANFORD: Correct, as the owner of it.

THE COURT: The operating agreement for D San Jose says that the manager is in charge. It is not even

clear to me, because of all of these alleged changes in ownership and all of those kinds of things that have happened over time that the current manager is -- is Mr. Dhillon. I don't know. Because the documents that I saw before the manager was San Jose, right? And so then -- but he's hired by the company. But the company, itself, I'm not sure has the management authority to hire a so-called representative. And I think that the corporate organizational documents, including the first amended one, has specific provisions on how you can hire a representative. And it doesn't talk about a, quote/unquote, owner's representative. It talks about officers or directors, or a manager. The manager does not have to be a member, but that requires some level of voting, et cetera, which I can't tell based on the ownership structure issues whether you had the requisite authority to do it. There's a lot of kind of disconnected or disjointed information that isn't kind of really easy for me to be able to follow from this record, right?

So those are some of the issues that I'm looking for. And the corporate minutes, frankly, having undated corporate minutes that were signed where the corporate minutes, itself, do not even indicate when the meetings were held, how the meetings were held, they're just undated. I don't even know what that means. Which, again, concerns the Court on corporate governance issues. So I'm not quite sure -- again,

you're going to have to walk me through --

MR. STANFORD: So your concern is whether Mr. Williams was appropriately engaged?

THE COURT: Well --

MR. STANFORD: Or who had the authority to do so? I believe Mr. Castillo is going to walk you through that.

THE COURT: With respect to Mr. Williams, I'm not concerned about his -- about his abilities, okay. What I am concerned about is two-fold. One is whether he was properly employed from a corporate governance point of view. In other words, did the debtor properly employ him? And then from a bankruptcy point of view, was he properly employed without -- most bankruptcy professionals, as you know, have to get employed through the Court by a motion, right?

MR. STANFORD: We did look at that issue, Your Honor. And we -- our research indicated that 327 of the Bankruptcy Code employs professionals like attorneys, accountants, things of that nature. Because this was done at the corporate level, it was not -- I understand the Court has a question as to whether that was proper or not.

THE COURT: Well, I understand your argument. I figured that's exactly what you were going to argue, which is why I looked at your corporate governance documents. And your corporate governance documents doesn't provide for this

owner representative person to do the bankruptcy related matters, the schedules, et cetera. I think once you get into the bankruptcy matters and authorization to sign bankruptcy schedules, documents, take positions in court, that runs into the 327 issues.

On the other hand, if it's not, it's just a corporate thing like an officer in connection with your corporate governance documents, he wasn't hired to be president or any of the other kinds of officers that are set out in the corporate governance documents. That's what I'm trying to understand. This guy seems sort of betwixt and between, if you will.

MR. STANFORD: I understand that, Your Honor.

THE COURT: And it's not even clear to me that the person who did it, the so-called owner, had the authority to do it under your corporate document -- corporate governance documents. So those are the questions I have. So if you can walk me through all of that.

MR. STANFORD: And, again, because this took place at the corporate level, then Mr. Dhillon's personal attorney is going to address that. I'm sure he's taken notes as you're speaking.

THE COURT: I'm trying to be transparent so you all see what arguments -- or what the issues are --

MR. STANFORD: Absolutely, Your Honor.

Absolutely.

THE COURT: -- so that you can focus your arguments on those issues. I'm not suggesting you can't make all of your other closing arguments, but those are the issues that I've been sort of honing in on as we get through --

MR. STANFORD: Certainly. Well, what we know the debtor did have authority to do and did do, because it was required to, was hire a new management company. And so the testimony here today is they are onboard. They're a third-party independent, no connection with Mr. Dhillon, no connection to Galaxy Management. And they are performing the accounting for the -- for the property now, as well as managing it. And so that should aleve some concerns that Choice Hotel has that there's improper management, mismanagement by the --

THE COURT: Well, those are some of the questions I'm going to be asking them.

MR. STANFORD: Exactly. Exactly. Okay.

Let's see. So many of the issues that the Court heard today, though, are not new in bankruptcy cases. A lot of the companies are mis-managed like my colleague referenced. But they don't automatically mean a Chapter 11 Trustee must be appointed.

Many of the allegations can be addressed, frankly, in the debtor's disclosure statements. I have no doubt that

Choice will function as a one-member Creditor's Committee when we get to asking for approval of a disclosure statement and many of the issues raised, the chaos that they refer to, can be spelled out better at the disclosure statement level to make sure that they know and all of the other creditors know what's happened in the past, also what will happen in the future. So there's other avenues to deal with this.

If it turns out that -- if some type of third-party claims, or some type of claims may exist against Mr. Dhillon, or against some of the other affiliates, then it's also possible to put in a litigation trust in a Chapter 11 plan. So the Chapter 11 plan is a fluid process. It is supposed to be drafted in conjunction with creditors and try to aim for a plan that creditors will vote for. And the debtor is only willing to do that in this case, as well.

The debtor's doing everything it can. Everything from the time that the interim agreed order was entered in December to now, the debtor's time is spent almost entirely on meeting all of the obligations under that order. But they are being met. Adequate protection payments are being paid. It's -- you know, their concerns here today, they haven't really shown how they're prejudiced, necessarily by what happened before. They haven't shown how they're prejudiced now in the Chapter 11 case and why a Chapter 11 Trustee should be appointed, particularly now that we have a new

management company.

So the debtor's ready to move forward with this plan. The appraiser --

THE COURT: Let me ask you something.

MR. STANFORD: Okay.

THE COURT: You are the debtor's counsel, right?

MR. STANFORD: Correct.

THE COURT: Who's the business person from whom you're taking instructions?

MR. STANFORD: Mr. Williams.

THE COURT: Mr. Williams.

Does Mr. Williams have authority under the -- under this ownership agreement to give you those -- that -- the instructions?

MR. STANFORD: I would have to dig through and look a little deeper, Your Honor.

THE COURT: Well, I've been looking through it. So -- these -- it says he has the authority to communicate with counsel, you, bankruptcy counsel. And it says he has authority to perform additional tasks reasonably requested by the owner related to the bankruptcy. That would be the owners.

MR. STANFORD: The owner being the debtor.

THE COURT: Well, that's part of the question.

Who is the owner? I don't know yet. That's what I'm trying to figure out.

MR. STANFORD: Are you referring to the owner representation agreement?

THE COURT: Well, yes, that's what I'm looking at.

MR. STANFORD: Well, the owner is defined as --

THE COURT: Oh, I know who it's defined by. The question is, who is authorized to act on behalf of the owner? That's the manager, right, under your own -- under the debtor's own operation agreement with -- as amended, that is the manager.

MR. STANFORD: Well, I can tell the Court I'm taking my --

THE COURT: I'm not clear who the manager is.

MR. STANFORD: I can tell the Court I'm taking my directions from Mr. Williams. He's very knowledgeable.

THE COURT: Okay. But there's a question about what Mr. Williams has the authority to do. It doesn't say -- you'll have to read it -- read it and tell me where you would argue that he has the independent authority to -- to bind this debtor and to instruct -- because I think, if I remember correctly, there's a provision that says he doesn't have any authority to bind the debtor. And he's paid $1,000

a month?

MR. STANFORD: That's correct.

We will look at that issue. Perhaps Mr. Castillo will have an explanation for the Court. I will continue to look myself. I believe I can conclude here in just a couple of minutes.

THE COURT: Okay.

MR. STANFORD: I just want to point out that the testimony of the appraiser is that the value of the property has stabilized and it's not likely to decrease in the next three to six months, which would be our time arising for a Chapter 11 plan. So that goes to the issue that the Court should continue authorization for the debtor to use cash collateral. We're willing to do the same terms that we've entered into with Choice Hotels now. They're unwilling to give an extension, but the Court can order authorization for use of cash collateral on whatever terms the Court believes is -- is sufficient. We don't believe the value of the property is going to depreciate in the next six months. So we would ask the Court just to renew the existing terms. We'll maintain our transparency by continuing to give them weekly reports.

THE COURT: Okay. Well, it's the transparency I'm concerned about. That's what I'm trying to understand.

MR. STANFORD: Certainly.

THE COURT: But just so you know, it's the very last sentence in Section 2, scope of services of the owner representation agreement -- owner representative agreement, which is Exhibit 6. It says, Representative is not authorized to bind the owner to contracts or legal commitments without written approval from owner.

MR. STANFORD: And the owner would be the debtor.

THE COURT: Well, again, the question is who is -- who can act for the debtor?

MR. STANFORD: I realize that seems circular.

THE COURT: Your argument is circular because you're saying --

MR. STANFORD: Yes.

THE COURT: -- he is the person who's acting for the debtor, except this says that you can't act for the debtor unless the debtor agrees. And so the question is, who is that? That's why I keep coming back to the whole issue of --

MR. STANFORD: Right.

THE COURT: -- under the corporate governance structure, who is the manager?

MR. STANFORD: Well, it is a redundant provision, I understand.

THE COURT: Well, it suggests to me you can't

take -- you can't take direction from Mr. Williams unless you get specific approval from whoever is authorized for the owner. And that is not Mr. Williams, under this document.

MR. STANFORD: Well --

THE COURT: That's my point.

MR. STANFORD: Okay. I understand.

THE COURT: I'm trying to understand.

MR. STANFORD: The word owner is capitalized and it's defined as the debtor.

THE COURT: Right. Which brings you back to who has the corporate authority to act for the debtor? In a normal context, if we were not talking about an LLC, let's just say we're talking about a corporation, okay. A corporation would have a president who is authorized -- a CEO or president who is authorized to take basically whatever actions the board of director has authorized him to do, or the board of directors that could take the action, right? And if the -- so you know who can act for that corporation. With respect to a member managed LLC, it's the manager. Whether that is a member or a non-member, depending on what the corporate documents authorize, right? I don't know who that manager is, because of the inconsistencies in all of the documents. But what it does tell me is it is the manager. In this case it may be the member manager of the debtor that has the authority to act or hire anybody, just like it's the

member manager that is authorized to hire you as counsel.

So what I'm trying to understand is, who had the authority to hire him? Because I'm not sure that that is, in fact -- because it's not signed by Mr. Dhillon as the member. But I'm not sure that he's the --

MR. STANFORD: As I read that sentence, it's not meant to require approval of the owner as much as it's meant to require that anything that he does agree to has to be in writing.

THE COURT: Is that what you think?

MR. STANFORD: Without written approval, yes.

THE COURT: Well, I think it says he can't make legal commitments, unless the owner has agreed to it. So unless he has some sort of legal authorization -- or written authorization from the owner, whoever is authorized to act for the owner, for the -- for Mr. Williams to make legal commitments, i.e. give you directions on what to do legally in court, he doesn't have authority to act. Or you can't take direction from him. You have to take direction -- it's somewhat analogous to whether you can take legal direction from somebody in a corporation who is a middle manager who's not otherwise an officer and director authorized to act. And I don't know that unless the person who is authorized to act grants that permission, I don't think you can.

174

MR. STANFORD: It does seem to be a circular sentence.

THE COURT: Exactly.

MR. STANFORD: And the savings provision clause in the contract, if some provision doesn't make sense and cannot be enforced by either party, then it's just nullified and the rest of the contract survives.

THE COURT: Well, maybe. I don't know. But I have a problem with this because I think I do agree with you generically. If the debtor is hiring officers or directors as corporate representatives, or such, Bankruptcy Court approval may not be required. But if you're hiring them specifically for bankruptcy purposes -- and that's what's being done here. It specifically talks about he's being hired with respect to the bankruptcy proceedings. He's being hired for things -- operations, financial or administrative matters related to the bankruptcy. He's signing documents, legal documents and swearing to things under oath, under penalty of perjury on behalf of the debtor. Those are things I believe require employment under the relevant Bankruptcy Code provisions.

MR. STANFORD: Okay. If that's the case --

THE COURT: Not just an officer. So we're there.

Be that as it may, I know that you have been

transparent about the fact that he's hired. If there's an issue about his retention and we need to correct that I am, again, I think that corrective action could be taken without the appointment of a Trustee. There may be consequences, or whatever, but that's different.

MR. STANFORD: Yeah. That would be an easy fix for us, Your Honor.

THE COURT: Well --

MR. STANFORD: And we will do it.

THE COURT: But, again, the crux of this Court's concern is exactly what Mr. Rae has testified about. About this impression that all of these documents leave. That there's inconsistency in the books and records and that makes it unreliable. And that's really what I'm looking to you for. And I think given the lateness of the hour, I don't mind continuing it to give you all time to kind of focus in on this so that when you have -- to put together a cogent closing argument that walks me through these mound of exhibits to show me why it's not inconsistent. But it looks like there are some concerns.

Mr. Castillo.

MR. CASTILLO: Your Honor, thank you for that.

We would love a little bit of time to put together the answer to some of your questions. But I want to answer it right now as this. The evidence shows that no one in the

world but Jagmohan Dhillon or Jagmohan Dhillon's solely owned entity, Jose Motel, LLC, has ever been the manager of this debtor. And so the buck stops at Mr. Dhillon. Mr. Dhillon's testimony and the debtor's amended schedules indicate the membership is Mr. Dhillon and Mrs. Dhillon, with Mr. Dhillon being the manager.

THE COURT: No. It shows that there's a bunch of other people who allegedly had some kind of significant interest that --

MR. CASTILLO: That's the tax returns.

THE COURT: And they had somehow been waived, or allegedly waived. And I'm not quite sure if somebody made an $800,000 contribution to this debtor that they somehow waived it in December, but that certainly creates some questions about that.

MR. CASTILLO: Yes.

THE COURT: So I don't think it's quite as easy as what you say.

MR. CASTILLO: Okay. Well, I want the opportunity to show you.

THE COURT: Right.

MR. CASTILLO: But -- and I appreciate you giving us some time to do that and we will. But I think what you'll see at the end of the day is that even if the original operating agreement for the debtor said Mr. Dhillon's the

manager. The amendments to the operating agreement that are in Choice's exhibits say that San Jose is the member and that Mr. Dhillon is the manager signing for San Jose.

I'm looking at the amended and restated operating agreement of San Jose -- D San Jose, LLC.

THE COURT: Right. So my point is, I would like you all -- and I'm perfectly happy to give you all time, because I would like to see it --

MR. CASTILLO: Okay.

THE COURT: -- tied up in a pretty little bow where you can walk me through from A through Z of why all these things are okay, or why -- and then on the other hand --

MR. CASTILLO: Thank you. We'll do that.

THE COURT: -- by the creditor about why it's not. Because I do agree that having an independent manager in place may be helpful. But if they're managing solely for the purpose of the operations and not the bankruptcy, that creates some other issues, as well, that I want to kind of understand. But there may already be some safeguards in place that would obviate the need for a Trustee. There may be certainly mechanisms for authorizing creditors to do their own investigation as -- into potential causes of action against third parties in lieu of requiring -- appointing a Chapter 11 Trustee. There may be something else, I suppose,

examining the books and records if they think that there's truly some inconsistencies that need to be investigated, as Mr. Ray has suggested. So there may be some safeguards that have already been put into place and some safeguards that could be put into place. That might make more sense for everybody in terms of the cost associated with that, as well as proceeding with the bankruptcy case.

And I think, frankly, I have a very pragmatic view about these issues, which is all of you are in the same boat. And that boat has a bunch of holes in it. And it's either going to sink or it's going to be -- it's going to float. And, frankly, if it sinks, you all sink together. Your value is based on this asset being turned around in some manner, or it's going to continue to sink. And, frankly, if there's serious problems with the books and records, your asset is not worth what you think it's worth. So either you're going to help shore it up, or you're not. But you're all in the same boat now that these causes of action against third parties. That can certainly be looked at. But I don't think that it requires the appointment of a Trustee.

So I'm going to be thinking about all of those things. But I do want you all to know those are some of the concerns that the Court has. And I'll let you address all of those in closing, because, again, I'm trying to be transparent so you address the issues that I have. And there may be other

issues that I haven't even thought about that you want to address, obviously. But those are some of the questions I have in connection with the matters that were presented today.

Now -- yes, sir.

MR. RAY: Sorry, Your Honor.

I don't want to take this any longer than it has to be. I assume we're going to reschedule for some --

THE COURT: I'm going to give you time to close, yes. Probably tomorrow or the next day, Friday. I'll give you enough time to kind of go digest it and also give me time to look at these exhibits in detail and get out my own magnifying glass.

MR. RAY: Thank you. I'm going to give it back, Your Honor.

The other things I wanted to say. I have the Exhibit 57 here. May I approach and hand it to the clerk? This is on the USB drive.

THE COURT: Okay. Yes.

I think that will give you all time to kind of walk me through the evidence.

MR. RAY: Two other points to reflect on what you just said. One, you saw me walk over to Mr. Castillo. Mr. Castillo said something and I didn't want him to dig a bigger hole. Exhibit 9 of the Trustee exhibits is the

appointment of Ms. Abbas as the general manager of Jose Motel. And Jose Motel is the owner of the debtor, which is why Mr. Williams originally testified that Ms. Abbas was the person responsible for the debtor. So that was to correct Mr. Castillo who made an inadvertent, I am absolutely sure inadvertent mis-statement.

THE COURT: Okay.

MR. CASTILLO: He's right. It was. And I appreciate him pointing it out and I wrote it down.

THE COURT: Okay.

MR. RAY: And I'm not --

MR. CASTILLO: That's why we appreciate the extra time so we can -- it's a lot of documents.

THE COURT: Exactly. And I'm concerned about making sure that the i's are dotted and t's are crossed. So if I am -- if kind of where we are right now is based on sort of part of the information. There's more things to be digested from all the evidence presented and I'll certainly do that.

MR. RAY: And that reflects the last thing you said, Your Honor. Because I want Your Honor to understand the reality of the situation. Mr. Dhillon has a lot of hotels.

THE COURT: I'm well aware of that. We've had several cases involving Mr. Dhillon.

MR. RAY: And Choice has several different contracts with him.

THE COURT: Okay.

MR. RAY: So this is not a one off, just looking at Choice being a lender with a single asset that it needs to be paid from. Choice's views on this are based on its idea that needs to work towards something that is the best possible recovery for the creditors that builds trust with the creditors, which is what the purpose of 1104(a)(2) is. It doesn't need to be prove to be absolute fraud. It just needs those four factors.

THE COURT: I understand. But let me make something else clear to you, okay.

The only thing that's before the Court is this case. If you all have other relationships that need to be taken up, you know obviously you can -- you may do that. But all I'm deciding is this case and these issues today. Okay? And at the end of the day it is clear to me, pretty clear, right, that Choice has lost trust in Mr. Dhillon. And, again, what I cannot tell is if it's just the level of sloppiness that rises to the level of creating some serious concern, or if it's just -- or if it's an intentional act, et cetera. So I need to kind of dig into this stuff a little bit more. But I clearly understand from the tenor of the pleadings, as well as the evidence presented and the arguments raised by counsel

that Choice has lost trust in this gentleman. Okay.

But, again, that is not unique to this bankruptcy case. And there are ways to handle that short of spending a lot of money. Because I am certain that you would not be shocked to now that, you know, Trustees can spend a good chunk of money doing investigations, et cetera. And somebody's going to have to pay for it. And if you're not willing to pay for it, I'm not sure I'm going to hire a Trustee if there's no money to pay for it. So there are all of those issues.

And you have said throughout this hearing that you're prepared to kind of agree to use of cash collateral to some extent. But, again, the question is -- is what that is. But, again, I think that it's in everybody's interest, to the extent that there needs to be -- it's not unusual to need some kind of review into insider transactions when there's multiple insider transactions that occurred pre-petition. That's not unusual, right? But that can be done in a way that's more cost effective than hiring a Trustee to come into it brand new and hire their own professionals and accountants, et cetera. So I think it's worth exploring. I would invite you all to explore those kinds of issues before you come back. Okay?

All right. Anything else?

MR. STANFORD: Do we know when we're coming back?

THE COURT: Oh, I'm fixing to tell you.

MR. STANFORD: Okay. I will just state that the debtor's reading of the last interim agreed order is that cash collateral continues until the conclusion of this hearing.

THE COURT: That's what I understand too. But I was going to ask you about that.

MR. RAY: That is not Choice's understanding. Cash collateral terminated when they had an uncured default. They've had three uncured defaults.

THE COURT: Well, that already exists now, right?

MR. RAY: Right. Exists now.

THE COURT: So either it's already terminated, or it's not. But if it's not terminated under your interpretation --

MR. STANFORD: Under our interpretation. And we'd argue waiver, because they have accepted payments since those earlier --

THE COURT: Okay. Well, yeah.

MR. STANFORD: -- defaults.

THE COURT: So I think what I'm going to do then, I'm going to carry the motion to use cash collateral, as well as this motion -- the motion to appoint the Trustee to, I think I can give you Friday 11 a.m.

Does that give you all enough time to prepare your closings?

MR. NEALON: Is Erin Schmidt still on the line?

THE COURT: Ms. Schmidt?

MS. SCHMIDT: Yes, I'm still on the line.

MR. NEALON: Yes. I know that we reached out. I just want to confirm on the other 341 that was requested to do this Friday at 10 a.m., just wanted to make sure that she knows --

MS. SCHMIDT: No. My understanding is that Mr. Dhillon's not available on Friday, so we're going to have to come up with an alternate date any way.

MR. NEALON: I just wanted to confirm.

MS. SCHMIDT: Just waiting until -- yeah. And obviously this takes precedence over the 341.

THE COURT: Okay. All right. So Friday at 11 a.m. closing arguments. And if you can tie all of this up into a pretty little bow and walk me through it step by step. Again, I don't -- it won't help me for you all to do the 10,000 foot level arguments. I want you to actually walk me through the specific evidence that's there. Okay?

MR. RAY: And, Your Honor, do you have any specific questions for Choice that you'd like us to address?

THE COURT: I think I've already asked them.

The question is, why isn't some of the Band-Aid that I've talked about sufficient to get you -- to address the concerns that you've raised?

MR. RAY: That's a fair question. Thank you for reminding me of that, Your Honor.

THE COURT: Okay. All right. And then -- and, again, I do expect you all to walk me through what you believe are the inconsistencies that are of concern. Right?

MR. RAY: Your Honor, some of my people -- some of the Pillsbury attorneys may appear virtually, or seek permission to appear virtually.

THE COURT: Whatever you need to do to keep the costs down. I don't know if we need to have everybody here for your closing arguments. So if they want to attend by video, or just not attend and then listen to it later, that's up to you. But you need to be here because I'm assuming you're the one that's going to be making closing.

MR. RAY: I assume that too, Your Honor.

THE COURT: Okay.

MR. RAY: Thank you, Your Honor.

THE COURT: Okay. What else? All right. Thank you. Parties are excused and we are adjourned.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

/s/Cindy Sumner

CINDY SUMNER, CSR #5832
Expires 10-31-2026
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196