IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

IN RE: ) BK. NO: 25-43157-BTR
)
D SAN JOSE, LLC )
D E B T O R. )

* * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

* * * * * * * * * *

BE IT REMEMBERED, that on the 16th day of January, 2026, before the HONORABLE BRENDA T. RHOADES, United States Bankruptcy Judge at Plano, Texas, the above styled and numbered cause came on for hearing, and the following constitutes the transcript of such proceedings as hereinafter set forth:

P R O C E E D I N G S

COURTROOM DEPUTY: Page 1, number 1, D San Jose, LLC, 25-43157. Final hearing on motion for authority to use cash collateral and motion for appointment of Trustee.

THE COURT: Okay. Appearances.

MR. STANFORD: Good morning, Your Honor. John Paul Stanford appearing for the debtor, D San Jose, LLC. And with me is my associate --

MR. NEALON: Rian Nealon.

THE COURT: Thank you.

MR. CASTILLO: Mark Castillo on behalf of Mr. Jagmohan Dhillon. Good morning, Your Honor.

THE COURT: Good morning.

MR. RAY: Your Honor, Hugh M. Ray, III of Pillsbury Winthrop Shaw Pittman on behalf of Choice Hotels International. On the phone there are two of my counsel from the firm, one of my partners and one of the counsel from the firm, Mr. Fitzmaurice and Mr. Alfano.

THE COURT: Okay.

MR. STROMBERG: Good morning, Your Honor. Mark Stromberg as local counsel for Choice Hotels.

THE COURT: Thank you, sir.

Okay. Do we have telephonic appearances?

MS. SCHMIDT: Yes, Your Honor. Erin Schmidt for the U.S. Trustee.

THE COURT: Okay.

MR. CATUOGNO: Good morning, Your Honor. David Catuogno of K&L Gates on behalf of Super 8 Worldwide, Inc.

THE COURT: Okay. All right.

Where are we?

MR. CASTILLO: Your Honor, I'll start.

THE COURT: Okay.

MR. CASTILLO: If I may approach, I have a demonstrative chart of the review of the corporate documents for who the manager and members are. If I may approach the bench?

THE COURT: All right. You may.

All right. Let's just mark it for identification. What's your next in line?

MR. CASTILLO: We would get Galaxy-P.

THE COURT: Galaxy-P, okay. For identification we'll mark that as Galaxy-P, as in Paul.

MR. CASTILLO: Correct.

So, Your Honor, my associate and I were up past 2 a.m There's a lot of documents and there are a lot of different statements and information in them. And I feel really good about this document. I would love -- well, I wouldn't love more time on this. I would feel better if we had a little bit, a few more uninterrupted hours just to proof this a

little bit more. But we feel really good about having looked at this in the middle of the night and then early this morning. What we did is we looked at the exhibits that are in evidence, both by the debtor and by Choice and by Galaxy, and tried to create a chronological time frame.

What you see on the first page is D San Jose, LLC and the second page is Jose Motel, LLC. And what we wanted to look at is who was ever the manager of these companies and then who was ever the members of these companies, looking at the corporate documents.

So one thing we do gain from this is for the debtor there's only one document that we found that names anyone other than Mr. Jagmohan Dhillon as the manager of this debtor. All the documents indicate that Jagmohan Dhillon is the manager of this debtor. We found the amended and restated operating agreement of D San Jose, LLC that said that Jose Motel, LLC is the manager and the member. But even that signature block itself says the manager of Jose Motel, LLC is Jagmohan Dhillon. And so we think this is consistent with the Galaxy and debtor's position that the buck stops with Mr. Dhillon. He is the manager of this debtor.

And when we looked at the documents of Jose Motel, LLC, there are documents that say Mr. Dhillon is the manager. There are documents that say Ms. Abbas is manager. But we consistent see that it's Jagmohan Dhillon, the member. I

noted that there is one document, it's in the exhibits twice because one of the versions does not have Ms. Ghazal Abbas' signature. That's Choice Exhibit 12 of the cash collateral motion. And then Choice's cash collateral, Exhibit 13, it's the same document, but it has Ms. Abbas' signature on it. That can be read to indicate that Ms. Abbas is a member of Jose Motel, LLC. But there's no document that actually says that she is the member. The documents that --

THE COURT: Okay. Hold on.

MR. CASTILLO: Yes.

THE COURT: Okay. You said there's no document that shows Ms. Abbas as the -- as the manager?

MR. CASTILLO: That granted her membership of the debtor, except for that --

THE COURT: Granted her a membership as opposed to appointed her a manager?

MR. CASTILLO: Correct, yes.

So the unanimous written consent 100 percent does say that Ms. Abbas is the manager of Jose Motel, LLC.

THE COURT: Right.

MR. CASTILLO: And it can be read that --

THE COURT: That's Exhibit 8 and 9, right?

MR. CASTILLO: Of the Trustee exhibits for Choice, yes.

THE COURT: Right. Okay.

MR. CASTILLO: And I think, if you look at the signature, it can be read to also say she's a member, because it says sole manager. It doesn't -- when it lists -- the point is to show that she's the manager. But, you know, I think it could be read to say she's a member, but --

THE COURT: Okay. Again, these are some of the inconsistencies in the documentation which certainly causes some level of heartburn. And this is, I guess, goes back to does it bear additional scrutiny, right? Because Exhibit 8 and 9, Choice's motion to appoint a Trustee, okay, both of those documents are dated the same day; is that right? Are they dated as of --

MR. CASTILLO: Yes.

THE COURT: -- March 3, 2025. But the signatories are different.

MR. CASTILLO: Yes. I believe it's the same document, but it --

THE COURT: Well, that's what it looks like. And that's part of, again, this whole question that Choice is raising about, I don't know, it almost feels like who's on first kind of issue. Because it looks like it's the same document. It looks like it's the same date. It's certainly dated the same. And, yet, there are different members purportedly between the two documents. So which is it?

MR. CASTILLO: Yes. And so may I approach

with another document?

THE COURT: Okay.

MR. CASTILLO: I guess we can mark it -- it's not even --

THE COURT: Okay. I guess my point is, your demonstrative page 2 leaves out Mrs. Dhillon as a potential member and a signatory to one of these documents, right? So therein lies the inconsistency.

MR. CASTILLO: Yeah, yeah.

THE COURT: Or part of the inconsistency, I suppose.

Okay. So now -- okay.

MR. CASTILLO: So, Your Honor, may I approach to show Your Honor just a document that we've created to try and work this out?

THE COURT: Is this another demonstrative?

MR. CASTILLO: I guess we could call it a demonstrative.

THE COURT: Okay. So Galaxy-Q?

MR. CASTILLO: Yes, Your Honor.

THE COURT: Okay. Let's mark it.

MR. RAY: Your Honor, this is -- the evidence is closed, Your Honor. I don't --

THE COURT: This is not new evidence. This is supposed to be a demonstrative of existing evidence. So

we'll -- if it's not, it's not and I won't take it into account.

So you have to show me where in the record it is, okay?

MR. CASTILLO: Yes, Your Honor. This is really -- it's not submitted for evidence. It is not signed. This is more just explanation of where the debtor and Galaxy are headed.

THE COURT: Okay. But this looks like this is new -- this is new evidence that you're submitting? This is not in the record, right? It's not signed.

MR. CASTILLO: It's not signed. I don't want to submit it as evidence.

THE COURT: Okay.

MR. CASTILLO: It's more -- what I want to tell the Court is, we have drafted a document --

THE COURT: Gotcha.

MR. CASTILLO: -- that will clarify these issues. It is not signed. I have indications that if we ask for it to be signed, it will be signed. But I'm sensitive to signing another document.

THE COURT: Okay. What you're proposing to do to fix a problem that exists is not really going to address this issue. I mean, the question is, does the problem exist or not? Is there appropriate grounds for appointment of a Trustee for the purpose of examining these issues because the

documents are inconsistent, right?

MR. CASTILLO: Yes.

THE COURT: And the problem is, corporations, or corporate entities, whether we're talking about LLCs or corporations, et cetera, are legal fiction entities that only exist because of the documentation and how the parties treat the entity.

MR. CASTILLO: Uh-huh.

THE COURT: And that's -- the entity we have in bankruptcy is an LLC. There's certain formalities in terms of who owns it, who controls it, who acts for it, et cetera, right? And I think what I'm understanding from you, Mr. Castillo, in all candor is that, yes, there are some inconsistencies here and you're trying to explain it to me. But there are inconsistencies in the corporation's own documents.

MR. CASTILLO: That is accurate. That is 100 percent accurate, Judge.

So, you know, closer to midnight, but not quite 2, you know, looking -- seeing where we were, I think the fix is to do a unanimous consent to resolve the Jose Motel, LLC issue. Because if you look at the first page, it's -- almost unanimously Jagmohan Dhillon is the manager in each of these documents. It's this outlier amended and restated agreement. And because Mr. Dhillon is the member and manager of Jose

Motel, LLC, it can be read under Texas law as -- what do we -- an error, basically, that needs to be corrected. And so we're -- we have a document prepared to resolve that issue. I just didn't want to move forward just yet. I wanted to raise it to the Court where we are, because there is that document that says Jose Motel, LLC is out there. But I do think at the end of the day that the manager is Mr. Jagmohan Dhillon.

THE COURT: Manager of the debtor.

MR. CASTILLO: Of the debtor, yes, Your Honor.

And the ratification and acknowledgement would be signed by both Mr. Dhillon and Ms. Abbas to clarify the issue.

THE COURT: What is the relationship of Ms. Abbas and Mr. Dhillon and these entities?

MR. CASTILLO: That I'm not sure, Your Honor. I've never speak -- spoken to Ms. Abbas. I understand she's ill and I've never been able to talk to her.

THE COURT: Is she a relative of some sort, or --

MR. CASTILLO: I'm not sure.

THE COURT: Okay.

MR. CASTILLO: And just so Your Honor knows, Mr. Dhillon had to leave for India to follow his wife. They're celebrating their 25th and so he had already had

these plans and he's delayed in getting to her, so that's why he can't be here today.

THE COURT: That's fine. I mean, today's just oral arguments on closing, so that's just fine.

Okay.

MR. CASTILLO: So, Your Honor, the -- I know Choice has another demonstrative exhibit that goes through the membership. In looking at that, there are the tax returns that show that there are other members of the debtor. At the end of the day, the debtor's position -- or Galaxy's position, I won't speak for the debtor, is that Mr. Dhillon and Mrs. Dhillon are the members and that the amended schedules are accurate. But for purposes of filing the bankruptcy case, hiring counsel, and employing Mr. Williams, Mr. Dhillon is the manager of the debtor and should have authority to do that, subject to Court approval as needed.

THE COURT: Okay.

MR. CASTILLO: And we're ready to ratify that.

THE COURT: So explain to me, is there anything in the record that shows when and how Mody, Ghelane, Bhanot, Potia, Mathur, Khichadia, and Mahabub allegedly got some kind of membership interest in this debtor and when that was?

MR. CASTILLO: Your Honor, we're investigating that, as well.

THE COURT: Okay.

MR. CASTILLO: I don't know that it's in the record. If it's in the record it would be in the testimony. It's our understanding in May of 2022 Galaxy invested $2.2 million. And that consists of value given by these individuals. I will tell you -- and I'm going to be very careful because this is not in the record, I have information from Galaxy that indicates dates and amounts, but some of them predate the debtor. They -- in funds given years before and made through Galaxy. So I think the testimony from Mr. Dhillon is that when he gave the membership interests to these individuals and the debtor started to lose value he said, look, I'll take it back. I'll figure out another way to get you some equity in something else, but that hasn't occurred yet. So, you know, I have some information and I have some -- there will be bank statements that we can share with Choice. But they're not in evidence and I want to be sensitive to that.

THE COURT: Okay. But there is evidence in the record that the debtor at some point in time, it's unclear when, recharacterized some kind of alleged equity by some or all of those individuals as loans on the debtor's books; is that -- I thought I saw some of the books that showed that.

MR. CASTILLO: I think there was the GL page.

I want to say maybe it was Exhibit 57 of Choice. And Mr. Dhillon was asked about that. And to his understanding, he didn't do it. It's something that is not final and is being looked at, but it had -- it was the page that had all January 1, 2025 dates.

THE COURT: Uh-huh.

MR. CASTILLO: And --

THE COURT: That's exactly what I'm talking about.

MR. CASTILLO: Yeah. That is not final and it's going to be revised.

THE COURT: Well, that's the point, right. That's exactly part of why someone needs to look at this, somebody neutral that's not --

MR. CASTILLO: Yes.

THE COURT: -- Mr. Dhillon, in particular, because he's the one that's orchestrating some of those things. They may or may not be appropriate, okay. But the point is, these books are not accurate.

MR. CASTILLO: Yes. Well, Your Honor, I'll tell you that Mr. Dhillon supports, and the debtor's offered to Choice to hire an accountant to correct all of this. That was rejected. We offered --

THE COURT: Well, it's not just to correct it. It's to actually investigate --

MR. CASTILLO: Investigate and --

THE COURT: -- causes of actions against --

MR. CASTILLO: We also offered an examiner and that was rejected. We also offered a CRO and that was rejected. So, you know, I can tell you Mr. Dhillon realizes this is something that needs to be investigated and corrected. And we would support that in sense. But we don't think that it goes as far as to require a change of control of the entire reorganizational process. And, you know, we think the record is clear enough that Mr. Dhillon has been the manager and acted as the manager and we can rectify that with the approval of Ms. Abbas, who I'm told I can get. I just didn't want to get that before today's hearing.

THE COURT: Okay. All right. Let me hear from the -- from Choice.

MR. RAY: Your Honor, I've already handed the Choice exhibit demonstratives to counsel for the debtor. I would like to approach and hand Your Honor I guess two copies of Exhibit 58 and 59 as -- marked solely as demonstratives.

THE COURT: Okay. You may approach.

MR. RAY: Your Honor, as required by Local Rule, I will tell you that Exhibit 59, which is labeled D San Jose two mutually inconsistent sets of truths was created by artificial intelligence, or using artificial intelligence in addition to myself. I have reviewed it. I believe it is

true. But AI made it.

Exhibit 57 was made by an associate.

THE COURT: 57? I have 58 and 59.

MR. RAY: Sorry, 58. 58.

THE COURT: Okay.

MR. RAY: The spreadsheet that says who owns the debtor.

THE COURT: Uh-huh.

MR. RAY: Your Honor, this -- first of all, to answer the question that no one has yet asked. Choice will allow the Trustee, if a Chapter 11 Trustee is appointed, to use the cash collateral that would otherwise be paid as cash collateral to choice. So that's 80,000 a month plus the net operating income. In excess of that, it could be 100,000, 110,000 a month which we believe is sufficient for a Chapter 11 Trustee and accountant and lawyer, especially at these rates. I need to make that representation so that we don't have that question.

Now, Your Honor, I think this ends only one of two ways. Either this case is dismissed or a Trustee is appointed. And let me explain why. Your Honor may remember asking itself if this is a question of whether or not the Court has subject matter jurisdiction. The paper --

THE COURT: Subject matter jurisdiction over what?

MR. RAY: Over this case because the petition was not filed with the knowledge or authorization of Ms. Abbas. Ms. Abbas is supposedly the manager of Jose Motel, LLC. Ms. Abbas did not know of the case. Mr. Williams testified he never even spoke to her before filing this bankruptcy. And that is troubling. But it is not a failure of subject matter jurisdiction.

A case is commenced under Section 301 by filing a petition. This entity qualifies to be a bankrupt debtor as an LLC under Section 109. And the question -- the reason I think this can only go one of two ways is since Ms. Abbas signed that, didn't sign it, since Mr. Williams' authorization to sign the petition is an agreement that says he cannot bind the debtor, and since Mr. Williams and Ms. Abbas never spoke before the petition, this case was signed essentially by a shill of Mr. Dhillon. It is not subject matter jurisdiction failure, however, if we consider California state law.

This LLC is not a Texas LLC. This is a California LLC, which also follows the law of Delaware and most other places. And those laws say that in inequitable situations, a control person is the entity in situations where there has been a sham, a cutout, a bag man, a shield. In instances like that, the Court when equity requires ignores the substance -- the form, rather, and looks at the substance. The state law of

California says there can be disregarded shans. You can have a control person who is liable. California recognizes the control person rule. California Courts recognize someone who is a de facto officer as one who had no legal authority to act, but presented himself or herself as having that authority with the acquiescence of the involved party.

Ms. Abbas is an infirm, ill person who was placed there in her role by Mr. Dhillon as part of his scam. Since Ms. Abbas knew she was a shill, and since she has done nothing to stop Mr. Dhillon, Mr. Dhillon can be considered a de facto officer if he has acted inequitably.

California also -- and the cases on that, if Your Honor wants some case law, is I've got Music Group Macao Commercial Offshore Limited versus Foote, 2015 U.S. District Court Lexis 81415. That's Northern District of California. It cites In re Redevelopment Plan of Bunker Hill, 62 Cal.2d 21 at 42, a 1964 case. Also Marine Forest Society versus Cal Coastal Commission, 36 Cal.4th 1 at 54, 2005 case. So someone who is in actual control and acting in a very inequitable manner is considered to abound the entity, the entity's acquiescence in the scheme.

California also looks at substance over form and they emphasize, and this is a quote, quote, The Courts will not permit themselves to be blinded or deceived by mere forms of law, but will deal with the substance of the transaction

involved as if the corporate agency did not exist and as the justice of the case may require. That case is Greenspan versus LADT, LLC, 191 Cal.4th 486 at 504 to 505. That's also -- I also have 121 Cal Reporter.3d 118 2018 -- sorry, 2010 case quoting Anderson versus Abbott, which is a United States Supreme Court case, 321 U.S. 349. As California Courts have always explained, when there is a fraud or injustice, they disregard the form of the transaction.

I don't think there's any real doubt that Ms. Abbas, an elderly infirm person was placed in her role as a cutout. California would recognize that Mr. Dhillon cannot disavow his action that he used -- as the actual control person who did this.

But, Your Honor, we're asking here in this Chapter 11 case for one of two things, really just the Trustee. And if there is inequity, the Court can disregard the inconsistencies in ownership. And that same inequity that would reach that same level justifies a Trustee.

When we did opening argument, Your Honor heard how this is a tax lost harvesting scheme, double dipping on tax losses, passing through tax losses to people who never gave any money to this debtor, and who apparently Galaxy has now conceded gave money to Galaxy. Though they were never owners, they were given tax losses. At the same time -- I'm sorry, Your Honor, I need to put my phone on mute. At the

same time those contributions from those owners have now been reclassified as loans from Galaxy's affiliates and will be written off by those affiliates using this Bankruptcy Court, using the bankruptcy system. Not only is that a fraud, that is a fraud using this Court. And here we are after two full days of evidence and the Court cannot reliably identify who owns and controls the debtor, who has authority to act, or whether the financial information is truthful and complete.

Your Honor, do you believe Mr. Dhillon's testimony? Do you believe his meeting minutes, half of which show no date at all and the other half are dated as of December 31, 2024? That's, I believe, Exhibit 19 in the Trust -- in Choice's Trustee materials. None of those minutes show which members met. None are signed by the putative members, or even identify them. The minutes all conveniently appeared only after Mr. Dhillon's deposition, after he saw the tax returns and realized these friends of his who were getting these passthrough losses could be swept up into the case. Do we believe those minutes? Do we believe Mr. Dhillon's explanation of the July 2024 pledge agreement and July 2024 corporate document?

Remember when he first took the stand on recross, Mr. Dhillon testified he was a 49/51 percent owner that somehow changed to 50/50. And that he and his wife were always the owners. And that that was true from 2022 until

this day. Then he testified only 15 minutes later that he had friends who were investors in that specific property, not in Galaxy but at that property. And that's why those investors are on the tax returns. Then Mr. Dhillon has also testified that the 2024 pledge agreement and second amended operating agreement where he represented Jose Motel was the 100 percent owner were signed by him in 2024. And we have his 2025 document appointing Ms. Abbas as the manager. Mr. Dhillon claims he still owns the debtor 50/50, but there is no document that -- actually, no document that says he owns it 50/50. Exhibit 9 and Exhibit 8 are documents signed by one member or two members appointing Ms. Abbas the manager.

Do we believe that Mr. Dhillon's testimony is accurate, the whole truth? Do we believe his statement that he signed the agreement with Mr. Williams and it was not backdated, even though Mr. Williams said he didn't have an agreement when he first filed, not a written agreement? Mr. Williams said that on the stand. Mr. Dhillon said quite amazingly that he actually remembers signing it. That makes no sense.

Do you believe Mr. Dhillon's statement, Your Honor, about why these insider loans were not on the taxes? Because he said, I don't understand. I rely on my accountants for those taxes. Yet the tax accountant who testified -- and I believe every word of that witness' testimony, Your Honor.

He said he didn't give any tax advice. He merely compiled the returns from financial records he was given. He never looked at ownership records or corporate organizational documents. It is almost unbelievable that Mr. Dhillon was relying on tax advice.

Do we believe Mr. Dhillon's statement that he always had these loans and that they were good for the debtor, even though there are SPE limits in the operating agreement that prohibit those loans? Even though the tax returns don't show those loans. And the only documents that show those loans are a spread sheet he generated and a 20 -- and apparently a post-petition backdated ledger. Why do we say that?

Remember how the post-petition October 31, 2025 balance sheet printed in December, that's post-petition, shows no insider loans at all and has 10 million in negative equity, but the 2025 ledger shows loans as of 1/1/25. That means, like Mr. Rae testified, there had to be post-petition changes to create a pre-petition debt. And the only one who could have made those changes is someone at Galaxy. And the only person who would have done that is at the direction of Mr. Dhillon.

I do believe -- and I think we do believe, don't we, the appraiser's statement that this business needs to be well run with good books to get value. And that the debtor is running an operation with 20 rooms missing hot water. That's

pretty rundown. Do you believe 40 percent of the tenants pay cash? So with all of that the public -- is the public and those creditors served by having Mr. Dhillon in control of the books and potential claims, or is this creating a hazard for the public? Can management be entrusted to investigate itself? Can current management be entrusted with the books?

Your Honor, there is a Third Circuit case that I want to cite to Your Honor. It is Protopapas, P-r-o-t-o-p-a-p-a-s, versus Brenntag, B-r-e-e -- sorry, B-r-e-n-n-t-a-g, In re Whittaker & Clark, 152 F.4th 432, September 10, 2025. It just came out. It's a Third Circuit case.

In that case it was argued that the bankruptcy petition had not been authorized. And someone sought to dismiss it on the basis of subject matter jurisdiction. And in that case it is explained that, no, there is a case, because there is a petition. And if it is not properly authorized, it could be cause to dismiss. But not automatically so. And we do look to state law to determine whether or not to dismiss. There's only two ways this happens. Either the case, if it was legitimate, was signed by a stranger and then it shouldn't be here. Or the case is part of a scam and it should be here and it was filed by the person who actually controls the company through shills and cutouts.

So we need an independent fiduciary. The Code provides

that. Lesser options are simply not available. It is not possible to abstain in the face of this fraud. Section 305 is simply not available because the creditors would be harmed by that. Similarly, it would not be okay to have an examiner who's merely a reporter and has no power. And even an examiner with expanded power would not have sufficient power to do the job that equity demands. And similarly while offers were made for a chief restructuring officer who reports to Ms. -- Mr. Dhillon who's Mr. Dhillon's subordinate who doesn't actually exclusively control any of the books, that's not -- that's not okay. That won't protect the creditors. That won't protect the bankruptcy system.

Congress gave us the option -- Congress gave us the option of having a Trustee. Trust worthiness of the debtor is an element for either discretionary or mandatory Trusteeship. Mr. Dhillon has shown himself untrustworthy. Here in this room he said for 20 minutes -- he gave that testimony that we talked about. The debtor's schedules and statement of financial affairs have been incomplete. They've been conflicting. And they have had untrue information. And Mr. Dhillon's tales about the accounting, the investments, the management just can't be believed. He has -- even if you could believe him, there are still conflicts of interest when it comes to investigating and pursuing claims against his affiliated entities, his family members, or himself. And

they can't -- those conflicts cannot be ignored.

The AB Bank 1887 omission is shocking. I'm going to try to make this as objective and quick as possible. Those schedules don't ever list the debtor's 1887 AB Bank account, or even the existence of that, the Bank. The schedules list East West Bank and Chase. And the amended schedules list East West Bank and Chase. And we would never have known about this bank account but for the general ledger. And that shows large inflows categorized as contributions in the year before bankruptcy of millions of dollars. And then immediately after the Choice closing, significant multi-million dollar transfers out within weeks, within a week, July 26th to August 6th. I think that's about a week. The timing is a problem. So the estate has an undisclosed bank account (inaudible word) millions of dollars, receiving last-minute affiliate cash right before the transaction and then routing the funds out at closing.

Even if the debtor wants to argue that every one of those transactions had an innocent explanation, the disclosure failure and inability to reconcile the story, the sworn schedules is cause to appoint a Trustee. The Court does not have to accept trust me accounting, or third-party accounting. It should appoint a Trustee under 1104.

Let's consider the four factors of a Trustee under 1104(a)(2). We should do a cost benefit analysis with four

factors. These are in all the case law including Ironside, including Ionosphere Club, including Collier's. These are the four factors for 1104(a)(2); trustworthiness of the debtor is number one. Number two, the debtor's past and present performance and prospects for rehabilitation. We had two witnesses say they had books hurt that. Three, the confidence or lack thereof the business community and the creditors in management. There is zero confidence of this creditor in management. Four, the benefits derived by the appointment of a Trustee balanced against the cost of the appointment. Since my client bears those costs, the benefits are worth it. Mr. Dhillon's removal hurts no one. And the new management company is already running the company so there won't be a disruption if the Trustee takes over.

And then let's look at 1104(a)(1). The statute, itself, says it's for cause, which includes fraud, dishonesty, and competence or gross mismanagement in the debtor's affairs by current management. I think fraud has been proven, tax fraud, regular fraud. Any number of frauds. And gross mismanagement by Mr. Dhillon is actually the best most charitable treatment of what he has done, the best treatment. And these statutory factors are not an exclusive list. Other Courts have said that conflicts of interest warrant a Trustee under 1104(a)(1). Inappropriate relations between corporate parents and subsidiaries, check. We've got

that. Mis-use of assets and funds, I think that's been proven beyond any sort of legal standard that needs to be proven. Inadequate recordkeeping and reporting. Again, this is -- we can look at the Ancona case, 2016 Westlaw 7868696. Creditor confidence, in similar instances misconduct.

Likewise, noncompliance with the Bankruptcy Code and Bankruptcy Rules. We've discussed the AB Bank account. We've discussed the different stories that have been told. This debtor did more than be sloppy. Sloppy is sufficient for a Trustee. Sloppy at this level of sloppiness is beyond gross -- is gross mismanagement or worse. But this was outright fiction. If the debtor -- if the debtor can't comply with the Code, a Trustee is necessary.

So I did hear about the burden of proof, Your Honor. I think whatever the burden of proof is that is required by Choice, we have met the burden of proof for a Trustee.

I will talk briefly about Grogan v. Garner, the Supreme Court case. The Supreme Court has said it's a preponderance of the evidence unless there's a specific burden of proof in the statute. Silence is inconsistent. The legislative history is silent on the burden of proof. And Grogan dealt with discharge based on fraud, which used to be a higher standard. But it's just a burden -- it's just preponderance. And the best case discussing the burden of proof is Keeley versus Grabanski. That's K-e-e-l-e-y and Grabanski,

G-r-a-b-a-n-s-k-i. And it's cited in our materials. It's a great case because they say, if preponderance of the evidence standard is sufficient of the denial of discharge based on fraud, it should be sufficient for the appointment of a Trustee based on fraud or misconduct. The Cajun Electric decision was withdrawn on that issue. And while there are a minority of Courts that say there's a higher standard, those Courts cannot explain how they got there other than it's just tradition that we hold them to a high standard of clear and convincing.

But remember Marama. Marama was that case the Supreme Court had where the debtor had an absolute right to convert and the Supreme Court said, no, you don't, because you did it in bad faith. And they said, the principal purpose of the Bankruptcy Code is to grant the honest debtor a fresh start through discharge. But also good faith is read into every provision of the Code.

And so how hard do you have to work to prove bad faith? I don't think it has to be more -- it can't be more than just preponderance of the evidence. That being said, whatever the standard is, it was met. If it was beyond reasonable doubt, it was met. If it was clear and convincing, it was met. If it was beyond a shadow of a doubt, it's met. Because Mr. Dhillon -- the evidence only needs to prove that Mr. Dhillon cannot be the one to unwind the truth. It

doesn't need to prove every element of fraud. It only needs to prove a conflict. It only needs to prove gross mismanagement. It only needs to prove bad books.

And here we are where the amended filings are now asserting millions of dollars of insider loans controlled by Mr. Dhillon. That is a new fact. They're not supported by the 2024 loan accounts. They're not supported by the 2024 tax returns. The same insider control person would then be deciding whether those claims -- those loans are legitimate. And he would benefit financially from having those loans written off and taking the tax loss again. So I understand Your Honor's reluctance to appoint a Trustee.

We understand that the appointment of a Trustee is something this Court does not do lightly. And this Court would like to have a compromise option. But the record here shows the case just needs an independent Trustee. A true Trustee. The handoff is already in place. The new operating company's there. The money is there to pay for it. Choice will allow its cash collateral for that purpose. And there's no one else who can do it.

So if the shill is what it is, if the ownership is what we claim it is, then this is a bankruptcy that's been authorized by the actual person in control, Mr. Dhillon, though he uses inequitable means to conceal his control by having -- by putting Ms. Abbas in.

On the -- very briefly, Your Honor, on the demonstratives, Exhibit 58 which says who owns the debtor. It's just a chart of inconsistencies. But the most interesting thing is the timing. The 2024 statements just don't make sense. The same year, the same time in 2024 there were different ownerships alleged on different documents. You could conclude that we just don't know who owns the debtor, but Mr. Dhillon is in actual control. And we could conclude that Jose, LLC -- Jose Motel, LLC owns the debtor and that Ms. Abbas, is just a shill, a cutout, a bag man, a patsy, someone put there by Mr. Dhillon probably to throw heat somewhere else for breach of duty or some other reason.

On Exhibit 59, Your Honor, this is how I thought I was going to start. It is simply showing the difference between the two worlds of truth. They are at dramatic factual contra-position. It doesn't make sense to have both of these facts be true. They cannot be. This is not a system where there was one set of facts and then an amendment. This is a system where both systems -- both sets of facts in this courtroom on the witness stand, both sets of facts were alleged to be true simultaneously, and that is impossible. You cannot have loans and no loans on the tax return. You cannot have one set of owners and one in return, and another set of owners on a corporate document that gives $21 million to the debtor, and another set of documents that say

something different than that. This doesn't make sense. The only one to unwind this is the Trustee. We know we don't seek it lightly, but we ask for that remedy, Your Honor.

Thank you.

THE COURT: So why not simply convert?

MR. RAY: Because we have -- I've thought about that, Your Honor. Because we have a potential for selling the property (inaudible word) while it's operating, otherwise the Trustee will have to get approval to operate --

THE COURT: You could have an operating Chapter 7, I suppose.

MR. RAY: Right. But my experience has been that the operating -- that Trustees don't always like to operate.

THE COURT: My Trustees have.

MR. RAY: And a Chapter 11 Trustee might also have the ability to -- I guess it would have the ability to propose a plan of reorganization that could also protect creditors going forward by creating litigation trusts or whatever. The option for Chapter 7 does exist, Your Honor. In full disclosure --

THE COURT: Well, I think the debtor has offered to create litigation trusts under a plan. I heard them say that at the hearing.

MR. RAY: Yes, Your Honor.

THE COURT: Okay. So that's on the table. So what else?

MR. RAY: Your Honor, I think a Chapter 11 Trustee is preferable to a Chapter 7 Trustee because Chapter 7 Trustees are not normally operating Trustees. That is the answer.

THE COURT: Well, one, they can be. And I believe Chapter 7 Trustees, just like a Chapter 11 Trustee is voted on by creditors, right? There's an initial Trustee, but the creditors can choose a different one, so there are those issues. But I'm surprised you didn't say that perhaps on average when a Trustee is appointed, or when there's a Chapter 7 Trustee the value of the going concern is usually less. You can't sell it for as much. It depresses the price.

MR. RAY: That's -- sorry, Your Honor. I didn't --

THE COURT: And I would think creditors, everybody would be at least concerned about that, unless there's such a huge equity creditors don't care.

MR. RAY: I disagree. I will give you this, Your Honor. Everything else being equal, Your Honor would be correct. But when you have -- as two witnesses have testified -- tainted books, bad management, bad things going on, decreasing the value, inability to put -- have hot water

in the rooms, adding a Trustee increases the value. A Chapter 11 Trustee would be able to have hot water, know what's going on, keep better books, make it more valuable, not less. That's why this is different, Your Honor.

THE COURT: Okay. So there's already an independent operator/management company in place that is actually running the hotel; is that accurate?

MR. RAY: Yes, Your Honor.

MR. STANFORD: That is correct.

THE COURT: Okay. So for the most part, what the concerns are, the accuracy of the books and records of the debtor, examination into debtor's management's conduct in this bankruptcy case, and also an investigation of the types of activities described in Section 1106(a)(3) --

MR. RAY: Your Honor, there is one major concern that we have.

THE COURT: -- and (a)(4).

MR. RAY: Sorry, Your Honor.

THE COURT: Okay.

MR. RAY: Your Honor, our major concern is not just that there are inaccurate books. It's that the books are currently in the exclusive possession of Mr. Dhillon and his team. And that if a Trustee is appointed, the Trustee will have those books and will have the privilege -- and with the attorney/client privilege and actual exclusive possession

of the books, he can do things an examiner could not, CRO could not.

THE COURT: I'm not talking about an examiner just yet. I'm just asking about what the issues are that need to be addressed, right. So it's not about, quote/unquote, mismanagement of the operations of the debtor post-petition in the sense that there's an independent operator there operating the hotel itself, right?

MR. RAY: The hotel's operations are being managed by a management company, correct.

THE COURT: Okay. And that is a third party management company that is unrelated to Mr. Dhillon.

MR. RAY: Yes. But still reporting to him and being --

THE COURT: I understand that.

MR. RAY: Yes.

MR. STANFORD: And the management agreement does provide for them to produce the accounting. That's a separate fee for them to produce the --

THE COURT: But that's from the time that they take over.

MR. STANFORD: That's correct.

THE COURT: Okay. And then -- but there are concerns about the accuracy of the books, the conduct of insiders.

Okay. All right. Anything further from either party?

MR. STANFORD: No, Your Honor.

MR. RAY: No, Your Honor.

THE COURT: Okay. I guess I've been here for 23 years now almost, and I don't think I've ever appointed a Trustee in a Chapter 11 case. Post-confirmation Trustees, but not a Chapter 11 Trustee. But I think here there's cause to appoint a Trustee subject to 1105 if there's a motion at some time prior to confirmation to -- for the debtor to be restored as to their possession. But the debtor would have to make that showing.

The duties of a Chapter 11 Trustee set out in 1106 are the kinds of issues I think that need to be addressed here, which is that the debtor -- I'm not sure that the schedules and statements are exactly accurate because there's questions about the accuracy of the debtor's books and records themselves. And the only person who executed that was somebody who had no personal knowledge of those things. He was just looking at the books and records as stated. And there is certainly some evidence that makes the books and records as stated questionable.

I'm not -- the Court is not finding that, in fact, they are wrong. But the Court is finding that there were inconsistent book entries that make it unreliable. And we need to have the Trustee look at those issues, particularly

the issues that are listed in 1106(3) and (4). And the other issues as stated in 1106. So the Court finds cause under 1104 to appoint a Trustee. The Court will instruct the U.S. Trustee's Office to take appropriate steps for that to occur as soon as reasonably practicable.

With respect to plans, the Court does note that the debtor retains the right to file a plan under 1121, although the Trustee also can file a plan under 1106(a)(5).

So I'm going to ask Mr. Ray to submit an order consistent with that ruling.

MR. RAY: Your Honor, one has already been uploaded. It is -- it accompanied the motion. So it is simply direct --

THE COURT: I want the order to reflect the Court's ruling on the record today, not a generic order that you submitted with your motion.

MR. RAY: Thank you, Your Honor. We'll do that.

THE COURT: Okay. If you'll submit that order.

MR. RAY: Yes, Your Honor, we'll do that.

THE COURT: Thank you.

Anything further?

MR. STANFORD: No, Your Honor.

THE COURT: Okay. Now --

MS. SCHMIDT: Your Honor, Erin Schmidt for the U.S. Trustee.

THE COURT: Yes, ma'am.

MS. SCHMIDT: Just a comment. We will certainly endeavor to find and appoint a Chapter 11 Trustee as quickly as possible. I just want to note, though, that Monday is a Federal Holiday and it may not -- it may be before -- Tuesday might be the earliest that we're able to appoint someone. I just wanted to let the Court and the parties know, because I don't know how that would affect -- I mean obviously the debtor would continue operating the hotel, or motel.

THE COURT: There is an operating company that is currently in place who will continue to remain in place until the Trustee makes any other decision with respect to that operating company. So -- and I don't know, folks. I'm pretty sure you all can talk before Tuesday to at least get it lined up so that it can occur on Tuesday. But, you know, there are -- it's noon, so you've got all day today to at least visit about those kinds of issues.

All right. Anything further?

MR. RAY: For the record, Your Honor, with the -- as I stated on opening, Your Honor, for the record cash collateral is authorized by consent of Choice now that the Trustee is going to be appointed. So we do not need a

cash collateral order.

THE COURT: Well --

MR. RAY: Until the Trustee's appointed.

THE COURT: So the debtor can use cash collateral until the Trustee is appointed. And once the Trustee is appointed, the Trustee can also use cash collateral --

MR. RAY: Yes, Your Honor.

THE COURT: -- with the consent of Choice?

MR. RAY: Yes, Your Honor.

THE COURT: Mr. Stanford, you can submit that order.

MR. STANFORD: I will submit that order. I'm unsure of what the debtor's duties are at this point under that order with the appointment of a Chapter 11 Trustee, although I suppose that won't happen until Tuesday at the earliest.

THE COURT: Right. The debtor will continue to have all of the duties that they have under the Code until the Trustee is -- actually is appointed and takes over control. Having said that, I think you all know -- you all are very experienced bankruptcy lawyers. You know the debtor should not be taking any extraordinary effort -- any extraordinary actions or any actions that are outside the ordinary course of business without Court approval, right?

MR. STANFORD: Certainly.

THE COURT: And that includes, just so we're all clear, no recharacterization of anything, okay. If things need to be clarified or recharacterized, I think the Trustee can look at it and you all can visit with the Trustee about those kinds of issues. But that's going to bear some scrutiny. So none of that occurs between now and the time the Trustee's appointed, okay.

MR. STANFORD: Understood.

THE COURT: Okay.

MR. RAY: Thank you. Are we excused, Your Honor?

THE COURT: Yes. Parties are excused and we're adjourned.

MR. STANFORD: Thank you.

(End of Proceedings.)

C E R T I F I C A T E

I, CINDY SUMNER, do hereby certify that the foregoing constitutes a full, true, and complete transcription of the proceedings as heretofore set forth in the above-captioned and numbered cause in typewriting before me.

/s/Cindy Sumner

_______________________________

CINDY SUMNER, CSR #5832
Expires 10-31-2026
Cindy Sumner, CSR
5001 Vineyard Lane
McKinney, Texas 75070
214 802-7196